Jeff Katofsky, *Pro Se* Defendant
4558 Sherman Oaks Avenue
Sherman Oaks, CA 91403
(818) 990-1475
jeff@oremowlz.com
Representing: Defendant Katofsky Pro Se

## UNITED STATES DISTRICT COURT

## EASTERN MICHIGAN DISTRICT

| | |
|---|---|
| RSS WFCM2020-CFF – MI RHM, LLC., a ) <br> Michigan limited liability company, ) <br>       Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> RKJ HOTEL MANAGEMENT, LLC a ) <br> Nevada limited liability company, and ) <br> Jeff Katofsky, a California resident, ) <br>       Defendants. ) | Civil Action No: |

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE THAT** Defendant Jeff Katofsky, *Pro Se* (hereinafter "Katofsky") hereby removes the above-captioned action to this Court from the State of Michigan, Third Judicial District of the Circuit Court for the County of Wayne. As set forth below, Katofsky has complied with the statutory requirements for removal under 28 U.S.C. §§ 1441 and 1446, and this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a).

## BACKGROUND

1.    On or about December 14, 2020, Plaintiff RSS WFCM2020-C55-MI RHM,, LLC (hereinafter "RSS") filed a complaint against RKJ Hotel Management, LLC (hereinafter "RKJ") in the Third Judicial District for the State of Michigan, Circuit Court for the County of Wayne, Case No. 20-016230-CB (hereinafter State Court Action).  Plaintiff brings claims for, *inter alia*, breach of contract.

1

2.      RKJ, on February 9, 2021, filed for protection under Chapter 11 of the United
        States Bankruptcy Code in the District of Nevada, in re RKJ Hotel Management,
        LLC, case number 21-10593-NMC.  The State Court Action was then stayed.

3.      Despite the automatic stay, the State Court Action allowed an amended
        complaint, filed March 22, 2021, not only improperly modifying allegations
        against the Debtor, but adding Jeff Katofsky ("Katofsky") as an additional party.
        A true and correct copy of Plaintiff's Amended Complaint is attached hereto as
        Exhibit "A."

4.      Defendant Katofsky was drop-served improperly, with a copy of the Amended
        Complaint on April 13, 2021.  This removal petition is timely filed using such
        date. *See* 28 U.S.C §1446(b) (requiring removal within 30 days of receipt of
        initial pleading).

5.      Removal to the Eastern District of Michigan is proper because this District
        includes Wayne County, Michigan.  28 U.S.C. §1441.

6.      Defendant Katofsky will file a copy of this Notice of Removal with the Clerk of
        the Third Judicial District Circuit Court for the County of Wayne, State of
        Michigan, and will serve a copy on Plaintiff, as required by 28 U.S.C.§1446(d).

## REMOVAL BASED ON TRADITIONAL DIVERSITY JURISDICTION

7.      Defendant Katofsky's basis for removal is diversity jurisdiction. Defendants are
        citizens of a different state, and the amount in controversy exceeds $75,000.00.
        28 U.S.C. §1332(a).

8.      Plaintiff is a Michigan limited liability company (See First Amended
        Complaint ¶1).

9.      Defendant Katofsky is, and at all relevant times was, an individual living
        in Los Angeles County, California.  Katofsky is not, and was not at any
        relevant time, a citizen of the State of Michigan. (See First Amended
        Complaint ¶3).

10.     RKJ is a Nevada Limited Liability Company, with its principal place of
        business located in Los Angeles, California. (See First Amended
        Complaint ¶2).

11.     This is a civil action over which the Court has original jurisdiction under
        the provisions of 28 U.S.C. §1332 and may be removed to this Court by the
        Defendant pursuant to the provision of 28 U.S.C. §1441(a) because it is a
        civil action between citizens of different states and the matter in

controversy herein exceeds the sum or value of $75,000.00, exclusive of interest and costs.

12.  RKJ submits to and does not object to this removal.

## RESERVATION OF RIGHTS

13. Defendant Katofsky denies the allegations contained in the First Amended Complaint and files this Notice of Removal without waiving any defenses, objections, exceptions, or obligations that may exist in its favor in either State or Federal court.

14. Further, in making the allegations in this Notice of Removal, Defendants do not concede in any way the allegations in the First Amended Complaint are accurate, that Plaintiff has asserted claims upon which relief can be granted, or that recovery of any of the amounts sought is authorized or appropriate.

15. Katofsky also reserves the right to amend or supplement this Notice of Removal.  If any questions arise as to the propriety of the removal of this Action, Katofsky expressly requests the opportunity to present such further evidence as necessary to support its position that this Action is removable.

16. For the reasons state above, Defendants remove this Action, Case No. 20-016230-CB, currently pending in the Third Judicial District, State of Michigan, Circuit Court for the County of Wayne.  Katofsky respectfully requests that this Court assume jurisdiction over this matter and grant Defendant Katofsky such other and further relief as this Court deems just and proper.

17. Katofsky, representing himself *pro se*, certifies that they will file a copy of this Notice of Removal with the Clerk of the Third Judicial District, State of Michigan, Circuit Court for the County of Wayne, and will give notice of same to counsel for Plaintiff and counsel for RKJ.

DATED: ـ 6/8/21

Respectfully Submitted,

/s/ JEFF KATOFSKY, *Pro Se*
Defendant

3

## CERTIFICATE OF SERVICE

Re: RSS WFCM2020-CFF-MI RHM, LLC v. RKJ Hotel Management

I am a citizen of the United States and I am employed in the County of Los Angeles, State of California at the office of Jeff Katofsky, at whose direction this service was made.   I am over the age of eighteen years and not a party to the within action.  My business address is 4558 Sherman Oaks Avenue, Sherman Oaks, CA 91403.

On 6/8/2021, I served the foregoing documents described as **NOTICE OF REMOVAL** on the interested parties herein through the Court's Electronic Filing System, serving the parties as indicated below:

> Brian M. Moore (P585584)/Jonathan Kama, Jr. (P83703)
> DYKEMA GOSSETT PLLC
> *Attorneys for Plaintiff*
> 39577 Woodward Avenue, Suite 300
> Bloomfield Hills, MI 48304 * (248) 203-0700
> bmoore@dykema.com
> jkama@dykema.com

> Mark W. Sadecki (P57069)
> SADECKI & ASSOCIATES
> *Attorneys for Defendant RKJ*
> P. O. Box 310
> Davisburg, MI 48350-2454 * (248) 328-1300
> msadecki@saalaw.net

**X/ By CM/ECF Service:** Such documents were delivered electronically via the Court's CM/ECF system as noted.

__/ By U. S. Mail as indicated below: I deposited such envelope in the U.S. mail at Sherman Oaks, California with postage fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U. S. postal service on that same day with postage thereon fully prepaid at Sherman Oaks, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed 6/8/2021 at Sherman Oaks, California.

/s/
Judith Groves

# EXHIBIT A

To Katifsky Notice of Removal

20-016230-CB FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   3/22/2021 1:53 PM   Carlita McMiller

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

RSS WFCM2020-C55 – MI RHM, LLC, a
Michigan limited liability company,

      Plaintiff,

vs.

RKJ HOTEL MANAGEMENT LLC, a
Nevada limited liability company, and Jeff
Katofsky, a California resident,

      Defendants.

Case No. 20-016230-CB

Hon. Brian Sullivan

*This case meets the statutory requirements
to be assigned to the business court. MCR
2.112(O)(1).*

---

Brian M. Moore (P58584)
Jonathan Kama, Jr. (P83703)
DYKEMA GOSSETT PLLC
*Attorneys for Plaintiff*
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
bmoore@dykema.com
jkama@dykema.com

Mark W. Sadecki (P57069)
Sadecki & Associates PLLC
*Attorneys for Defendants*
650 Broadway
PO Box 310
Davisburg, MI 48350-2454
(248) 328-1300
msadecki@saalaw.net

---

## FIRST AMENDED COMPLAINT

    Plaintiff RSS WFCM2020-C55 – MI RHM, LLC, by its attorneys Dykema Gossett PLLC,

and for its First Amended Complaint against Defendants, states as follows:

### GENERAL ALLEGATIONS

#### Parties

    1.    Plaintiff RSS WFCM2020-C55 – MI RHM, LLC ("Plaintiff" or "Lender") is a

Michigan limited liability company.

108652.000064 4828-4188-2589.5

2.      Defendant RKJ Hotel Management LLC ("Borrower") is a Nevada limited liability company with its principal place of business located at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403, and owns the real property at issue in this lawsuit located in Wayne County, Michigan.

3.      Defendant Jeff Katofsky ("Guarantor") resides at 15447 Valley Vista Boulevard, Sherman Oaks, California 91403.

4.      Borrower and Guarantor are at times collectively referred to as "Defendants."

### Jurisdiction and Venue

5.      Jurisdiction is proper in this Court pursuant to MCL 600.601, MCL 600.605, and MCL 600.3101 because this action involves, among other claims, a claim for judicial foreclosure and the amount in controversy exceeds $25,000, exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to MCL 600.1621 and MCL 600.1605 because this matter involves real property located in Wayne County and Defendants' conduct business in Wayne County.

### Nature of Action

7.      This action concerns a loan made to Borrower related to and secured by real property and a hotel located in Romulus, Michigan.  The original principal amount of the loan was $20,500,000.  It is undisputed that Borrower is in default of the loan documents for, among other things, failing to pay the amounts due and owing of the loan.

8.      Guarantor is in default of a certain guaranty agreement executed in connection with the loan because Borrower (a) filed a voluntary Chapter 11 bankruptcy petition on February 9, 2021 and (b) incurred certain indebtedness in violation of the loan documents.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

2

9.      In this action, Lender seeks damages against Borrower, judicial foreclosure of the subject property, judicial foreclosure of other collateral, the appointment of a receiver over the subject property, and damages against Guarantor.

### Loan Transaction and Defaults

10.     On or about January 14, 2020, Rialto Mortgage Finance, LLC ("Original Lender") entered into a Loan Agreement with Borrower, wherein Original Lender loaned Borrower the original principal amount of Twenty Million Five Hundred Thousand Dollars ($20,500,000.00) ("Loan"), evidenced by a Promissory Note. *See* Loan Agreement, as **Exhibit A**; Promissory Note, as **Exhibit B**.

11.     The Loan is secured by, among other things, a Mortgage dated January 14, 2020, made by Borrower in favor of Original Lender and recorded on January 22, 2020 with the Wayne County Register of Deeds at Liber 55537, Page 530 ("Mortgage"). The Mortgage encumbers certain real property and a hotel located at 31500 Wick Road, Romulus, Michigan, and legally described on Exhibit "A" attached thereto ("Property"). *See* Mortgage, as **Exhibit C**.

12.     At the Property, Borrower operated the hotel known as Delta Hotels By Marriott – Detroit Metro Airport ("Hotel") pursuant to a Franchise Agreement with Marriott International, Inc. ("Franchisor") dated March 22, 2018 ("Franchise Agreement"), until Borrower closed the Hotel on or about August 21, 2020.

13.     The Loan is also secured by a Guaranty of Recourse Obligations dated January 14, 2020 made by Guarantor in favor of Original Lender ("Guaranty"). Pursuant to Section 1.1(a) of the Guaranty, Guarantor irrevocably and unconditionally assumed liability for all Guaranteed

Obligations,[1] which means all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 8.6 of the Loan Agreement.  See Guaranty, as **Exhibit D**.

14.     The Loan Agreement, Promissory Note, Mortgage, Guaranty, and other agreements, documents and instruments concerning the Loan, including that certain Assignment of Leases and Rents, Guaranty, Assignment of Management Agreement and Subordination of Management Fees, Environmental Indemnity Agreement, Cash Management Agreement, Deposit Account Control Agreement, and UCC-1 Financing Statements, in their original form and as amended, restated or replaced from time to time, and as assigned, are collectively referred to as the "Loan Documents."

15.     Pursuant to certain assignments, the Loan Documents were assigned to and are held by Plaintiff.

16.     On or about August 7, 2020, Lender, through its special servicer Rialto Capital Advisors, LLC ("Special Servicer"), notified Borrower of an event of default under the Loan Documents as a result of Borrower's failure to make the monthly debt service payment amount, tax deposit, insurance deposit, and capital expenditure deposit due under the Loan Documents beginning on April 6, 2020.  See Default Letter, as **Exhibit E**.

17.     Subsequently, on or about September 16, 2020, Lender, through its Special Servicer, notified Borrower of an additional event of default under the Loan Documents as a result of Borrower closing the Hotel in violation of Section 7.1(xiv) of the Loan Agreement.  Lender also notified Borrower of its election to accelerate the total amount due and owing under the Loan.  See Default Letter, as **Exhibit F**.

---

[1]  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Documents.

18.     Franchisor initially agreed to a temporary closure of the Hotel through November 21, 2020. *See* Marriott Letter dated August 18, 2020, as **Exhibit G**. Under Section 19.1(B)(6) of the Franchise Agreement, Franchisor may terminate the Franchise Agreement without providing Franchisee any opportunity to cure the default if "the Hotel ceases to operate as a System Hotel."

19.     The total unpaid principal balance of the Loan is $20,472,280.67, exclusive of interest, default interest, prepayment defeasance, late charges, tax and reserve escrows, and other fees and sums provided for under the Loan Documents.

20.     On February 5, 2021, this Court entered an Order Appointing Receiver, pursuant to which DMMI Associates LLC was appointed as the receiver for the Hotel and Property.

21.     On February 9, 2021, Borrower filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, District of Nevada, Case No. 21-105593 ("Bankruptcy Action").

22.     The Bankruptcy Action triggers full recourse liability of Guarantor under Section 1.1(a) of the Guaranty and Section 8.6 of the Loan Agreement.

23.     Further, upon information and belief, Guarantor holds a $2,200,000 note receivable due from Borrower. In addition, as reflected on certain schedules in the Bankruptcy Action, Borrower received loans from Ernest Barreca ($250,000) and Gary Salomons ($116,461.45), both of whom share a mailing address with Guarantor. All of these loans constitute Indebtedness under the Loan Agreement, and were obtained without Lender's prior consent. Upon information and belief, Borrower received other loans which may constitute Indebtedness under the Loan Agreement, and were obtained without Lender's prior consent.

24.     This unpermitted Indebtedness triggers full recourse liability of Guarantor under Section 1.1(a) of the Guaranty and Section 8.6 the Loan Agreement.

5

25.     Further, the Bankruptcy Action was filed without the unanimous consent of the Board of WOFM, Inc., the manager of Borrower, as the Independent Director of the Board did not participate and vote on this action.

26.     The manner in which the Bankruptcy Action was filed violates the special purpose entity provisions of the Loan Documents, and Guarantor is liable for any Losses arising from such conduct under Section 1.1(a) of the Guaranty and Section 8.6 of the Loan Agreement.

27.     Counts I-IV are stayed due to the pendency of the Bankruptcy Action.

## COUNT I – BREACH OF CONTRACT

28.     Lender incorporates the prior paragraphs by reference.

29.     Lender and Borrower entered into the Loan Documents.

30.     Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents, including its failure to pay the amounts due and owing of the Loan.

31.     The total unpaid principal balance of the Loan is $20,472,280.67, exclusive of interest, default interest, yield maintenance default premium, late charges, tax and reserve escrows, and other fees and sums provided for under the Loan Documents.

32.     Lender is also entitled to its attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action pursuant to the terms of the Loan Documents.

WHEREFORE, Lender respectfully requests that this Court award the following relief:

A.      Enter a judgment in favor of Lender and against Borrower for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action; and

B.      Award Lender such other and further relief as may be just or appropriate.

6

## COUNT II – JUDICIAL FORECLOSURE OF MORTGAGE

33.     Lender incorporates the prior paragraphs by reference.

34.     As security for the Loan, Borrower granted the Mortgage in favor of Lender encumbering the Property.

35.     The Mortgage provides that Lender, upon an event of default, is authorized and empowered to sell the Property pursuant to judicial foreclosure proceedings.

36.     As described above, Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents, including its failure to pay the amounts due and owing of the Loan.

37.     The total unpaid principal balance of the Loan is $20,472,280.67, exclusive of interest, default interest, yield maintenance default premium, late charges, tax and reserve escrows, and other fees and sums provided for under the Loan Documents.

38.     Lender has satisfied the conditions precedent, if any, to the exercise and enforcement of its rights under the Mortgage to foreclose the Property.

39.     An action to recover all of the debt secured by the Mortgage has not previously been brought by Lender.

40.     Lender is not aware of any other party or entity claiming an interest in the Property whose rights would be affected by this foreclosure.  To the extent such interest exists, such interests are inferior and subordinate to Lender's mortgage interest.

41.     Pursuant to applicable law, specifically MCL 600.3115, and the terms of the Mortgage, Lender is entitled to foreclose the Mortgage and sell the Property.

WHEREFORE, Lender respectfully requests that this Court award the following relief:

A.      Enter a judgment favor of Lender and against Borrower for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs

and expenses incurred to collect the outstanding debt and prosecute this action;

B.  If the judgment is not paid by Borrower within ten (10) days, order a foreclosure of the Mortgage and sale of the Property, pursuant to MCL 600.3115, to satisfy the judgment in whole or in part;

C.  Order that, pursuant to MCL 600.3120, if, after this judgment is entered, Borrower brings into court the judgment amount, the foreclosure proceedings in this action shall be stayed, however, the court shall enter a judgment of foreclosure sale to be enforced by a further order of the court upon a subsequent default in the payment or any portion or installment of the principal, or any interest thereafter to become due;

D.  Order that, pursuant to MCL 600.3145, any sum paid by Lender at any time after foreclosure and prior to expiration of the period of redemption for taxes assessed against the Property and/or the portion of premium of any insurance policy covering the Property as is required to keep the policy in force until the expiration of the period of redemption, shall be added to the amount of the judgment;

E.  Order that, pursuant to MCL 600.3140, Borrower may redeem the Property by paying the foreclosure bid price together with interest and all other amounts as required by MCL 600.3101 et. seq. from the date of the sale at the interest default rate provided by the Mortgage within 6 months from the date and time of the foreclosure sale;

F.  Order that the purchaser at the foreclosure sale shall, upon the expiration of the applicable redemption period, become the fee owner of the Property, free and clear of any interest of Borrower; and

G.  Award Lender such other and further relief as may be just or appropriate.

## COUNT III – JUDICIAL FORECLOSURE OF PERSONAL PROPERTY

42.  Lender incorporates the prior paragraphs by reference.

43.  Pursuant to the Mortgage, Borrower granted Lender a security interest in all of the real and personal property, including without limitation, all assets, cash, fixtures, equipment, inventory, and accounts receivable of Borrower.

44.  Lender has perfected its security interest in such personal property by filing UCC Financing Statements.

8

45.    Lender is entitled to foreclose and sell such personal property upon an event of default under the Loan Documents.

46.    As described above, Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents, including its failure to pay the amounts due and owing of the Loan.

47.    Lender has satisfied the conditions precedent, if any, to the exercise and enforcement of its rights under the Loan Documents and MCL 440.9601(1)(a) to foreclose the personal property.

48.    Lender is not aware of any other party or entity claiming an interest in the personal property whose rights would be affected by this foreclosure.  To the extent such interest exists, such interests are inferior and subordinate to Lender's security interest.

WHEREFORE, Lender respectfully requests that this Court award the following relief:

A.    Enter a judgment in favor of Lender and against Borrower for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action;

B.    If the judgment is not paid by Borrower, order a foreclosure and sale of the personal property to satisfy the judgment in whole or in part; and

C.    Award Lender such other and further relief as may be just or appropriate.

## COUNT IV – APPOINTMENT OF RECEIVER

49.    Lender incorporates the prior paragraphs by reference.

50.    The Lender is entitled to the appointment of a receiver over the Property under the Loan Documents and Michigan statutory law.

51.    Pursuant to MCL 600.2926, this Court has the authority to immediately appoint a receiver.

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

52.     Lender is entitled to a receiver under MCL 554.1011 et seq, specifically MCL 554.1016, which provides that this Court may appoint a receiver in connection with a foreclosure where "the person that granted a lien in the property agreed to in a signed record to appointment of a receiver on default," and/or this Court may appoint a receiver before judgment or in connection with a foreclosure to prevent waste, loss, dissipation or impairment of the property.

53.     The Mortgage provides that Lender may apply for the appointment of a receiver upon an event of default under the Loan Documents and that Borrower expressly consents to such appointment. Ex. C, Mortgage, Section 8.1(g).

54.     Borrower is in default and material breach of the Loan Documents for its failure to fulfill its obligations under the Loan Documents, including its failure to pay the amounts due and owing of the Loan.

55.     Upon information and belief, the Hotel remains closed.

56.     Further, Borrower has failed to pay property taxes.

57.     MCL 600.2927 provides that the failure of a mortgagor to pay taxes constitutes waste, and courts may appoint receivers to prevent waste.

58.     Borrower explicitly consented to the appointment of a receiver under MCL 600.2927 in the event of such waste. Ex. C, Mortgage, Section 15.5.

59.     Lender's collateral is in jeopardy and Lender will be irreparably harmed if a receiver is not appointed to take control of the Property, pay the delinquent real property taxes, ensure compliance with Franchise Agreement, and otherwise do all things necessary to preserve, maintain and protect the Property.

60.     As a result, Lender is contractually and statutorily entitled to the appointment of a receiver.

WHEREFORE, Lender respectfully requests that this Court award the following relief:

A.  Appoint a receiver over the Property, and other assets of Borrower of which Lender has a security interest in, with the authority to manage, operate, and pay all necessary operating expenses for the Property, sell the Property pursuant to MCR 2.622(E)(2) and MCL 554.1026, enforce any security agreement or lien pursuant, and otherwise do all things necessary to preserve and protect the Property;

B.  Enjoin Borrower and all persons or entities acting by, through or in concert with it, from interfering in any manner with the receiver's powers and duties conferred upon the receiver by this Court;

C.  Order Borrower and all persons acting by, through or in concert with it, to cooperate with the receiver in transferring possession of the Property; and

D.  Award Lender such other and further relief as may be just or appropriate.

## COUNT V – BREACH OF CONTRACT (GUARANTY)

58.  Lender incorporates the prior paragraphs by reference.

61.  Lender and Guarantor entered into the Guaranty.

62.  Guarantor is in default and material breach of the Guaranty for its failure to fulfill its obligations under the Guaranty.

63.  As a result of the Bankruptcy Action described above, Guarantor is liable under the Guaranty for the full amount due and owing of the Loan.

64.  As a result of the unpermitted Indebtedness described above, Guarantor is liable under the Guaranty for the full amount due and owing of the Loan.

65.  As a result of filing the Bankruptcy Action in violation of the special entity provisions of the Loan Documents, Guarantor is liable under the Guaranty for all Losses arising out of such conduct.

11

66. The total unpaid principal balance of the Loan is $20,472,280.67, exclusive of interest, default interest, prepayment yield maintenance default premium, late charges, tax and reserve escrows, and other fees and sums provided for under the Loan Documents.

67. Lender is also entitled to its attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action pursuant to the terms of the Loan Documents.

WHEREFORE, Lender respectfully requests that this Court award the following relief:

A. Enter a judgment in favor of Lender and against Guarantor for all amounts due and owing under the Loan Documents, including all attorneys' fees, costs and expenses incurred to collect the outstanding debt and prosecute this action; and

B. Award Lender such other and further relief as may be just or appropriate.

Respectfully submitted,

Date: March 22, 2021

By: */s/ Brian M. Moore*
Brian M. Moore (P58584)
Jonathan Kama, Jr. (P83703)
DYKEMA GOSSETT PLLC
*Attorneys for Plaintiff*
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
bmoore@dykema.com
jkama@dykema.com

DYKEMA GOSSETT PLLC • 39577 Woodward Avenue, Bloomfield Hills, Michigan 48304

12

## **CERTIFICATE OF SERVICE**

I certify that on March 22, 2021, I electronically filed the foregoing document with the

Clerk of the Court using the MiFile e-filing system, and this document was served on all counsel

listed on the caption.

DYKEMA GOSSETT PLLC

Date:  March 22, 2021

By: */s/ Brian M. Moore*
     Brian M. Moore (P58584)
     Jonathan Kama, Jr. (P83703)
     DYKEMA GOSSETT PLLC
     *Attorneys for Plaintiff*
     39577 Woodward Avenue, Suite 300
     Bloomfield Hills, MI 48304
     (248) 203-0700
     bmoore@dykema.com
     jkama@dykema.com

13

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

RSS WFCM2020-C55 – MI RHM, LLC, a
Michigan limited liability company,

        Plaintiff,

vs.

RKJ HOTEL MANAGEMENT LLC, a
Nevada limited liability company, and Jeff
Katofsky, a California resident,

        Defendants.

Case No. 20-016230-CB

Hon. Brian Sullivan

*This case meets the statutory requirements
to be assigned to the business court. MCR
2.112(O)(1).*

---

Brian M. Moore (P58584)
Jonathan Kama Jr. (P83703)
DYKEMA GOSSETT PLLC
*Attorneys for Plaintiff*
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
bmoore@dykema.com
jkama@dykema.com

Mark W. Sadecki (P57069)
Sadecki & Associates PLLC
*Attorneys for Defendants*
650 Broadway
PO Box 310
Davisburg, MI 48350-2454
(248) 328-1300
msadecki@saalaw.net

---

## INDEX OF EXHIBITS

### First Amended Complaint

| Exhibit A | Loan Agreement |
|-----------|----------------|
| Exhibit B | Promissory Note |
| Exhibit C | Mortgage |
| Exhibit D | Guaranty |
| Exhibit E | August 7, 2020 Default Letter |
| Exhibit F | September 16, 2020 Default Letter |
| Exhibit G | August 18, 2020 Marriot Letter |

108652.000064 4832-1198-3329.1

# Exhibit A

**LOAN AGREEMENT**

Dated as of January 14, 2020

Between

**RKJ HOTEL MANAGEMENT LLC,**
as Borrower

and

**RIALTO MORTGAGE FINANCE, LLC,**
as Lender

## Table of Contents

Page

I.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................................ 1

    Section 1.1    Definitions. ................................................................................. 1
       1.1.1       Certain Defined Terms ........................................................... 1
       1.1.2       Other Defined Terms .............................................................. 3

    Section 1.2    Principles of Construction ........................................................ 28

II.  GENERAL TERMS ......................................................................................................... 28

    Section 2.1    Loan .......................................................................................... 28

    Section 2.2    Interest; Payments; Late Payment Charge ................................ 28
       2.2.1       Interest ..................................................................................... 28
       2.2.2       Payments Before Maturity Date ............................................. 29
       2.2.3       Payment on Maturity Date ...................................................... 29
       2.2.4       Late Payment Charge .............................................................. 29
       2.2.5       Usury Savings .......................................................................... 30

    Section 2.3    Prepayments. ............................................................................ 30
       2.3.1       Voluntary Prepayments ........................................................... 30
       2.3.2       Mandatory Prepayments .......................................................... 30
       2.3.3       Prepayments After Default ...................................................... 30
       2.3.4       Prepayment Prior to Permitted Defeasance Date ................... 31

    Section 2.4    Making of Payments ................................................................. 31

    Section 2.5    Defeasance. ............................................................................... 31
       2.5.1       Voluntary Defeasance ............................................................. 31
       2.5.2       Release of Property .................................................................. 33

III.  REPRESENTATIONS AND WARRANTIES ................................................................. 33

    Section 3.1    Borrower Representations ......................................................... 33
       3.1.1       Organization ............................................................................ 33
       3.1.2       Authority .................................................................................. 34
       3.1.3       Validity of Documents ............................................................ 34
       3.1.4       Litigation ................................................................................. 35
       3.1.5       Warranty of Title ..................................................................... 35
       3.1.6       Property Status and Condition ................................................ 35
       3.1.7       Leases ...................................................................................... 36
       3.1.8       Solvency .................................................................................. 37
       3.1.9       Financial Information .............................................................. 37
       3.1.10      Not a Foreign Person ............................................................... 37
       3.1.11      Filing and Recording Taxes .................................................... 37
       3.1.12      Franchise Agreement ............................................................... 37
       3.1.13      Management Agreement .......................................................... 38
       3.1.14      Material Agreements and Operating Agreement ..................... 38
       3.1.15      ERISA Compliance .................................................................. 38
       3.1.16      Business Purposes ................................................................... 39
       3.1.17      Taxes ........................................................................................ 39
       3.1.18      OFAC ....................................................................................... 39
       3.1.19      [Intentionally Omitted] ............................................................ 39
       3.1.20      No Change in Facts or Circumstances; Disclosure ................ 39

0139458.0721479   4827-9003-2281v9

Table of Contents
(continued)

|  |  | Page |
|---|---|---|
| 3.1.21 | Liquor Licenses | 39 |
| 3.1.22 | Prior Loan | 40 |
| 3.1.23 | Discounted Payoff | 40 |
| Section 3.2 | Survival of Representations | 40 |

**IV.    BORROWER COVENANTS** ..... **40**

| Section 4.1 | Covenants | 40 |
|---|---|---|
| 4.1.1 | Existence; Compliance with Legal Requirements | 40 |
| 4.1.2 | Taxes and Other Charges; Liens | 41 |
| 4.1.3 | Maintenance of Property | 42 |
| 4.1.4 | Financial Reporting | 43 |
| 4.1.5 | Litigation | 44 |
| 4.1.6 | Leasing Matters | 45 |
| 4.1.7 | Alterations | 46 |
| 4.1.8 | Management Agreement | 47 |
| 4.1.9 | Franchise Agreement | 48 |
| 4.1.10 | [Intentionally Omitted] | 49 |
| 4.1.11 | Performance of Other Agreements | 49 |
| 4.1.12 | Transfers | 49 |
| 4.1.13 | O&M Program | 52 |
| 4.1.14 | Patriot Act Compliance | 52 |
| 4.1.15 | Debt Cancellation | 53 |
| 4.1.16 | Name, Identity, Structure, or Principal Place of Business | 53 |
| 4.1.17 | Access to the Property | 53 |
| 4.1.18 | Notice of Default | 53 |
| 4.1.19 | Further Assurances | 53 |
| 4.1.20 | Liquor License | 53 |
| 4.1.21 | Estoppel Statement | 54 |

**V.    INSURANCE; CASUALTY; CONDEMNATION** ..... **54**

| Section 5.1 | Insurance | 54 |
|---|---|---|
| Section 5.2 | Casualty | 58 |
| Section 5.3 | Condemnation | 58 |
| Section 5.4 | Restoration | 58 |

**VI.    CASH MANAGEMENT AND RESERVE FUNDS** ..... **62**

| Section 6.1 | Cash Management | 62 |
|---|---|---|
| 6.1.1 | Clearing Account | 62 |
| 6.1.2 | Instruction Notices; Deposits | 62 |
| 6.1.3 | Disbursements from the Clearing Account and Cash Management Account | 65 |
| 6.1.4 | Limitation of Liability | 65 |
| 6.1.5 | Application After Event of Default | 65 |
| 6.1.6 | Payments Received Under Cash Management Agreement | 66 |
| 6.1.7 | Security Interest; Perfection of Accounts | 66 |
| Section 6.2 | Required Repair Funds | 67 |
| 6.2.1 | Deposit of Required Repair Funds | 67 |
| 6.2.2 | Release of Required Repair Funds | 67 |

-ii-

Table of Contents
(continued)

Page

Section 6.3      Tax Funds. ...................................................................... 67
    6.3.1       Deposits of Tax Funds ...................................................... 67
    6.3.2       Release of Tax Funds ........................................................ 68

Section 6.4      Insurance Funds............................................................... 68
    6.4.1       Deposits of Insurance Funds ............................................. 68
    6.4.2       Release of Insurance Funds .............................................. 68

Section 6.5      Capital Expenditure Funds. ............................................ 68
    6.5.1       Deposits of Capital Expenditure Funds ............................ 68
    6.5.2       Release of Capital Expenditure Funds .............................. 69

Section 6.6      [Intentionally Omitted]. .................................................. 69

Section 6.7      [Intentionally Omitted]. .................................................. 69

Section 6.8      [Intentionally Omitted]. .................................................. 69

Section 6.9      Excess Cash Flow Funds. ............................................... 69
    6.9.1       Deposits of Excess Cash Flow Funds ............................... 69
    6.9.2       Release of Excess Cash Flow Funds ................................. 69

Section 6.10     Scheduled PIP Reserve Funds ........................................ 70
    6.10.1      Deposits of Scheduled PIP Reserve Funds....................... 70
    6.10.2      Release of Scheduled PIP Reserve Funds ......................... 70

Section 6.11     Future PIP Reserve Funds .............................................. 72
    6.11.1      Deposits of Future PIP Reserve Funds ............................. 72
    6.11.2      Release of Future PIP Reserve Funds ............................... 72

Section 6.12     Reserve Funds, Generally. ............................................. 74
    6.12.1      Security Interest............................................................... 74
    6.12.2      Investments; Income Taxes .............................................. 74
    6.12.1      Costs ............................................................................... 75

Section 6.13     Letter of Credit. ............................................................. 75
                 Delivery of Letter of Credit............................................. 75
                 Additional Security; Lender's Right to Draw ................... 75
                 Transfer of Letter of Credit ............................................. 75
    6.13.4      Waiver of Rights of Subrogation ..................................... 76

VII.   DEFAULTS................................................................................. 76

Section 7.1      Event of Default ............................................................. 76

Section 7.2      Remedies ........................................................................ 77

Section 7.3      Remedies Cumulative; Waivers ...................................... 78

VIII.  SPECIAL PROVISIONS .............................................................. 78

Section 8.1      Sale of Mortgage and Securitization ............................... 78

Section 8.2      Securitization Indemnification ........................................ 79

Section 8.3      Servicer........................................................................... 80

Section 8.4      Mezzanine Loan; Components ........................................ 80

Section 8.5      Single Purpose Entity ..................................................... 81

Section 8.6      Exculpation..................................................................... 81

-iii-

Table of Contents
(continued)

Page

IX.   MISCELLANEOUS ................................................................................................. 85
    Section 9.1     Survival ................................................................................ 85
    Section 9.2     Lender's Discretion .............................................................. 85
    Section 9.3     Governing Law ..................................................................... 85
    Section 9.4     Modification, Waiver in Writing ........................................ 86
    Section 9.5     Delay Not a Waiver ............................................................. 86
    Section 9.6     Notices .................................................................................. 86
    Section 9.7     Trial by Jury ......................................................................... 87
    Section 9.8     Headings ............................................................................... 87
    Section 9.9     Severability ......................................................................... 87
    Section 9.10    Preferences .......................................................................... 88
    Section 9.11    Waiver of Notice ................................................................. 88
    Section 9.12    Remedies of Borrower ......................................................... 88
    Section 9.13    Expenses; Indemnity ........................................................... 88
    Section 9.14    Schedules and Exhibits Incorporated .................................. 90
    Section 9.15    Offsets, Counterclaims and Defenses .................................. 90
    Section 9.16    No Joint Venture or Partnership; No Third Party Beneficiaries.......... 90
    Section 9.17    Publicity ............................................................................... 91
    Section 9.18    Waiver of Marshalling of Assets ......................................... 91
    Section 9.19    Waiver of Counterclaim ...................................................... 91
    Section 9.20    Conflict; Construction of Documents; Reliance................... 91
    Section 9.21    Brokers and Financial Advisors .......................................... 92
    Section 9.22    Joint and Several Liability .................................................. 92
    Section 9.23    Limitation on Liability ......................................................... 92
    Section 9.24    Prior Agreements................................................................. 92

0139458.0721479   4827-9003-2281v9

## SCHEDULES

| | |
|---|---|
| SCHEDULE I | Single Purpose Entity |
| SCHEDULE II | Organizational Chart |
| SCHEDULE III | Rent Roll |
| SCHEDULE IV | Required Repairs – Deadlines for Completion |
| SCHEDULE V | O&M Program |
| SCHEDULE VI | Credit Card Companies |
| SCHEDULE VII | Scheduled PIP |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Form of Tenant Instruction Notice |
| EXHIBIT B | Form of Credit Card Instruction Notice |

0139458.0721479   4827-9003-2281v9

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of January 14, 2020 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, having an address at 590 Madison Avenue, 9th Floor, New York, New York 10022 ("**Lender**") and **RKJ HOTEL MANAGEMENT LLC**, a Nevada limited liability company, having an address at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403 ("**Borrower**").

## W I T N E S S E T H :

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.

1.1.1    Certain Defined Terms.  For all purposes of this Agreement, the following terms shall have the meanings ascribed to them below:

"**Acceptable Letter of Credit**" shall mean a Letter of Credit in the amount of the related Future PIP Deposit.

"**Alteration Threshold**" shall mean an amount equal to the greater of (i) one percent (1%) of the original Loan amount and (ii) $200,000.

"**Applicable Interest Rate**" shall mean 4.94% per annum.

"**Approved Bank**" shall mean a bank or other financial institution, the long-term unsecured debt rating of which are at least "A" by S&P, Fitch and DBRS and "A2" by Moody's and the short-term unsecured debt ratings of which are at least "A-1" by S&P, "F1" by Fitch, "R-1" by DBRS and "P-1" by Moody's.

"**Franchisor**" shall mean (i) Marriott, or, if the context requires, (ii) any replacement franchisor approved by Lender in accordance with the terms of this Agreement.

"**Free Window Date**" shall mean the Payment Date that occurs three (3) months prior to the Stated Maturity Date.

"**Guarantor**" shall mean, individually and/or collectively, as the context may require (i) JEFF KATOFSKY, an individual, and (ii) any other Person guaranteeing any payment or performance obligation of Borrower.

"**Initial Capital Expenditure Deposit**" shall mean an amount equal to $0.00.

"**Initial Insurance Deposit**" shall mean an amount equal to $98,666.82.

"**Initial Tax Deposit**" shall mean an amount equal to $38,060.76.

"**Key Principal**" shall mean Guarantor.

"**Loan**" shall mean the loan in the original principal amount of **TWENTY MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($20,500,000.00)** made by Lender to Borrower pursuant to this Agreement.

"**Manager**" shall mean (i) **REAL HOSPITALITY GROUP, LLC**, a Delaware limited liability company, or, if the context requires, (ii) a Qualified Manager that manages the Property in accordance with the terms and provisions of this Agreement and the other Loan Documents pursuant to a Replacement Management Agreement. For the avoidance of doubt, subject to the terms and conditions of Section 4.1.8 hereof and the applicable provisions of the other Loan Documents, it is hereby acknowledged and agreed that Borrower, either personally or through an Affiliate reasonably acceptable to Lender, may manage or self-manage the Property.

"**Marriott**" shall mean **MARRIOTT INTERNATIONAL, INC.**, a Delaware corporation, together with any parent, subsidiary, division and/or Affiliate thereof acting, from time to time, as the "Franchisor" or "Licensor" under the Franchise Agreement in effect as of the date hereof (together with any amendments, supplements, renewals and/or extensions thereto and/or thereof).

"**Monthly Capital Expenditure Deposit**" shall mean an amount equal to the *greater* of (a) an amount equal to one-twelfth (1/12) of (i) for each Payment Date occurring during the first twelve (12) calendar months following the Closing Date, one percent (1%) of Gross Income from Operations during the calendar year immediately preceding the calendar year in which such Payment Date occurs, (ii) for each Payment Date occurring from and after the thirteenth (13th) calendar month following the Closing Date through and including the last day of the twenty-fourth (24th) calendar month following the Closing Date, two percent (2%) of Gross Income from Operations during the calendar year immediately preceding the calendar year in which such Payment Date occurs, (iii) for each Payment Date occurring from and after the twenty-fifth (25th) calendar month following the Closing Date through and including the last day of the thirty-sixth (36th) calendar month following the Closing Date, three percent (3%) of Gross Income from Operations during the calendar year immediately preceding the calendar year in which such Payment Date occurs, and (iv) for each Payment Date occurring after the thirty-sixth (36th) calendar month following the Closing Date, four percent (4%) of Gross Income from Operations during the calendar year immediately preceding the calendar year in which such Payment Date occurs, *and* (b) the aggregate amount, if any, required to be reserved under the Management Agreement and the Franchise Agreement.

"**Monthly Debt Service Payment Amount**" shall mean a constant monthly payment amount of $109,297.94.

"**PACE Loan**" shall mean any Property-Assessed Clean Energy loan or any similar financing.

"**Permitted Defeasance Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code of the REMIC Trust established in connection with the last Securitization involving any portion of the Loan.

"**Permitted Release Date**" shall mean the date that is the earlier of (a) three (3) years from the Closing Date or (b) Permitted Defeasance Date.

"**Required Repair Deposit**" shall mean an amount equal to $7,500.00.

"**Reserve Accounts**" shall mean, collectively, the Required Repair Account, the Tax Account, the Insurance Account, the Capital Expenditure Account, the Scheduled PIP Reserve Account, the Future PIP Reserve Account, the Excess Cash Flow Account and any other reserve fund account established pursuant to the Loan Documents.

"**Reserve Funds**" shall mean, collectively, the Required Repair Funds, the Tax Funds, the Insurance Funds, the Capital Expenditure Funds, the Scheduled PIP Reserve Funds, the Future PIP Reserve Funds, the Excess Cash Flow Funds and any other escrow or reserve fund established by the Loan Documents.

"**Restoration Threshold**" shall mean an amount equal to one percent (1%) of the Outstanding Principal Balance.

"**Scheduled PIP Deposit**" shall mean an amount equal to $187,000.00.

"**Stated Maturity Date**" shall mean February 6, 2030.

1.1.2   Other Defined Terms.  For all purposes of this Agreement, except as otherwise expressly provided:

"**Account Liabilities**" shall have the meaning set forth in Section 6.1.4.

"**Accrual Period**" shall mean, with respect to any Payment Date, the period commencing on the eleventh (11th) day of the preceding month and ending on the tenth (10th) day of the calendar month in which such Payment Date occurs, provided that if the Closing Date is any date other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist of only the date hereof, if the date hereof is the tenth (10th) day of a month, or (ii) commence on the date hereof and shall end on the immediately following tenth (10th) day of a calendar month.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) directly or indirectly, owns twenty percent (20%) or more of legal, beneficial or economic interests in such Person, (ii) is in control of, is controlled by or is under common ownership or control with such Person, (iii)

is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any property manager which is an Affiliate of Borrower or any Guarantor.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Approved Annual Budget**" shall have the meaning set forth in the Cash Management Agreement.

"**Approved Capital Expenditures**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Approved PIP Expenditures**" shall mean (A) (i) the Scheduled PIP Expenditures set forth in the Scheduled PIP Budget approved by Lender in connection with the closing of the Loan, and (ii) in the event any such expenditures exceed the amounts set forth in such Scheduled PIP Budget, upon Lender's approval of such expenditures in accordance with the terms and conditions hereof, and (B) any Future PIP Expenditures set forth in a Future PIP Budget approved by Lender in accordance with the terms and conditions hereof.

"**Assignment of Leases**" shall mean, that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Available Funds**" shall have the meaning set forth in Section 6.1.3.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition under the Bankruptcy Law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Law; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

0139458.0721479  4827-9003-2281v9

"**Bankruptcy Code**" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"**Bankruptcy Law**" shall mean the Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Brand Standards Upgrade PIP**" shall mean any future property, product or brand standards improvement, upgrade, renovation or similar plan implemented by Franchisor (or any replacement franchisor) to bring the Property into compliance with the brand standards or other requirements of such Franchisor (or any replacement franchisor).

"**Broker**" shall have the meaning set forth in Section 9.21 hereof.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Capital Expenditure Account**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Capital Expenditure Funds**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" shall have the meaning set forth in Section 6.1.3 hereof.

"**Cash Management Activation Notice**" shall mean a written notice from Lender or Servicer to Clearing Account Bank stating that a Cash Management Trigger Event has occurred and instructing Clearing Account Bank to transfer all available funds in the Clearing Account to the Cash Management Account in accordance with the Clearing Account Agreement.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, between Lender, Borrower and Cash Management Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean Wells Fargo Bank, National Association or any other federal or state chartered depository institution or trust company acting in its fiduciary capacity and subject to supervision or examination by federal and State authority selected by Lender.

"**Cash Management De-Activation Notice**" shall mean a written notice from Lender or Servicer to Clearing Account Bank stating that a Cash Management Trigger Event no longer exists and instructing Clearing Account Bank to transfer all available funds in the Clearing Account to an account designated by Borrower in accordance with the Clearing Account Agreement.

0139458.0721479   4827-9003-2281v9

"**Cash Management DSCR Trigger Event**" shall mean that, as of any date on which Lender determines the Debt Service Coverage Ratio, the Debt Service Coverage Ratio based on the trailing twelve (12) month period immediately preceding the date of such determination is less than 1.25 to 1.00.

"**Cash Management Trigger Event**" shall mean the occurrence of:

(i)     an Event of Default;

(ii)    without waiving any Event of Default or the assessment of late charges arising therefrom, Borrower's second failure in any consecutive twelve (12) month period to pay a Monthly Debt Service Payment Amount on a Payment Date;

(iii)   any Bankruptcy Action of Borrower;

(iv)    any Bankruptcy Action of Guarantor;

(v)     any Bankruptcy Action of Manager;

(vi)    a Cash Management DSCR Trigger Event; or

(vii)   a Franchise Trigger Event.

"**Cash Management Trigger Event Cure**" shall mean:

(i)     if the Cash Management Trigger Event is caused solely by the occurrence of clause (i) in the definition of "Cash Management Trigger Event," a cure of the Event of Default which is accepted or waived in writing by Lender which gave rise to such Cash Management Trigger Event; _provided_ that Lender shall not have exercised any of its rights under the Security Instrument to accelerate the Loan, move to appoint a receiver or commence a foreclosure action;

(ii)    if the Cash Management Trigger Event is caused solely by the occurrence of clause (ii) in the definition of "Cash Management Trigger Event," the timely payment of Monthly Debt Service Payment Amounts on twelve (12) consecutive Payment Dates;

(iii)   if the Cash Management Trigger Event is caused solely by the occurrence of clause (iii) in the definition of "Cash Management Trigger Event," if such Cash Management Trigger Event is as a result of the filing of an involuntary petition against Borrower with respect to which neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within thirty (30) days of such filing; _provided_ that (A) in Lender's reasonable opinion, such filing (after dismissal or discharge)

-6-

does not materially increase Borrower's monetary obligations, and (B) Borrower is not in breach of the provisions set forth in Sections 4.1.12 or 8.5 of this Agreement;

(iv)   if the Cash Management Trigger Event is caused solely by the occurrence of clause (iv) in the definition of "Cash Management Trigger Event," if such Cash Management Trigger Event is as a result of the filing of an involuntary petition against Guarantor with respect to which neither Guarantor nor any Affiliate of Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within sixty (60) days of such filing; *provided* that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Guarantor's ability to perform its obligations under the Loan Documents to which it is a party;

(v)   if the Cash Management Trigger Event is caused solely by the occurrence of clause (v) in the definition of "Cash Management Trigger Event," (A) if Borrower replaces Manager with a new Manager acceptable to Lender in accordance with the Assignment of Management Agreement, or (B) if such Cash Management Trigger Event is as a result of the filing of an involuntary petition against Manager with respect to which neither Manager nor any Affiliate of Manager solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within one hundred twenty (120) days of such filing; provided that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Manager's ability to perform its obligations under the Management Agreement;

(vi)   if the Cash Management Trigger Event is caused solely by the occurrence of clause (vi) in the definition of "Cash Management Trigger Event," once the Debt Service Coverage Ratio based upon the trailing twelve (12) month period immediately preceding the date of such determination is greater than 1.25 to 1.00 for two (2) consecutive quarters; and

(vii)   if the Cash Management Trigger Event is caused solely by the occurrence of clause (vii) in the definition of "Cash Management Trigger Event," the date upon which the applicable Franchise Trigger Event Cure shall have occurred.

provided that each Cash Management Trigger Event Cure set forth above shall be subject to the following conditions: (1) after giving effect to such Cash Management Trigger Event Cure, no Cash Management Trigger Event shall have occurred and remain outstanding, (2) Borrower shall have notified Lender in writing of its election to cure the applicable Cash Management Trigger Event, and (3) Borrower shall have paid all of Lender's reasonable costs and expenses incurred in

-7-

connection with such Cash Management Trigger Event Cure (including reasonable attorneys' fees and expenses).

"**Cash Management Trigger Event Period**" shall mean any period commencing on the occurrence of a Cash Management Trigger Event and continuing until the earlier of (i) the Payment Date following the date that no Cash Management Trigger Event shall have occurred and be continuing or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Cash Receipts**" shall mean Rents and other income generated from the operation of the Property in the form of cash, checks and money orders (and specifically excluding Rents and other income in the form of credit card receipts).

"**Cash Sweep DSCR Trigger Event**" shall mean that, as of any date on which Lender determines the Debt Service Coverage Ratio, the Debt Service Coverage Ratio based on the trailing twelve (12) month period immediately preceding the date of such determination is less than 1.20 to 1.00.

"**Cash Sweep Event**" shall mean the occurrence of:

    (i)      an Event of Default;

    (ii)     any Bankruptcy Action of Borrower;

    (iii)    any Bankruptcy Action of Guarantor;

    (iv)    any Bankruptcy Action of Manager;

    (v)     a Cash Sweep DSCR Trigger Event; or

    (vi)    a Franchise Trigger Event.

"**Cash Sweep Event Cure**" shall mean:

    (i)      if the Cash Sweep Event is caused solely by the occurrence of clause (i) in the definition of "Cash Sweep Event," a cure of the Event of Default which is accepted or waived in writing by Lender which gave rise to such Cash Sweep Event; provided that Lender shall not have exercised any of its rights under the Security Instrument to accelerate the Loan, move to appoint a receiver or commence a foreclosure action;

    (ii)     if the Cash Sweep Event is caused solely by the occurrence of clause (ii) in the definition of "Cash Sweep Event," if such Cash Sweep Event is as a result of the filing of an involuntary petition against Borrower with respect to which neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary

petition, upon the same being discharged, stayed or dismissed within sixty (60) days of such filing; *provided* that (A) in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially increase Borrower's monetary obligations and (B) Borrower is not in breach of the provisions set forth in <u>Sections 4.1.12</u> or <u>8.5</u> of this Agreement;

(iii)    if the Cash Sweep Event is caused solely by the occurrence of clause (iii) in the definition of "Cash Sweep Event," if such Cash Sweep Event is as a result of the filing of an involuntary petition against Guarantor with respect to which neither Guarantor nor any Affiliate of Guarantor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed within sixty (60) days of such filing; *provided* that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Guarantor's ability to perform its obligations under the Loan Documents to which it is a party;

(iv)    if the Cash Sweep Event is caused solely by the occurrence of clause (iv) in the definition of "Cash Sweep Event," (A) if Borrower replaces Manager with a new Manager acceptable to Lender in accordance with the Assignment of Management Agreement, or (B) if such Cash Sweep Event is as a result of the filing of an involuntary petition against Manager to which Manager did not consent, upon the same being discharged, stayed or dismissed within one hundred twenty (120) days of such filing; <u>provided</u> that, in Lender's reasonable opinion, such filing (after dismissal or discharge) does not materially and adversely affect Manager's ability to perform its obligations under the Management Agreement;

(v)    if the Cash Sweep Event is caused solely by the occurrence of clause (v) in the definition of "Cash Sweep Event," once the Debt Service Coverage Ratio based upon the trailing twelve (12) month period immediately preceding the date of such determination is greater than 1.20 to 1.00 for two (2) consecutive quarters;

(vi)    if the Cash Sweep Event is caused solely by the occurrence of clause (vi) in the definition of "Cash Sweep Event," the date upon which the applicable Franchise Trigger Event Cure shall have occurred; and

(vii)    without limiting the terms and provisions of clause (vi) of this definition, in the event a Cash Sweep Event is caused solely by the occurrence of clauses (i) or (ii) of the definition of Franchise Trigger Event, the occurrence of a Future PIP Deposit Cure.

<u>provided</u> that each Cash Sweep Event Cure set forth above shall be subject to the following conditions: (1) after giving effect to such Cash Sweep Event Cure, no Cash Sweep Event shall have occurred and remain outstanding, (2) Borrower shall have notified Lender in writing of its election to cure the applicable Cash Sweep Event, and (3) Borrower shall have paid all of Lender's

-9-

reasonable costs and expenses incurred in connection with such Cash Sweep Event Cure (including reasonable attorneys' fees and expenses).

"**Cash Sweep Event Period**" shall mean any period commencing on the occurrence of any Cash Sweep Event and continuing until the earlier of (i) the Payment Date following the date that no Cash Sweep Event shall have occurred and be continuing or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Casualty**" shall have the meaning set forth in Section 5.2 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4(b)(iii) hereof.

"**Casualty Retainage**" shall have the meaning set forth in Section 5.4(b)(iv) hereof.

"**Clearing Account**" shall have the meaning set forth in Section 6.1.1.

"**Clearing Account Agreement**" shall mean any depository account control agreement between Clearing Account Bank, Borrower and Lender with respect to the Clearing Account and any lockbox established in connection therewith in a form acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Clearing Account Bank**" shall mean **WELLS FARGO BANK, NATIONAL ASSOCIATION**, or any successor thereto designated in accordance with the terms of Sections 6.1.2(b) or 6.1.2(c) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**control**" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"**Credit Card Company**" shall have the meaning set forth in Section 6.1.2(a).

"**Credit Card Instruction Notice**" shall have the meaning set forth in Section 6.1.2(a).

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon and all other sums payable to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"**Debt Service**" shall mean the scheduled monthly principal and interest payments due and payable under the Note (but assuming, for the purpose of calculating the Debt Service Coverage Ratio, that the Debt Service was based on the Applicable Interest Rate and an amortization period of thirty (30) years).

"**Debt Service Coverage Ratio**" shall mean as of any date of determination, the ratio, as determined by Lender for the applicable period, in which:

      (i)      the numerator is the Net Operating Income (excluding interest on credit accounts and using annualized operating expenses for any recurring expenses not paid monthly) for such period as set forth in financial statements required hereunder (and if the applicable period is less than twelve (12) months, the Net Operating Income for such period shall be annualized), without deduction for (a) actual management fees incurred in connection with the operation of the Property, (b) actual franchise fees incurred in connection with the operation of the Property, or (c) actual amounts paid to the Reserve Funds, less (1) management fees equal to the greater of (A) assumed management fees of three percent (3%) of Gross Income from Operations and (B) the actual management fees incurred, (2) franchise fees equal to the greater of (A) assumed franchise fees of seven and one-half percent (7.5%) of Gross Income from Operations and (B) the actual franchise fees incurred, and (3) contributions to the Capital Expenditure Account contributions for such period based on an assumed annual amount equal to $1,229 per hotel room at the Property; and

      (ii)     the denominator is the annual Debt Service.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"**Defeasance Collateral**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Deposit**" shall mean an amount sufficient to purchase U.S. Obligations necessary to meet the Scheduled Defeasance Payments, pay any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and pay any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of Section 2.4 hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a) hereof.

0139458.0721479   4827-9003-2281v9

"**Defeasance Security Agreement**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Disclosure Document**" shall have the meaning set forth in Section 8.2 hereof.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**Event of Default**" shall have the meaning set forth in Section 7.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in the Cash Management Agreement.

"**Excess Cash Flow Account**" shall have the set forth in Section 6.9.1 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 6.9.1 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**FF&E**" shall mean all furniture, fixtures, equipment and Personal Property (as defined in the Security Instrument) now or hereafter owned by Borrower.

"**FF&E Loan**" shall have the meaning set forth in Section 3.1.22 hereof.

-12-

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Franchise Agreement**" shall mean (i) that certain Delta Hotels by Marriott Franchise Agreement dated March 22, 2018, by and between Franchisor and Borrower (together with all amendments, supplements and modification thereof, and all exhibits, guaranties, schedules, addenda, manuals, guidelines, handbooks and standards attached thereto or referenced therein), as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, (ii) any replacement franchise agreement approved by Lender in accordance with the terms and provisions of this Agreement.

"**Franchise Trigger Event**" shall mean:

(i)   the earlier to occur of the date (x) upon which the Franchise Agreement shall expire or is terminated or canceled for any reason, (y) that is twelve (12) months prior to the then current expiration date of the Franchise Agreement, or (z) upon which Borrower or Franchisor gives notice of its intention to terminate or cancel or not to extend or renew the Franchise Agreement;

(ii)   the implementation (or notice to Borrower thereof) by Franchisor (or any replacement franchisor) of any PIP;

(iii)   the occurrence of an event of default under the Franchise Agreement beyond any applicable cure period; or

(iv)   the occurrence of any Bankruptcy Action of Franchisor.

"**Franchise Trigger Event Cure**" shall mean:

(i)   if a Franchise Trigger Event is caused solely by the occurrence of clause (i) in the definition of Franchise Trigger Event, the satisfaction of each of the following conditions: (A) Borrower has extended or renewed the Franchise Agreement or executed a new franchise agreement approved by Lender with a franchisor approved by Lender in accordance with the terms hereof, for a term of not less than (10) years after the current stated expiration date of the Franchise Agreement, (B) all Future PIP Work and other related property improvement requirements have been completed and paid for in full in accordance with Section 6.11.2 hereof and accepted by Franchisor, and (C) Lender shall have received an acceptable comfort letter from such Franchisor;

(ii)   if a Franchise Trigger Event is caused solely by the occurrence of clause (ii) in the definition of Franchise Trigger Event, the satisfaction of each of the following conditions: (A) all PIP Work and other related property improvement requirements have been completed and paid for in full in accordance with Section 6.10.2 or Section 6.11.2 hereof, as applicable, and

-13-

accepted by Franchisor, and (B) Lender shall have received an acceptable comfort letter from such Franchisor;

(iii)    if a Franchise Trigger Event is caused solely by the occurrence of clause (iii) in the definition of "Franchise Trigger Event," a cure of the event of default which is accepted or waived in writing by Franchisor and Lender which gave rise to such Franchise Trigger Event; and

(iv)    if the Franchise Trigger Event is caused solely by the occurrence of clause (iv) in the definition of "Franchise Trigger Event," if such Franchise Trigger Event is as a result of the filing of an involuntary petition against Franchisor with respect to which neither Franchisor nor any Affiliate of Franchisor solicited or caused to be solicited petitioning creditors or consented to or otherwise acquiesced in or joined in such involuntary petition, upon the same being discharged, stayed or dismissed.

"**Franchise Trigger Event Period**" shall mean any period commencing on the occurrence of a Franchise Trigger Event and continuing until the earlier of (i) the Payment Date following the occurrence of the related Franchise Trigger Event Cure, provided that no other Franchise Trigger Event shall have occurred and be continuing, or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents.

"**Future PIP**" shall mean (i) other than a Brand Standards Upgrade PIP, any future property, product or brand standards improvement, upgrade, renovation or similar plan required by the Franchisor (or any replacement franchisor) from time to time, whether pursuant to the terms of the Franchise Agreement (or any replacement franchise agreement) or otherwise, or in connection with (x) any renewal, extension, amendment and/or other modification of the Franchise Agreement (or any replacement franchise agreement) and/or (y) any replacement franchise agreement entered into in accordance with the terms and conditions hereof, and/or (ii) a Brand Standards Upgrade PIP. For the avoidance of doubt, the term "Future PIP" does not include the "Scheduled PIP."

"**Future PIP Budget**" shall mean, with respect to any Future PIP, a budget of all Future PIP Expenditures.

"**Future PIP Deposit**" shall mean, with respect to any Future PIP and the related Future PIP Work, an amount equal to the greater of one hundred twenty-five percent (125%) of the estimated costs of the related Future PIP Work (i) set forth in the then applicable Future PIP Budget, and (ii) as reasonably determined by an independent construction consultant engaged by Lender, based upon its review of the applicable Future PIP and the related Future PIP Budget.

"**Future PIP Deposit Cure**" shall mean, with respect to any Cash Sweep Event existing solely due to the occurrence of a Franchise Trigger Event described in clauses (i) or (ii) in the definition of Franchise Trigger Event, the satisfaction of each of the following conditions: (i) the delivery by Borrower to Lender of an Acceptable Letter of Credit or cash in an amount equal to the Future PIP Deposit; *and* (ii) if, at any date of determination, any Letter(s) of Credit delivered to Lender pursuant to this definition ceases to satisfy the requirements of an Acceptable Letter of Credit, (x) the delivery by Borrower to Lender of an additional or replacement Letter of Credit in

-14-

an amount (either individually or collectively with any other Letter of Credit delivered to Lender pursuant hereto) necessary to satisfy the requirements of an Acceptable Letter of Credit; *or* (y) such time as the amount on deposit in the Future PIP Reserve Account, together with the amounts remaining on the Letter(s) of Credit delivered pursuant to this definition, equals or exceeds the Future PIP Deposit, it being acknowledged and agreed that Borrower's failure to deliver any Letter of Credit in accordance with clause (ii)(x) above shall not avoid a cash sweep pursuant to this clause (ii)(y). For the avoidance of doubt, any election of Borrower to effect a cure of a Cash Sweep Trigger Event existing solely due to the occurrence of a Franchise Trigger Event described in clauses (i) or (ii) in the definition thereof pursuant to a Future PIP Deposit Cure shall be irrevocable with respect to a cure of the Franchise Trigger Event in question.

Each Letter of Credit delivered pursuant to this definition (A) shall be held as additional collateral for the Loan, (B) shall be subject to the terms and provisions of Section 6.13 hereof and (C) shall be returned to Borrower upon the earlier of to occur of (i) the completion and payment in full, and acceptance by Franchisor, of all related Future PIP Work in accordance with the terms and conditions of Section 6.11.2 hereof; provided, however, in no event shall the return of any Letter of Credit pursuant to this clause (C)(i) or the occurrence of any Future PIP Deposit Cure be deemed to suspend, waive or cure any subsequent Franchise Trigger Event; provided, further, a Future PIP Deposit Cure shall operate as a cure only of a Cash Sweep Event existing solely because of the conditions expressly referenced herein and shall not operate to effect a cure of a Cash Management Trigger Event existing solely because of the same conditions, and (ii) payment in full of the Debt.

"**Future PIP Expenditures**" shall mean all expenditures to be made in connection with any Future PIP Work required under the applicable Future PIP.

"**Future PIP Reserve Account**" shall have the meaning set forth in Section 6.11.1 hereof.

"**Future PIP Reserve Funds**" shall have the meaning set forth in Section 6.11.1 hereof.

"**Future PIP Work**" shall mean all PIP Work required to be performed under any applicable Future PIP.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever of any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean all sustainable income and proceeds (whether in cash or on credit and computed on an accrual basis) received by Borrower or Manager for the use, occupancy or enjoyment of the Property, or any part thereof, or received by Borrower or Manager for the sale of any goods, services or other items sold on or provided from the Property in the ordinary course of the Property operation, including without limitation: (i) all income and proceeds received from Leases and rental of rooms, commercial space and meeting, conference and/or banquet space within the Property (including net parking revenue); (ii) all income and proceeds received from food and beverage operations and from catering services conducted from

-15-

the Property even though rendered outside of the Property; (iii) all income and proceeds from business or rental interruption or other loss of income insurance and use and occupancy insurance with respect to the operation of the Property (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof); (iv) all Awards for temporary use (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof and in Restoration of the Property); (v) all income and proceeds from judgments, settlements and other resolutions of disputes with respect to matters which would be includable in this definition of "Gross Income from Operations" if received in the ordinary course of the Property operation (after deducting therefrom all costs and expenses incurred in the adjustment or collection thereof); and (vi) interest on credit accounts, rent concessions or credits, and other required pass-throughs and interest on Reserve Funds; but excluding, (a) gross receipts received by lessees, licensees or concessionaires of the Property; (b) consideration received at the Property for hotel accommodations, goods and services to be provided at other hotels, although arranged by, for or on behalf of Borrower or Manager; (c) income and proceeds from the sale or other disposition of goods, capital assets and other items not in the ordinary course of the Property operation; (d) federal, state and municipal excise, sales, use or other taxes collected directly from patrons or guests of the Property as a part of or based on the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes; (e) Awards (except to the extent provided in clause (iv) above); (f) refunds of amounts not included in Operating Expenses at any time and uncollectible accounts; (g) gratuities collected by the Property employees; (h) the proceeds of any financing; (i) other income or proceeds resulting other than from the use or occupancy of the Property, or any part thereof, or other than from the sale of goods, services or other items sold on or provided from the Property in the ordinary course of business; and (j) any credits or refunds made to customers, guests or patrons in the form of allowances or adjustments to previously recorded revenues.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hotel Transactions**" shall mean, collectively, (i) occupancy arrangements for customary hotel transactions in the ordinary course of Borrower's business conducted at the hotel located at the Property, including nightly rentals (or licensing) of individual hotel rooms or suites, banquet room use and food and beverage services and (ii) informational or guest services which are terminable on one month's notice or less without cause and without penalty or premium, including co-marketing, promotional services and outsourced services.

"**Improvements**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"**Indebtedness**" shall mean, for any Person, without duplication, any debt or liability, secured or unsecured, direct or contingent (including any guaranty).

"**Indemnified Liabilities**" shall have the meaning set forth in Section 9.13 hereof.

"**Indemnified Parties**" shall mean Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by the

-16-

Security Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

"**Independent Director**" shall have the meaning set forth in Schedule I attached hereto.

"**Insolvency Opinion**" shall mean any bankruptcy non-consolidation opinion letter delivered to Lender in connection with the Loan.

"**Insurance Account**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Insurance Funds**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**Investor**" shall have the meaning set forth in Section 8.1(b) hereof.

"**Land**" shall have the meaning set forth in Article 1 of the Security Instrument.

"**Leases**" shall have the meaning set forth in Article 1 of the Security Instrument. Notwithstanding the foregoing, as used herein, the term "Leases" shall not include any Hotel Transactions.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities at any time affecting the Loan, any Secondary Market Transactions, Borrower, Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulations AB, S-K and S-X under the Securities Act, the rules and regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws, the Americans with Disabilities Act of 1990, as amended, and all permits, licenses and authorizations and regulations relating thereto, the Operating Agreements, any PIP, the Franchise Agreement and all other covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, Guarantor or the Property or any part thereof, including, without limitation, any which may (y) require repairs, modifications or alterations in or to the Property or any part thereof or (z) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of any transfer fee), clean sight draft letter of credit acceptable to Lender and the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) days after (i) the Stated Maturity Date or (ii) such earlier date as such Letter of Credit is no longer

-17-

required pursuant to the terms of this Agreement and the other Loan Documents) in favor of Lender and entitling Lender to draw thereon in New York, New York based solely on a statement purportedly executed by an officer of Lender stating that it has the right to draw thereon, issued by a domestic Approved Bank or the U.S. agency or branch of a foreign Approved Bank. If at any time the bank issuing any such Letter of Credit shall cease to be an Approved Bank, Lender shall have the right immediately to draw down the same in full and hold the proceeds of such draw in accordance with the applicable provisions of this Agreement. Any Letter of Credit delivered to Lender in connection with the Loan shall, in addition to any other requirements set forth herein, be subject to the terms and conditions set forth in Section 6.13 hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any direct or indirect interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Liquor License**" shall mean, individually and/or collectively, as the context may require, any and all licenses and permits issued to Borrower, Manager or any Affiliate thereof with respect to the Property, now or hereafter in effect, for the retail sale and consumption of liquor, wine, beer and other alcoholic beverages at the Property, together with all renewals, replacements, amendments, supplements and extensions thereto and thereof, including, without limitation, that certain License issued to Borrower by the State of Michigan Liquor Control Commission, dated to be effective as of May 1, 2019, License #000401420.

"**Liquor License Agreement**" shall mean that certain Agreement Regarding Liquor Licenses, dated the date hereof, by and among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Clearing Account Agreement, the Cash Management Agreement, the Liquor License Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Losses**" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"**Major Lease**" shall mean any Lease. Notwithstanding anything contained herein to the contrary, the usage of hotel units or banquet, meeting or food and beverage space substantially in accordance with the current ordinary course of operations of the Property shall not constitute a "Major Lease".

"**Management Agreement**" shall mean (i) that certain Hotel Management Agreement, dated February 14, 2019, between Borrower and Manager, pursuant to which the Manager is to

-18-

provide management and other services with respect to the Property, or, if the context requires, (ii) the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, Guarantor or the Property, (ii) the ability of Borrower or Guarantor to perform its obligations under any Loan Document to which it is a party, (iii) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document or (iv) the value, use or operation of the Property or the cash flows from the Property.

"**Material Agreements**" shall mean (i) each management, franchise, brokerage or leasing agreement (other than the Management Agreement and the Franchise Agreement), and (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall include, without limitation, any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"**Maturity Date**" shall mean the Stated Maturity Date, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall have the meaning set forth in <u>Section 8.4</u> hereof.

"**Mezzanine Loan**" shall have the meaning set forth in <u>Section 8.4</u> hereof.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000.00).

"**Monthly Insurance Deposit**" shall have the meaning set forth in <u>Section 6.4.1</u> hereof.

"**Monthly Tax Deposit**" shall have the meaning set forth in <u>Section 6.3.1</u> hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Cash Flow**" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"**Net Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4(b)(vi) hereof.

"**Note**" shall mean that certain promissory note of even date herewith in the original principal amount of the Loan, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged in connection with, or in anticipation of, a Securitization.

"**O&M Program**" shall have the meaning set forth in Section 4.1.13 hereof.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Agreements**" shall mean, collectively, any easements (including any reciprocal easement agreement), covenants, restrictions or agreements, whether of public record or otherwise, relating to the construction, operation, maintenance, alteration or use of the Property. Notwithstanding the foregoing, the Franchise Agreement shall not constitute an Operating Agreement hereunder.

"**Operating Expenses**" shall mean, for any period, the sum of all costs and expenses of operating, maintaining, directing, managing and supervising the Property (excluding (i) depreciation and amortization, (ii) any Debt Service, (iii) any Capital Expenditures, or (iv) the costs of any other things specified to be done or provided at Borrower's or Manager's sole cost and expense), incurred by Borrower or Manager pursuant to the Management Agreement, or as otherwise specifically provided therein, which are properly attributable to such period under Borrower's system of accounting, including, without limitation: (a) the cost of all food and beverages sold or consumed and of all necessary chinaware, glassware, linens, flatware, uniforms, utensils and other items of a similar nature, including such items bearing the name or identifying characteristics of the hotel as Borrower and/or Manager shall reasonably consider appropriate (collectively, the "**Operating Equipment**") and paper supplies, cleaning materials and similar consumable items (collectively, the "**Operating Supplies**") placed in use (other than reserve stocks thereof in storerooms). Operating Equipment and Operating Supplies shall be considered to have been placed in use when they are transferred from the storerooms of the Property to the

-20-

appropriate operating departments; (b) salaries and wages of personnel of the Property, including costs of payroll taxes and employee benefits (which benefits may include, without limitation, a pension plan, medical insurance, life insurance, travel accident insurance and an executive bonus program) and the costs of moving (1) employees of the Property whose primary duties consist of the management of the Property or of a recognized department or division thereof; or (2) personnel (A) who customarily and regularly direct the work of five (5) or more other employees of the Property, (B) who have authority with reference to the hiring, firing and advancement of other employees of the Property, (C) who customarily and regularly exercise discretionary powers, (D) who devote at least ninety five percent (95%) of their work time to activities which are directly and closely related to the performance of the work described in clauses (A) through (C) of clause (2) of this sentence, and (E) who are not compensated on an hourly basis (the "**Executive Hotel Personnel**"), their families and their belongings to the area in which the Property is located at the commencement of their employment at the Property and all other expenses not otherwise specifically referred to in this definition which are referred to as "Administrative and General Expenses" in the Uniform System of Accounts. If the Executive Hotel Personnel are on the payroll of Guarantor or any Affiliate of Guarantor, the cost of their salaries, payroll taxes and employee benefits (which benefits, in the case of employees who are not United States citizens or in the case of employees of hotels located outside the continental United States may include, without limitation, in addition to the foregoing benefits, reasonable home leave transportation expenses approved by Lender) shall be billed by said Affiliate to and be reimbursed by Borrower and/or Manager monthly, and such reimbursement shall be an Operating Expense. Except as otherwise expressly provided under the Management Agreement with respect to employees regularly employed at the Property, the salaries or wages of other employees or executives of Manager, Guarantor or any of their respective Affiliates shall in no event be Operating Expenses, but they shall be entitled to free room and board and the free use of all facilities at such times as they visit the Property exclusively in connection with the management of the Property. Notwithstanding the foregoing, if it becomes necessary for an employee or executive of Guarantor or an employee or executive of any Affiliate of Guarantor to temporarily perform services at the Property of a nature normally performed by personnel of the Property, his or her salary (including payroll taxes and employee benefits) as well as his or her traveling expenses will be Operating Expenses and he or she will be entitled to free room, board and use of the facilities as aforesaid, while performing such services; (c) the cost of all other goods and services obtained by Borrower or Manager in connection with its operation of the Property, including, without limitation, heat and utilities, office supplies and all services performed by third parties, including leasing expenses in connection with telephone and data processing equipment, and all existing and any future installations necessary for the operation of the Improvements for hotel purposes (including, without limitation, heating, lighting, sanitary equipment, air conditioning, laundry, refrigerating, built-in kitchen equipment, telephone equipment, communications systems, computer equipment and elevators), Operating Equipment and existing and any future furniture, furnishings, wall coverings, fixtures and hotel equipment necessary for the operation of the Property for hotel purposes which shall include all equipment required for the operation of kitchens, bars, laundries (if any), and dry cleaning facilities (if any), office equipment, cleaning and engineering equipment and vehicles; (d) the cost of repairs to and maintenance of the Property other than of a capital nature; (e) Insurance Premiums for general liability insurance, workers' compensation insurance or insurance required by similar employee benefits acts and such business or rental interruption or other loss of income insurance as may be provided for protection against claims, liabilities and losses arising from the operation

-21-

of the Property (as distinguished from any property damage insurance on the Property or its contents) and losses incurred on any self-insured risks of the foregoing types, provided that (1) Lender has specifically approved in advance such self-insurance or (2) insurance is unavailable to cover such risks. Premiums on policies will be pro rated over the period of insurance and premiums under blanket policies will be allocated among properties covered; (f) all Taxes and Other Charges (other than federal, state or local income taxes and franchise taxes or the equivalent) payable by or assessed against Borrower or Manager with respect to the operation of the Property; (g) legal fees and fees of any firm of independent certified public accounts designated from time to time by Borrower (the "**Independent CPA**") for services directly related to the operation of the Property; (h) the costs and expenses of technical consultants and specialized operational experts for specialized services in connection with non-recurring work on operational, legal, functional, decorating, design or construction problems and activities, including the reasonable fees of Guarantor, any Affiliate of Guarantor or any subsidiary or division of Guarantor or any Affiliate of Guarantor in connection therewith, provided that such employment of Guarantor, any Affiliate of Guarantor or of any such subsidiary or division of Guarantor or any Affiliate of Guarantor is approved in advance by Lender; provided, however, that if such costs and expenses have not been included in a budget approved by Lender, then, if such costs exceed $5,000 in any one instance, the same shall be subject to approval by Lender; (i) all expenses for advertising the Property and all expenses of sales promotion and public relations activities; (j) all out-of-pocket expenses and disbursements determined by the Independent CPA to have been reasonably, properly and specifically incurred by Borrower, Manager, Guarantor or any of their respective Affiliates pursuant to, in the course of and directly related to, the management and operation of the Property under the Management Agreement. Without limiting the generality of the foregoing, such charges may include all reasonable travel, telephone, telegram, radiogram, cablegram, air express and other incidental expenses, but excluding costs relating to the offices maintained by Borrower, Manager, Guarantor, or any of their respective Affiliates other than the offices maintained at the Property for the management of the Property and excluding transportation costs of Borrower or Manager related to meetings between Borrower and Manager with respect to administration of the Management Agreement, as applicable, or of the Property involving travel away from such party's principal offices; (k) the cost of any reservations system, any accounting services or other group benefits, programs or services from time to time made available to properties in the Borrower's system; (l) the cost associated with any Leases; (m) any management fees, basic and incentive fees or other fees and reimbursables paid or payable to Manager under the Management Agreement; (n) any franchise fees or other fees and reimbursables paid or payable to Franchisor under the Franchise Agreement; and (o) all costs and expenses of owning, maintaining, conducting, directing, managing and supervising the operation of the Property to the extent such costs and expenses are not included above.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the

-22-

use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Patriot Act**" shall mean, collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56), as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**Payment Date**" shall mean the sixth (6th) day of each calendar month prior to the Maturity Date commencing on (i) the sixth (6th) day of the next succeeding calendar month after the date hereof if the Closing Date is on or prior to the eleventh (11th) day of a calendar month; or (ii) the sixth (6th) day of the second succeeding calendar month after the date hereof if the Closing Date is after the eleventh (11th) day of a calendar month.

"**Permitted Encumbrances**" shall have the meaning set forth in Section 3.1.5 hereof.

"**Permitted Equipment Leases**" shall mean any future equipment leases or other similar instruments entered into with respect to the Personal Property (as defined in the Security Instrument); provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property, and (iii) do not, in the aggregate, exceed one percent (1%) of the original principal amount of the Loan at any one time.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Transfer**" shall mean any of the following, subject in all cases to the restrictions set forth in Section 4.1.14 hereof: (i) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question to the Person or Persons lawfully entitled thereto, (ii) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person to the Person or Persons lawfully entitled thereto, and (iii) any Lease of space in the Improvements to Tenants in accordance with the terms and provisions of Section 4.1.6 hereof.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**PIP**" shall mean each of the following: (i) the Scheduled PIP, and (ii) any Future PIP.

-23-

"**PIP Budget**" shall mean each of the following: (i) the Scheduled PIP Budget, and (ii) any Future PIP Budget.

"**PIP Work**" shall mean any and all repairs, improvements, upgrades, remodeling, redecorating, renovations, refurbishing, replacements and/or other work required to be performed under any applicable PIP.

"**Policy**" or "**Policies**" shall have the meaning set forth in Section 5.1(b) hereof.

"**Prior Loan**" shall have the meaning set forth in Section 3.1.22 hereof.

"**Prior Mortgage Loan**" shall mean that certain loan in the original principal amount of $15,641,250.00 made to Borrower by M360 Community Development Fund, LLC, a Delaware limited liability company, and secured by the Property.

"**Prohibited Person**" shall means any Person subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the Patriot Act, the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such legislation, including those related to Specially Designated Nationals and Specially Designated Global Terrorists or listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders.

"**Property**" shall mean each parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to the Property and Improvements, as more particularly described in Article 1 of the Security Instrument and referred to therein as the "Property".

"**Provided Information**" shall have the meaning set forth in Section 8.2 hereof.

"**Qualified Manager**" shall mean, in the reasonable judgment of Lender, a reputable and experienced manager (which may be an Affiliate of Borrower) which possesses experience in managing properties similar in location, size, class, use, operation and value as the Property.

"**Rating Agencies**" shall mean any NRSRO, including those designated by Lender to assign a rating to the Securities.

"**Rating Agency Confirmation**" shall mean written confirmation from each Rating Agency designated by Lender to assign a rating to any Securities that any particular act or omission shall not result in downgrade, withdrawal or qualification of the then current ratings assigned to any ratings of the Securities or the proposed rating of any Securities. In the event that, at any given time, no Rating Agency has elected to consider whether to grant or withhold such an affirmation, then the term "Rating Agency Confirmation" shall be deemed instead to require the written approval of Lender in its sole and absolute discretion.

0139458.0721479   4827-9003-2281v9

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rents**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"**Replacement Franchise Agreement**" shall mean, collectively, (a)(i) a franchise, trademark and license agreement with a Qualified Franchisor substantially in the same form and substance as the Franchise Agreement, or (ii) a franchise, trademark and license agreement with a Qualified Franchisor, which franchise, trademark and license agreement shall be in form and substance reasonably acceptable to Lender, and (b) an assignment of franchise agreement and subordination of franchise fees substantially in the form then used by Lender (or in such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Franchisor.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, and (b) an assignment of management agreement substantially in the form of the Assignment of Management Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Note**" shall have the meaning set forth in Section 8.4 hereof.

"**Required Number of Independent Directors**" shall mean one.

"**Required Repair Account**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Required Repair Funds**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Required Repairs**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"**Restricted Party**" shall mean, collectively, (i) Borrower, any SPC Party, any Affiliated Manager and Guarantor and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of Borrower, any SPC Party, any Affiliated Manager, Guarantor or any non-member manager.

"**RIALTO**" shall have the meaning set forth in Section 8.2 hereof.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.5.1(b) hereof.

-25-

"**Scheduled PIP**" shall mean that certain Property Improvement Plan, implemented pursuant to the Franchise Agreement in effect as of the date hereof and attached hereto as Schedule VII, together with all subsequent amendments, revisions, supplements and other modifications thereto.

"**Scheduled PIP Budget**" shall mean the budget of all Scheduled PIP Expenditures submitted to and approved by Lender in connection with the closing of the Loan.

"**Scheduled PIP Expenditures**" shall mean the expenditures set forth in the Scheduled PIP Budget.

"**Scheduled PIP Reserve Account**" shall have the meaning set forth in Section 6.10.1 hereof.

"**Scheduled PIP Reserve Funds**" shall have the meaning set forth in Section 6.10.1 hereof.

"**Scheduled PIP Work**" shall mean all PIP Work required to be performed under the Scheduled PIP, as more particularly set forth on Schedule VII attached hereto.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Securities**" shall have the meaning set forth in Section 8.1 hereof.

"**Securities Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization**" shall have the meaning set forth in Section 8.1 hereof.

"**Securitization Indemnification Liabilities**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 8.2 hereof.

"**Security Instrument**" shall mean that certain first priority mortgage, deed of trust or deed to secure debt, as applicable, assignment of leases and rents, fixture filing and security agreement, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 8.3 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 8.3 hereof.

"**Single Purpose Entity**" shall have the meaning set forth in Schedule I hereof.

"**SPC Party**" shall have the meaning set forth on Schedule I hereof.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.1(c) hereof.

"**Survey**" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Account**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Tax Funds**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Tenant Instruction Notice**" shall have the meaning set forth in Section 6.1.2(a).

"**Title Insurance Policy**" shall mean, with respect to the Property, an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 4.1.12 hereof.

"**Transferee**" shall have the meaning set forth in Section 4.1.12(d) hereof.

"**Transferee's Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, partners, members or non-member managers that, directly or indirectly, (i) own twenty- percent (20%) or more of legal, beneficial and economic interests in such Transferee or (ii) are in control of such Transferee.

"**Treasury Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Free Window Date.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State or, if the context requires, in the state of Borrower's formation, if different.

"**Uniform System of Accounts**" shall mean, as of any time of determination, the then most recent edition of the Uniform System of Accounts for the Lodging Industry, as adopted by the American Hotel and Lodging Association, together with any amendments, revisions, supplements and updates thereto.

-27-

"**Unsecured Loan**" shall have the meaning set forth in Section 3.1.22 hereof.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Treasury Regulations Section 1.860G-2(a)(8)(ii).

"**Yield Maintenance Default Premium**" shall mean an amount equal to the greater of: (i) three percent (3%) of the principal amount of the Loan being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being repaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being repaid.

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being prepaid.

Section 1.2     Principles of Construction. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.     GENERAL TERMS

Section 2.1     Loan. Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date. Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed. The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

Section 2.2     Interest; Payments; Late Payment Charge.

2.2.1     Interest. Interest on the Outstanding Principal Balance shall accrue from and including the Closing Date to and including the last day of the Accrual Period in which the Maturity Date occurs at the Applicable Interest Rate. Upon the occurrence and during the continuance of an Event of Default, interest on the Outstanding Principal Balance and, to the extent permitted under applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue at the Default Rate. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon

-28-

which the Debt is paid in full. Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default. Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance. Borrower hereby acknowledges that interest is to be calculated by Lender on the basis of a three hundred sixty (360) day year and is fully aware that such calculations may result in an accrual and/or payment of interest in amounts greater than corresponding interest calculations based on a three hundred sixty-five (365) day year.

2.2.2   <u>Payments Before Maturity Date</u>. If the Closing Date is not the eleventh (11th) day of a month, Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Accrual Period. The Monthly Debt Service Payment Amount shall be paid by Borrower to Lender on each Payment Date. Each Monthly Debt Service Payment Amount shall be applied first to the payment of interest that has accrued or is scheduled to accrue during the Accrual Period in which the related Payment Date occurs, and the balance, if any, shall be applied to the reduction of the Outstanding Principal Balance. Lender shall have the right to change the Payment Date to any other day of a calendar month selected by Lender, in its sole and absolute discretion (including in connection with a Securitization) upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change; provided that if Lender shall have elected to change the Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Accrual Period accordingly.

2.2.3   <u>Payment on Maturity Date</u>. Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all interest which has accrued and is scheduled to accrue through and including the last day of the Accrual Period in which the Maturity Date occurs and all other amounts payable to Lender hereunder and under the Note, the Security Instrument and the other Loan Documents. In the event Lender changes the Payment Date in accordance with this Agreement, the Maturity Date shall also be deemed to have been changed such that the Maturity Date and the Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

2.2.4   <u>Late Payment Charge</u>. If any principal, interest or any other sums due under the Loan Documents (other than the Outstanding Principal Balance due and payable on the Maturity Date) is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted under applicable Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable Legal Requirements. Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

2.2.5   <u>Usury Savings</u>.  This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.3     <u>Prepayments</u>.

2.3.1   <u>Voluntary Prepayments</u>.  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.  From and after the Free Window Date, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Debt in whole (but not in part) without payment of the Yield Maintenance Premium, provided that Borrower pays to Lender (i) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents.  If a notice of prepayment is given by Borrower to Lender pursuant to this <u>Section 2.3.1</u>, the amount designated for prepayment and all other sums required under this <u>Section 2.3</u> shall be due and payable on the proposed prepayment date.

2.3.2   <u>Mandatory Prepayments</u>.  On each date on which Lender actually receives any Net Proceeds, if Lender is not obligated to and elects not to make such Net Proceeds available to Borrower for the restoration of the Property, Borrower shall prepay the Outstanding Principal Balance in an amount equal to one hundred percent (100%) of such Net Proceeds.  No Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this <u>Section 2.3.2</u>.

2.3.3   <u>Prepayments After Default</u>.  If, following an Event of Default, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in <u>Section 2.3.1</u> and Borrower shall pay, in addition to the Debt, (i) an amount equal to the Yield Maintenance Default Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period

related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents.

2.3.4   Prepayment Prior to Permitted Defeasance Date. If the Permitted Release Date has occurred but the Permitted Defeasance Date has not occurred, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Debt in whole (but not in part), provided that Borrower pays to Lender (i) the Yield Maintenance Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents. Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration. If a notice of prepayment is given by Borrower to Lender pursuant to this Section 2.3.4, the amount designated for prepayment and all other sums required under this Section 2.3 shall be due and payable on the proposed prepayment date. Lender shall not be obligated to accept any prepayment of the Debt unless it is accompanied by the prepayment consideration due in connection therewith.

Section 2.4   Making of Payments. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement, the Note and the other Loan Documents shall be made to Lender not later than 2:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date. All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Section 2.5   Defeasance.

2.5.1   Voluntary Defeasance. (a) Provided no Event of Default shall then exist, Borrower shall have the right at any time after the Permitted Defeasance Date and prior to the Free Window Date to voluntarily defease the entire Loan by and upon satisfaction of the following conditions (such event being a "**Defeasance Event**"): (i) Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying the date (the "**Defeasance Date**") on which the Defeasance Event is to occur; (ii) Borrower shall pay to Lender (1) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the Defeasance Date (or, if the Defeasance Date occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date) and (2) all other sums then due and payable under the Note, this Agreement, the Security Instrument and the other Loan Documents; (iii) Borrower shall have delivered, or caused to be delivered, to Lender the Defeasance Deposit; (iv) [intentionally omitted]; (v) Borrower shall execute and deliver a security agreement, in form and substance reasonably satisfactory to Lender, creating a first priority lien on the Defeasance Collateral purchased with

-31-

the Defeasance Deposit in accordance with the provisions of this Section 2.5 (the "**Defeasance Security Agreement**"); (vi) Borrower shall deliver an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions stating, among other things, that Borrower has legally and validly transferred and assigned the Defeasance Collateral and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest in the Defeasance Collateral delivered by Borrower and that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance Event; (vii) Borrower shall deliver a Rating Agency Confirmation, and, if required by the applicable Rating Agencies, Borrower shall also deliver or cause to be delivered an Insolvency Opinion with respect to the Successor Borrower in form and substance reasonably satisfactory to Lender and the applicable Rating Agencies]; (viii) Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.5.1(a) have been satisfied; (ix) Borrower shall deliver a certificate of Borrower's independent certified public accountant certifying that the U.S. Obligations purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the Scheduled Defeasance Payments; (x) Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request; (xi) Borrower shall have paid to Lender any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Section 2.5; and (xii) Borrower shall pay all out of pocket costs and expenses of Lender incurred in connection with the Defeasance Event, including any costs and expenses associated with a release of the Lien of the Security Instrument as provided in Section 2.5.2 hereof, as well as reasonable attorneys' fees and expenses, and Rating Agency fees, costs and expenses, if any.

(b) In connection with a Defeasance Event, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations (the "**Defeasance Collateral**") which provide payments on or prior to, but as close as possible to, all successive scheduled payment dates after the Defeasance Date upon which interest and principal payments are required under the Note (including the Stated Maturity Date, as accelerated pursuant to the succeeding sentence) and in amounts equal to the scheduled payments due on such dates under this Agreement and the Note (including without limitation scheduled payments of principal and interest) (the "**Scheduled Defeasance Payments**"). Simultaneously with the delivery of the Defeasance Collateral and the satisfaction of all other conditions to the defeasance of the Loan set forth herein, the Stated Maturity Date shall be accelerated to the Free Window Date. Each of the U.S. Obligations that are part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent institutional lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book entry transfers and pledges through the book entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Collateral a first priority security interest therein in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests. Borrower, pursuant to the Defeasance Security Agreement or other appropriate document, shall authorize and direct that the payments received from the Defeasance Collateral may be made directly to the Cash Management Account (unless otherwise directed by Lender) and applied to satisfy the obligations of Borrower under the Note. Any portion of the Defeasance Deposit in excess of the amount

-32-

necessary to purchase the Defeasance Collateral required by this Section 2.5 and satisfy Borrower's other obligations under this Section 2.5 shall be remitted to Borrower.

(c) In connection with any Defeasance Event, Lender, its designee or, at Lender's election, Borrower, shall establish or designate a successor entity (the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity under criteria established by the Rating Agencies, and Borrower shall transfer and assign all obligations, rights and duties under and to the Note together with the pledged U.S. Obligations to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Defeasance Security Agreement and Borrower shall be relieved of its obligations under such documents and Guarantor shall be released from any liability under the Guaranty for acts and omissions first occurring after said assumption. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Defeasance Security Agreement. Notwithstanding anything in this Agreement to the contrary, no assumption fee shall be payable upon a transfer of the Note in accordance with this Section 2.5.1(c), but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses, incurred in connection therewith.

2.5.2   Release of Property.   Except as set forth in this Section 2.5.2 or in Section 2.6, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of any Lien of the Security Instrument on the Property. If Borrower has elected to defease the entire Loan and the requirements of Section 2.5.1 have been satisfied, the Property shall be released from the Lien of the Security Instrument and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note. In connection with the release of the Security Instrument, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien (and related Loan Documents) for the Property for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located and that would be satisfactory to a prudent lender. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such releases in accordance with the terms of this Agreement.

Section 2.6   Release on Payment in Full.   Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Loan Agreement, release the Lien of the Security Instrument on the Property.

### III.   REPRESENTATIONS AND WARRANTIES

Section 3.1   Borrower Representations.   Borrower represents and warrants as of the Closing Date that:

3.1.1   Organization. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business

-33-

and is in good standing in the State; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Agreement, the Security Instrument and the other Loan Documents. Borrower's principal place of business and chief executive office is and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is NV20131324195. Borrower's federal tax identification number is 46-3015551. The organizational chart attached hereto as <u>Schedule II</u> is true, correct and complete on and as of the date hereof. No Person, other than those Persons shown on <u>Schedule II</u>, has any ownership interest in, or right of control, directly or indirectly, in Borrower.

3.1.2   <u>Authority</u>. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Agreement, the Note, the Security Instruments and the other Loan Documents, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms of the Loan Documents and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed.

3.1.3   <u>Validity of Documents</u>.   (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of the Security Instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, any SPC Party, or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and, as to enforceability, to principles of equity),

-34-

and neither Borrower, any SPC Party nor Guarantor has asserted any right of rescission, set off, counterclaim or defense with respect thereto.

3.1.4   Litigation.   There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, any SPC Party, Guarantor or the Property that could have a Material Adverse Effect.

3.1.5   Warranty of Title.   Borrower has paid for and has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all Liens, encumbrances and charges whatsoever (including, without limitation, liens securing a PACE Loan) except for those exceptions shown in the title insurance policy insuring the lien of the Security Instrument (the "**Permitted Encumbrances**").   The Security Instrument, together with any Uniform Commercial Code financing statements required to be filed in connection therewith (when properly recorded and/or filed, as applicable, in the appropriate records) will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances, and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances.   All personal property necessary to operate the Property in the manner it is currently operated is owned by Borrower and included within the Property encumbered by the Security Instrument.   The Permitted Encumbrances do not and will not, individually or in the aggregate, materially adversely affect or interfere with the value, current use or operation of the Property, the security intended to be provided by the Security Instrument, or the ability of Borrower to pay or perform its obligations when due in accordance with the Note or the other Loan Documents.   Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of the Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

3.1.6   Property Status and Condition.   (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in Section 5.1; (b) Borrower has obtained all necessary certificates, licenses, permits and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business (including, without limitation, the commencement, performance and completion of the Scheduled PIP Work) and all required zoning, building code, land use, environmental and other similar certificates, licenses, permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) the Property and the present and contemplated use and occupancy thereof comply in all material respects with all Legal Requirements, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the Americans With Disabilities Act of 1990, as amended) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property

-35-

has accepted or is equipped to accept such utility service; (f) all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all weather and are physically and legally open for use by the public; (g) the Property is in good repair and free of any material damage, waste or defective condition, and to Borrower's knowledge, free from damage caused by fire, water, wind or other casualty or any previous damage to the Property has been fully restored; (h) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full; (i) all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and comply in all material respects with all Legal Requirements; (j) all Improvements lie within the boundary of the Land; (k) no Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property; (l) the Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property; (m) there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments; (n) the Property is used exclusively for hotel purposes and other appurtenant and related uses; (o) no portion of the Property has been or will be purchased with proceeds of any illegal activity and, to Borrower's knowledge, there are no illegal activities at the Property; and (p) Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Borrower or the Property is bound.

3.1.7 <u>Leases</u>. (a) The rent roll attached hereto as <u>Schedule III</u> is true, correct and complete in all material respects and the Property is not subject to any Leases other than the Leases described in <u>Schedule III</u>; (b) the Leases identified on <u>Schedule III</u> are in full force and effect and there are no defaults thereunder by any party thereto and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder; (c) the copies of the Leases delivered to Lender are true, correct and complete, and there are no oral agreements with respect thereto; (d) no Rent (including security or other deposits) has been paid more than two (2) months in advance of its due date; (e) all work to be performed by the landlord under each Lease has been performed as required and has been accepted by the applicable Tenant; (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant, and (without limitation to the foregoing) all tenant improvement, tenant allowance, leasing commission costs (other than leasing commissions related to unexercised renewal options) and other amounts required to be paid in connection with commencement of the lease term or rent commencement have been paid; (g) all security or other deposits are being held in accordance with the applicable Leases and all applicable Legal Requirements; (h) Borrower has no knowledge of any notice of termination or default with respect to any Lease; (i) Borrower has not assigned or pledged any of the Leases, the rents or any interest therein except to Lender; (j) no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of, or interest in, the Property; (k) no Tenant has any right or option for additional space in the Improvements; (l) to Borrower's knowledge, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby; (m) except as set forth in the Lease, no Tenant has the right to terminate its Lease prior to expiration of the stated term of such Lease; (n) [intentionally

-36-

omitted]; and (o) all existing Leases are subordinate to the Security Instrument either pursuant to their terms or a recorded subordination agreement. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, as more particularly set forth therein. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

3.1.8   Solvency. Borrower is solvent, has received reasonably equivalent value for entering into this Agreement and the other Loan Documents, and, immediately after the Loan is made, will have sufficient working capital, including cash flow from the Property or other assets, not only to adequately maintain the Property, but also to pay all of Borrower's outstanding debts as they come due. No petition under any state or federal bankruptcy or insolvency laws has ever been filed against Borrower, any SPC Party, Guarantor or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor. Neither Borrower, any SPC Party, Guarantor, nor any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's or such Person's assets or properties.

3.1.9   Financial Information. All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property or otherwise in connection with the Loan (i) are true, correct and complete in all material respects, and (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect. Borrower has no known contingent liabilities. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

3.1.10   Not a Foreign Person. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

3.1.11   Filing and Recording Taxes. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

3.1.12   Franchise Agreement. (a) The Franchise Agreement is in full force and effect, all franchise fees, reservation fees, royalties and other sums due thereunder have, to Borrower's knowledge, been paid in full to date, and neither Borrower nor Franchisor is in default thereunder.

-37-

The Franchise Agreement (together with (i) that certain comfort letter delivered by Franchisor to Lender in connection with the closing of the Loan, (ii) the Scheduled PIP and (iii) all manuals, guides and other ancillary brand standards and similar operating requirements and materials referenced therein) sets forth the entire agreement between Franchisor and Borrower concerning the Property, and there are no other agreements, written or oral, to which Franchisor and Borrower are parties concerning the Property or any portion thereof.

(b)     Borrower has delivered to Lender a true, correct and complete copy of the Scheduled PIP, the Scheduled PIP Work and the Scheduled PIP Budget. The Scheduled PIP Work set forth on <u>Schedule VII</u> hereto is true, correct and complete and sets forth all of the PIP Work required to be performed by Borrower under the Scheduled PIP.

(c)     With the exception of the Scheduled PIP and the Scheduled PIP Work and without limiting the terms of Section 3.1.6 hereof, (i) there is no current PIP, PIP Work or similar requirement currently required under the Franchise Agreement with respect to the Property or any portion thereof, (ii) Borrower has performed all PIP Work, capital and other property improvements currently required to be performed by the franchisee under the Franchise Agreement and all of the foregoing has been accepted by Franchisor, (iii) Borrower has not received notice from Franchisor or any of its subsidiaries or Affiliates of any renovations, upgrades, replacements, alterations, capital or other property improvements that are or will be required to be performed in the future by the franchisee under the Franchise Agreement, and (iv) Borrower has no knowledge of any renovations, upgrades, replacements, alterations, capital or other property improvements which Franchisor is contemplating or considering to be performed by the franchisee under the Franchise Agreement in the future.

(d)     The Property is not subject to any equipment leases or similar financing arrangements with respect to any FF&E or other personalty used in connection with the operation thereof other than the Permitted Equipment Leases identified in clause (A) of the definition thereof.

(e)     There are no collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound.

3.1.13  <u>Management Agreement</u>.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

3.1.14  <u>Material Agreements and Operating Agreement</u>.  Each Material Agreement and Operating Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Material Agreement or Operating Agreement, is in default thereunder, and to Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default under any Material Agreement or Operating Agreement. Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

3.1.15  <u>ERISA Compliance</u>.  As of the date hereof and throughout the term of the Loan, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA,

-38-

which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans. Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

3.1.16  <u>Business Purposes</u>.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

3.1.17  <u>Taxes</u>.  Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

3.1.18  <u>OFAC</u>.  Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates or, any other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates and, to Borrower's knowledge, each other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, are in compliance in all material respects with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury and the Patriot Act.

3.1.19  [Intentionally Omitted].

3.1.20  <u>No Change in Facts or Circumstances; Disclosure</u>.  No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect. All information submitted by or on behalf of Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan and all statements of fact made by or on behalf of Borrower in this Agreement or in any other Loan Document, are true, correct and complete in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

3.1.21  <u>Liquor Licenses</u>.  Without limiting the terms of <u>Section 3.1.6</u> hereof, Borrower has delivered to Lender true, correct and complete copies of the Liquor Licenses in effect as of the date hereof. Borrower is the duly authorized owner and holder of the Liquor Licenses. Such Liquor Licenses (x) provide for the retail sale and consumption of liquor, beer, wine and other

-39-

alcoholic beverages at the Property in compliance with all applicable Legal Requirements, and (y) are valid, subsisting and in full force and effect and not in danger of revocation, suspension, forfeiture or modification.

3.1.22 <u>Prior Loan.</u> Without limiting <u>Section 8.5</u> hereof, Borrower has not incurred any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Prior Mortgage Loan, (B) liabilities in the ordinary course of its business that are related to the ownership and operation of the Property and, in each case, permitted under the Prior Loan Documents, (C) a loan, secured by FF&E and a pledge agreement to Access Point Financial (the "**FF&E Loan**"), and (D) a loan, unsecured from David Bronson (the "**Unsecured Loan**"; the Prior Mortgage Loan, the FF&E Loan and the Unsecured Loan are, collectively, the "Prior Loan"), and no other Indebtedness has been secured (senior, subordinate or pari passu) by the Property. The Prior Loan has been repaid in full with the proceeds of the Loan and Borrower does not have any remaining liabilities or obligations in connection with the Prior Loan (other than environmental and other limited and customary indemnity obligations which, in each case and by their express terms, survive the repayment of the Prior Loan and which relate solely to the Property).

3.1.23 <u>Discounted Payoff.</u> In the event that proceeds from the Loan are being used directly or indirectly to pay off or refinance any mortgage, mezzanine or other similar debt (in whole or in part) that is in default or is the subject of a discounted payoff, Borrower hereby represents and warrants to Lender that each of Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) has complied with all the terms and conditions of any documentation or agreement relating to such default or discounted payoff and has provided to the holder of such debt all information and documentation relating to the Property, Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) (i) required to be so provided or (ii) necessary for the holder of such debt to make an informed decision as to any discounted payoff amount.

Section 3.2    <u>Survival of Representations</u>. Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 3.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.

## IV.    <u>BORROWER COVENANTS</u>

Section 4.1    <u>Covenants</u>. Borrower hereby covenants and agrees with Lender that:

4.1.1 <u>Existence; Compliance with Legal Requirements</u>. (i) Borrower will continuously maintain its existence and its rights to do business in the State together with its franchises and trade names, and will keep in full force and effect all material licenses, permits and applicable governmental authorizations necessary for the continued use and operation of the Property. Without limitation to the foregoing, Borrower shall (i) promptly comply and cause Guarantor and the Property to comply with all existing and future Legal Requirements, (ii) from time to time, upon Lender's request, provide Lender with evidence satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of

-40-

any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements, and (iv) take appropriate measures to prevent and not engage in or knowingly permit any illegal activities at the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

4.1.2   Taxes and Other Charges; Liens.   (a) Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable (provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 6.3). Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 6.3). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may apply such security

-41-

or part thereof held by Lender at any time when, in the judgment of Lender, the validity or applicability of such Tax or Other Charges is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien the Security Instrument being primed by any related Lien.

(b)     Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for (i) Permitted Encumbrances; and (ii) Liens for Taxes or Other Charges, in each case not yet due and payable; and (iii) the Liens created by the Loan Documents. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Liens, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Liens, together with all costs, interest and penalties which may be payable in connection therewith; (v) to insure the payment of such Liens, Borrower shall deliver to Lender either (A) cash, or other security as may be approved by Lender, in an amount equal to one hundred twenty-five percent (125%) of the contested amount or (B) a payment and performance bond in an amount equal to one hundred percent (100%) of the contested amount from a surety acceptable to Lender in its reasonable discretion, (vi) failure to pay such Liens will not subject Lender to any civil or criminal liability, (vii) such contest shall not affect the ownership, use or occupancy of the Property, and (viii) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (vii) of this Section 4.1.2(b). Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

4.1.3   Maintenance of Property. Borrower shall cause the Property to be maintained in a good and safe condition and repair. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of the Security Instrument. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property or any portion

-42-

thereof. The Property shall be used only for hotel use and other appurtenant and related uses, and for no other use without the prior written consent of Lender.

4.1.4 <u>Financial Reporting</u>. (a) Borrower shall keep and maintain, or shall cause to be kept and maintained, in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. All financial statements delivered to Lender pursuant to this <u>Section 4.1.4</u> shall be prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) and consistently applied.

(b) Prior to a Securitization, at Lender's written request, Borrower shall furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject month, including an average daily rate, and any franchise inspection reports received by Borrower during such month; (ii) monthly and year-to-date operating statements prepared for such month, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such month, all in form satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such month for the immediately preceding twelve (12) month period. On or before thirty (30) days after the end of each calendar month, Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(c) Borrower shall furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject quarter, including an average daily rate and franchise inspection reports; (ii) (A) a balance sheet for Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such quarter, all in form satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter for such quarter and for the last four quarters.

(d) Borrower shall furnish, or cause to be furnished, to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements prepared and reviewed by an independent certified public accountant acceptable to Lender in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the

-43-

Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower.  Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income and Net Cash Flow.  Borrower's annual financial statements shall be accompanied by (i) an Officer's Certificate stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender), and (ii) occupancy statistics for the Property.

(e)      Each such financial statement shall be in scope and detail reasonably satisfactory to Lender and certified by the chief financial officer or representative of Borrower.  Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, and (iii) if requested by Lender, in electronic form reasonably acceptable to Lender.  Lender shall have the right from time to time at all times during normal business hours to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(f)      For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender an annual operating budget presented on a monthly basis consistent with the quarterly and annual operating statements described above for the Property, including cash flow projections for the upcoming year, and all proposed Capital Expenditures at least fifteen (15) days prior to the start of each Fiscal Year.

(g)      Borrower shall furnish to Lender, within five (5) Business Days after written request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(h)      If Borrower fails to provide to Lender the financial statements and other information specified in this Section 4.1.4 within the respective time period specified and such failure continues for ten (10) days following delivery by Lender to Borrower of written notice therefor, then, in addition to any other rights and remedies Lender may have herein or under applicable law, Borrower shall pay to Lender a fee in the amount of $2,500.00 immediately upon the occurrence of such failure and a fee in the amount of $5,000.00 upon the expiration of each 30-day period thereafter until compliance is achieved, which amounts shall constitute a portion of the Obligations and, if unpaid, shall accrue interest at the Default Rate.

4.1.5   Litigation.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, Borrower or any Guarantor which, if adversely determined, could have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other

-44-

Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

4.1.6   Leasing Matters.   (a)   All Leases and all renewals of Leases executed after the date hereof shall (i) provide for economic terms, including rental rates, comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) have a term of not less than three (3) years (unless Lender approves in writing a shorter term), (iv) have a term of not more than fifteen (15) years, including all extensions and renewals (unless Lender approves in writing a longer term), (v) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale, (vi) be arms-length transactions with bona fide, independent third party tenants, (vii) be written substantially in accordance with a standard form of Lease which shall have been approved in writing by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant), (viii) not be with any Affiliate of Borrower, Guarantor or Manager, and (ix) not contain any option to purchase, any right of first option to purchase, or any right of first refusal to purchase; provided that, in connection with renewals of Leases existing on the date hereof, any applicable term that would otherwise breach the requirements set forth in this Section 4.1.6(a) shall be permitted to the extent necessary to implement a renewal term expressly contained in the applicable Lease and with respect to which Borrower has no discretion.

(b)   Borrower (i) shall perform the obligations which Borrower is required to perform under the Leases; (ii) shall enforce in a commercially reasonable manner the obligations to be performed by the Tenants thereunder (short of termination thereof); (iii) shall promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant; (iv) shall not collect any Rents for more than one (1) month in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to two (2) months' rent; (v) shall not enter into any ground Lease or master Lease of any part of the Property; (vi) shall not further assign or encumber any Lease or the Rents (except as contemplated by the Loan Documents); (vii) shall not, except with Lender's prior consent, cancel or accept surrender or termination of any Lease; and (viii) shall not, except with Lender's prior consent, modify or amend any Lease (except, solely with respect to Leases that are not Major Leases, for minor modifications and amendments entered into in the ordinary course of business, consistent with prudent property management practices, not affecting the economic terms of the applicable Lease, and which result in a Lease in conformance with the provisions of Section 4.1.6(a) above). Any action in violation of clause (v), (vi), (vii) or (viii) of this Section 4.1.6(b) shall be void at the election of Lender.

(c)   All Major Leases and all renewals, modifications and amendments thereof (other than renewals, modifications and amendments strictly limited to the implementation of options or rights expressly contained in Major Leases and with respect to which Borrower has no discretion as to the terms thereof) executed after the date hereof shall be subject to Lender's prior approval.

(d)   Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior approval (other than any assignment or sublease expressly permitted under a Major Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Borrower).

-45-

(e)    Upon Borrower's request and at Borrower's sole cost and expense, Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenant under any future Major Lease approved or deemed approved by Lender, with such commercially reasonable changes as may be requested by such Tenant and which are acceptable to Lender.

(f)    Borrower shall pay or reimburse Lender for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with the review of any matter requiring Lender's consent under this Section 4.1.6.

(g)    Within ten (10) days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security or other deposits and copies of all Leases not previously delivered to Lender, certified as being true, correct and complete.

(h)    All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with all applicable Legal Requirements and shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

4.1.7    Alterations.    Lender's prior approval shall be required in connection with any alterations to the Property (a)(i) that could have a Material Adverse Effect, (ii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, or (iii) that could adversely affect any structural component of any Improvements, any utility or HVAC system at the Property or the exterior of any building constituting a part of any Improvements or (b) any alterations to the Property during the continuation of any Event of Default. For the avoidance of doubt, routine maintenance and repairs (which do not constitute PIP Work) not meeting the criteria set forth in clauses (a) or (b) of the immediately preceding sentence shall not be subject to Lender's prior approval. Any alteration to the Property shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements. If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Property shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) cash, (B) letters of credit (in form and from an issuer acceptable to Lender), or (C) U.S. Obligations. Such security shall be in an amount equal to the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases; provided that the applicable Leases shall be in full force and effect), and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations. Upon substantial completion of any alteration to the Property, Borrower shall provide evidence satisfactory to Lender that (1) such alteration was constructed in accordance with all applicable Legal Requirements, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in

-46-

connection with such alteration have been paid in full and have delivered unconditional releases of liens, and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall diligently pursue procuring a permanent license or permit from the applicable Governmental Authority.

4.1.8   <u>Management Agreement</u>.   (a) Borrower shall cause the Property to be operated in accordance with the Management Agreement.  Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement and (iv) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner. If Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed in all material respects. Borrower shall not, without prior consent of Lender (not to be unreasonably withheld or delayed) and, to the extent required under the Franchise Agreement, Franchisor, (1) surrender, terminate, cancel, modify, renew, amend, or extend the Management Agreement; provided that Borrower may, without Lender's consent, replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement provided such replacement is made in compliance with Franchise Agreement, (2) reduce or consent to the reduction of the term of the Management Agreement, (3) increase or consent to the increase of the amount of any fees or other charges under the Management Agreement, or (4) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In connection with the replacement of Manager with a Qualified Manager, Borrower shall execute and cause Qualified Manager to execute an assignment of management agreement and subordination of management fees in the form then used by Lender.  In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with a Qualified Manager in compliance with the Franchise Agreement. Upon the occurrence and during the continuation of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior consent of Lender.

(b)      Without limitation to the foregoing, if (i) an Event of Default has occurred and is continuing, (ii) Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iii) Manager shall become insolvent or a debtor in any Bankruptcy Action, and/or (iv) at any time Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds, Borrower shall, at Lender's request, terminate the

-47-

Management Agreement and replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

4.1.9   <u>Franchise Agreement</u>.   Borrower shall cause the Property to be operated in accordance with the Franchise Agreement, including, without limitation, the terms and provisions therein relating to the engagement and/or replacement of Manager and all staff, employees, contractors and vendors of the foregoing with respect to the Property. Borrower shall ensure that its organizational structure remains at all times in compliance with the Franchise Agreement. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any default under the Franchise Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Franchise Agreement (including, without limitation, any PIP, PIP Work and any revisions, amendments, supplements and other modifications thereto), (iv) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Franchisor under the Franchise Agreement, in a commercially reasonable manner, (v) promptly complete all Scheduled PIP Work in a good and workman-like manner, lien free and in compliance with the Franchise Agreement, the Scheduled PIP, the Scheduled PIP Budget and all applicable Legal Requirements and (vi) promptly complete any Future PIP Work in a good workman-like manner, lien free and in compliance with the Franchise Agreement, the related PIP, the related PIP Budget and all applicable Legal Requirements. If Borrower shall default in the performance or observance of any term, covenant or condition of the Franchise Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Franchise Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Franchise Agreement on the part of Borrower to be performed or observed in all material respects. Borrower shall not, without the prior consent of Lender, (1) surrender, terminate, cancel, modify, renew, amend, or extend the Franchise Agreement or reject the Franchise Agreement in any Bankruptcy Action, (2) reduce or consent to the reduction of the term of the Franchise Agreement, (3) increase or consent to the increase of the amount of any fees or other charges under the Franchise Agreement, (4) consent to, approve or accept any Future PIP, Future PIP Work or Future PIP Budget or any amendments, revisions, supplements or modifications thereto or to the Scheduled PIP, the Scheduled PIP Work, the Scheduled PIP Budget or the Scheduled PIP Expenditures, or (5) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under the Franchise Agreement in any material respect. In the event that the Franchise Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Franchise Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a new franchise agreement in form and substance acceptable to Lender with a franchisor acceptable to Lender. Without limiting the foregoing, any Future PIP, Future PIP Work, Future PIP Expenditures and Future PIP Budget (A) required in connection with any replacement franchise agreement or any renewal, extension or amendment of the Franchise Agreement (or any replacement franchise agreement), or (B) otherwise required by the Franchisor (or any replacement franchisor) shall be subject to the prior written approval of Lender, which

-48-

such approval shall not be unreasonably withheld or delayed.  Upon the occurrence and during the continuation of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Franchise Agreement without the prior consent of Lender.  Borrower shall reimburse Lender for any out of pocket fees and expenses incurred by Lender in connection with the transfer or reissuance of any subordination agreement, comfort letter or similar agreement with any Franchisor in connection with the transfer of the Loan.

4.1.10  [Intentionally Omitted].

4.1.11  Performance of Other Agreements.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any Operating Agreements and Material Agreements.  Without limitation to the foregoing, Borrower shall (a) give prompt notice to Lender of any notice received by Borrower under any of the Material Agreements or Operating Agreements, together with a complete copy of any such notice, (b) enforce, short of termination thereof, the performance and observance of each and every term, covenant and provision of the Material Agreements or Operating Agreements to be performed or observed, if any, (c) not terminate or amend any of the terms or provisions of any Material Agreement or Operating Agreement, without the prior written consent of Lender and (d) not enter into any Material Agreement or Operating Agreement; provided, however, Lender's consent shall not be required with respect to (x) the execution of a Material Agreement on an arm's length basis and on commercially reasonable terms, (y) a termination of any Material Agreement if the other party thereto is in material default and the termination of such agreement would be commercially reasonable or (z) any amendment or waiver of any term or provision of any Material Agreement entered on an arm's length basis and on commercially reasonable terms.  In the event a Material Agreement terminates by its terms, with Lender's consent or pursuant to clause (y), Borrower shall enter into a replacement thereof that is negotiated on arm's length basis and contains commercially reasonable terms (except that no replacement shall be required where the related service or subject matter is no longer required or relevant to the use, operation or enjoyment of the Property).  Borrower shall notify Lender in the event Borrower does not replace the terminated Material Agreement.

4.1.12  Transfers.  (a)  Without the prior consent of Lender, neither Borrower nor any Restricted Party shall do any of the following (each, a "**Transfer**"): sell, transfer, convey, assign, mortgage, pledge, encumber, alienate, grant a Lien on, grant any option with respect to or grant any other interest in the Property, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower or any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record, other than Permitted Transfers.

(b)  A Transfer shall include (i) an installment sales agreement wherein Borrower agrees to sell the Property, any part thereof or any interest therein for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower or any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance

-49-

of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation; (iv) if Borrower or any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer, manager or member, the voluntary or involuntary transfer of any partnership, joint venture, membership or manager interest or any change in the control of such limited or general partnership, joint venture or limited liability company, or if Borrower is a limited liability company, Borrower dividing into two (2) or more separate entities and allocating any of Borrower's assets, liabilities, rights and/or obligations between or among such entities; (v) if Borrower or any Restricted Party is a trust, the change or removal of any trustee of such trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or the creation or issuance of new legal or beneficial interests or conversion of such trust from a revocable to an irrevocable trust; (vi) the transfer, assignment or pledge of any distribution or dividends of a stockholder, partner, venturer, member, manager or other beneficial owner of a Restricted Party; and (vii) if Borrower enters into, or the Property is subjected to, any PACE Loan.

(c)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer (other than a Permitted Transfer) without Lender's prior consent. This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)     No consent to any assumption of the Loan shall occur on or before the earlier to occur of (1) the first (1st) anniversary of the date hereof and (2) the sixtieth (60th) day following the initial Securitization of the Loan. Thereafter, Lender's consent to a Transfer of the Property and the assumption of the Loan (in whole and not in part) shall not be unreasonably withheld after consideration of all relevant factors and provided that the following conditions are satisfied: (i) Lender shall have received a notice from Borrower requesting Lender's consent to such Transfer not less than sixty (60) days prior to the proposed date of such Transfer; (ii) no Event of Default shall have occurred and remain outstanding; (iii) the proposed transferee ("**Transferee**") shall be a Single Purpose Entity (and shall not be a tenant in common structure, a Delaware statutory trust or a crowdfunded entity); (iv) the Organizational Documents of Transferee and any managing member or general partner thereof shall be reasonably satisfactory to Lender; (v) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have been a party to any Bankruptcy Action or taken advantage of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer; (vi) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have defaulted under its obligations with respect to any Indebtedness in a manner which is not reasonably acceptable to Lender; (vii) there shall be no material litigation or regulatory action pending or threatened against any Transferee's Sponsor, Transferee or any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors which is not reasonably acceptable to Lender; (viii) Transferee and Transferee's Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender; (ix) Transferee and Transferee's Sponsors (together with Transferee's proposed property manager) shall be experienced owners and operators of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being

-50-

understood and agreed that Lender reserves the right to approve Transferee without approving its proposed property manager); (x) if the Management Agreement will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Replacement Management Agreement; (xi) if a Franchise Agreement is in effect, such Franchise Agreement will remain in full force and effect after giving effect to such Transfer (unless (1) Lender has consented to the termination of such Franchise Agreement in its sole and absolute discretion and (2) a new franchise agreement has been executed with the franchisor under the terminated Franchise Agreement or a new franchisor, which new franchise agreement and franchisor shall be acceptable to Lender in its sole and absolute discretion); (xii) Transferee shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to Section 8.5 and/or Schedule 1 hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee); (xiii) no Event of Default shall occur as a result of such Transfer; (xiv) Transferee shall have assumed all obligations of Borrower under the Loan Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender; (xv) Borrower shall have delivered, at its sole cost and expense, an endorsement to the Title Insurance Policy, as modified by the assumption agreement, as a valid first lien on the Property and naming Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any Liens other than those contained in the Title Insurance Policy issued on the date hereof and the Permitted Encumbrances; (xvi) one (1) or more Transferee's Sponsors reasonably acceptable to Lender having (x) a direct or indirect equity interest of twenty percent (20%) or more in Transferee, (y) control over Transferee and (z) an aggregate net worth and liquidity reasonably satisfactory to Lender shall (A) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity or (B) have executed a replacement guaranty and a replacement environmental indemnity in form and substance reasonably satisfactory to Lender; (xvii) [intentionally omitted]; (xviii) if required by Lender, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and Transferee; (xix) Borrower shall have paid to Lender an assumption fee equal to one percent (1%) of the Outstanding Principal Balance; and (xx) Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies).

(e)     Notwithstanding anything to the contrary contained in this Section 4.1.12, Lender's consent shall not be required in connection with Transfers of the direct or indirect ownership interests in any Restricted Party (other than any SPC Party) (x) that do not result in a Transfer of more than forty-nine percent (49%), in the aggregate, of the direct or indirect ownership interests in Borrower or (y) to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of an owner of such interest (or a trust for the benefit of any such person(s)) for estate planning purposes; provided that the following conditions are satisfied: (i) no Event of Default shall have occurred and remain outstanding or shall occur solely as a result of such Transfer, (ii) such Transfer shall not (1) cause the transferee, together with its Affiliates, to acquire control of Borrower, (2) result in Borrower no longer being controlled by Key Principal, or (3) except in connection with a Transfer described in clause (y) above, cause the transferee, together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which exceeds forty-nine percent (49%) in the aggregate, (iii) to the extent the transferee owns twenty percent (20%) or more of the direct or indirect interests in Borrower immediately following such Transfer, or, if such Person is not formed, organized or incorporated in, or is not a citizen of, the United

-51-

States of America, ten percent (10%) or more of the direct or indirect interests in Borrower immediately following such Transfer (provided that such Transferee did not own 20% or more of the direct or indirect ownership interests in Borrower as of the Closing Date, or if such Person is not formed, organized or incorporated in, or is not a citizen of, the United States of America, ten percent (10%) or more of the direct or indirect interests in Borrower as of the Closing Date), Borrower shall deliver, at Borrower's sole cost and expense, customary searches (credit, judgment, lien, bankruptcy, etc.) reasonably acceptable to Lender with respect to such transferee and its Affiliates as Lender may reasonably require, (iv) after giving effect to such Transfer, Key Principal shall continue to (i) control, solely and exclusively, Borrower, and (ii) own, directly or indirectly, at least the same percentage of all legal, beneficial and economic interests in Borrower owned as of the date hereof, (v) Borrower shall give Lender notice of such Transfer request, together with copies of all instruments effecting such Transfer and copies of any Organizational Documents that Lender shall require, not less than thirty (30) days prior to the proposed date of such Transfer, (vi) such Transfer shall comply with all applicable terms and conditions of the Franchise Agreement and (vii) the legal and financial structure of Borrower and the single purpose nature and bankruptcy remoteness of Borrower, after such Transfer, shall satisfy Lender's the then current applicable underwriting criteria and requirements.

(f)     Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same.  Any Transfer made in contravention of this Section 4.1.12 shall be null and void and of no force and effect.

(g)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer.  If required by Lender, Borrower shall deposit with Lender an amount equal to Lender's anticipated costs and expenses in evaluating any proposed Transfer.

4.1.13  O&M Program.  Borrower hereby represents and warrants that attached hereto as Schedule V is a true and complete copy of that certain Asbestos Operations and Maintenance Plan, dated January 13, 2020, prepared by GRS Group (the "**O&M Program**"), and Borrower has, as of the date hereof, complied in all respects with the O&M Program.  Borrower hereby covenants and agrees that, during the term of the Loan, including any extension or renewal thereof, Borrower shall comply in all respects with the terms and conditions of the O&M Program.

4.1.14  Patriot Act Compliance.  Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower to comply therewith.  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, any SPC Party or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or

-52-

indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, any SPC Party or Guarantor, as applicable, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, any SPC Party or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law. All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender. All such indebtedness shall be secured by the Security Instrument.

4.1.15 <u>Debt Cancellation</u>. Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.1.16 <u>Name, Identity, Structure, or Principal Place of Business</u>. Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth herein, without, in each case, the consent of Lender. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

4.1.17 <u>Access to the Property</u>. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, subject to the rights of tenants.

4.1.18 <u>Notice of Default</u>. Borrower shall promptly advise Lender of the occurrence of any Event of Default of which Borrower has knowledge.

4.1.19 <u>Further Assurances</u>. Borrower shall, at Borrower's sole cost and expense: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations, as Lender may reasonably require; and (b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender shall reasonably require from time to time.

4.1.20 <u>Liquor License</u>. Borrower shall (or shall cause Manager to) continuously maintain (i) in full force and effect all Liquor Licenses (including any renewals or replacements thereof) to ensure the continued and uninterrupted retail sale of alcoholic beverages at the Property in compliance with all applicable Legal Requirements, and (ii) the uninterrupted operation of all bars, restaurants and lounges at the Property (and the retail sale of liquor, beer, wine and other alcoholic

beverages at the Property) in compliance with all applicable Legal Requirements.  All Liquor Licenses shall permit, at a minimum, the same level of retail sale and consumption of alcoholic beverages as permitted by the Liquor Licenses in effect as of the date hereof, unless otherwise approved in writing by Lender.

4.1.21  Estoppel Statement.  (a) After written request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (ii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)     Borrower shall deliver to Lender, within thirty (30) days after Lender's written request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; provided that (i) Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease, (ii) such estoppel certificate may be in the form required under such Lease, and (iii) Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than two (2) times in any calendar year.

## V.     INSURANCE; CASUALTY; CONDEMNATION

Section 5.1     Insurance.  (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)     comprehensive all risk (otherwise known as special form) insurance (including wind and named storms) on the Improvements and the personal property at the Property (A) in an amount equal to one hundred percent (100%) of the "full replacement cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Fifty Thousand and No/100 Dollars ($50,000) for all such insurance coverage, except for wind/named storms and earthquake which may provide for a deductible of five percent (5%) of the total insurable value of the Property; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, containing "law and ordinance" coverage including coverage for loss of the undamaged portion of the Improvements, demolition and increased costs of construction in an amount acceptable to Lender.  In addition, Borrower shall obtain:  (1) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus such excess amount as Lender shall require; and (2) if the Property is located in seismic zone 3 or 4 and the PML/SEL of the Property exceeds twenty percent (20%), earthquake insurance

-54-

in amounts and in form and substance satisfactory to Lender, provided that the insurance pursuant to clauses (1) and (2) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 5.1(a)(i);

(ii)    broad form commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with an occurrence limit of not less than One Million and No/100 Dollars ($1,000,000) and an aggregate limit of not less than Two Million and No/100 Dollars ($2,000,000); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article 9 of the Security Instrument to the extent the same is available;

(iii)    business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by insurance pursuant to Sections 5.1(a)(i), (iv), (vi), (xi) and (xii) for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch or the expiration of eighteen (18) months, whichever first occurs, and notwithstanding that the Policy may expire prior to the end of such period; (C) in an amount equal to one hundred percent (100%) of the projected gross income (less non-continuing expenses) from the Property for a period of eighteen (18) months; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income (less non-continuing expenses) from the Property for the succeeding twelve (12) month period. All proceeds payable to Lender pursuant to this Section 5.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligation to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella liability insurance covering claims related to construction, repair and alteration at the Property not covered by or under the terms or provisions of the commercial general liability insurance and umbrella liability insurance policies required under this Section 5.1; and (B) the insurance provided for in Section 5.1(a)(i) above written in a so-called builder's risk

-55-

completed value form in amounts and with deductibles, terms and conditions required by Lender (1) on a non-reporting basis, (2) covering all risks required to be insured against pursuant to Sections 5.1(a)(i), (iii), (vi), (xi) and (xii), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)      workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000) for disease aggregate (if applicable);

(vi)      comprehensive boiler and machinery insurance in amounts required by Lender and on terms consistent with the insurance required under Section 5.1(a)(i) above (if applicable);

(vii)      umbrella liability insurance in addition to primary coverage in an amount not less than Fifteen Million and No/100 Dollars ($15,000,000) per occurrence on terms consistent with the insurance required under Section 5.1(a)(ii) and, if applicable, (viii);

(viii)      commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000) (if applicable);

(ix)      liquor liability insurance or other liability insurance required in connection with the sale of alcoholic beverages (if applicable);

(x)      insurance against employee dishonesty in an amount required by Lender (if applicable);

(xi)      with respect to commercial property, general liability, business income, and umbrella liability insurance required under this Section 5.1(a) (including, if applicable, insurance required under Section 5.1(a)(iv) above), insurance for loss resulting from perils and acts of terrorism in amounts and with terms and conditions applicable to commercial property, general liability, business income, and umbrella liability insurance required under this Section 5.1(a). The policy or endorsement providing for such insurance shall be in form and substance satisfactory to Lender and shall satisfy Rating Agency criteria for securitized loans; and

(xii)      upon sixty (60) days' notice, such other insurance and in such amounts as Lender may, from time to time, reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (each individually, a "**Policy**" and collectively, the "**Policies**") and, to the extent not specified above, shall be subject to the approval of Lender as to insurers, amounts, deductibles, loss payees and insureds. Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies (and, upon Lender's request, certified copies of such Policies or such other evidence as shall be

-56-

acceptable to Lender) accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**") shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy shall be subject to Lender's approval, which approval shall be conditioned upon, among other things, evidence satisfactory to Lender that such Policy provides the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1(a).

(d)     All Policies of insurance provided for or contemplated by Section 5.1(a) shall be primary coverage and shall name Borrower as a named insured and, in the case of liability policies, except for the Policy referenced in Section 5.1(a)(v) and (viii), Lender and its successors and/or assigns as the additional insured, as its interests may appear, and, in the case of property insurance (including, but not limited to, flood, earthquake, boiler and machinery, and terrorism insurance), shall name Lender and its successors and/or assigns, as their interests may appear, as mortgagee pursuant to a non-contributing mortgagee clause (or its equivalent) in favor of Lender and its successors and/or assigns providing that the loss thereunder shall be payable to Lender and its successors and/or assigns.  Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Borrower or Lender to collect any proceeds under any of the Policies.

(e)     All property insurance provided for in Section 5.1(a) shall:  (a) provide that no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (b) provide that the Policy shall not be canceled or permitted to lapse without at least thirty (30) days' written notice to Lender, except ten (10) days' written notice for non-payment of premium; (c) not contain any provisions which would make Lender be liable for any Insurance Premiums thereon or subject to any assessments thereunder; and (d) provide that the issuers thereof shall give written notice to Lender if the issuers of the Policies elect not to renew prior to its expiration.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all costs and expenses (including any Insurance Premiums) incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such indebtedness shall be secured by the Security Instrument.

(g)     In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Obligations, all right, title and interest of Borrower in and to the Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in Lender, the purchaser at such foreclosure or the transferee in the event of such other transfer of title.

-57-

(h)    The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A-" or better by S&P.

Section 5.2    Casualty. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 5.4. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In the event of a Casualty where the loss and the applicable Net Proceeds are less than the Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and remains outstanding and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss and the applicable Net Proceeds is equal to or greater than the Restoration Threshold or if an Event of Default has occurred and remains outstanding, Borrower may settle and adjust such claim only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost and expense, in any such adjustments.

Section 5.3    Condemnation. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.4. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 5.4    Restoration. The following provisions shall apply in connection with the Restoration of the Property:

-58-

(i)      If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 5.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(ii)     If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 5.4.  The term "**Net Proceeds**" shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 5.1(a)(i), (iv), (vi), (xi) and (xii) as a result of such damage or destruction (or any proceeds of self-insurance maintained in lieu of such insurance policies), after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)      The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:  (A) no Event of Default shall have occurred and remain outstanding; (B)(1) in the event the Net Proceeds are Insurance Proceeds, less than twenty five percent (25%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property; (C) [intentionally omitted]; (D) Borrower shall have commenced the Restoration as soon as reasonably practicable (but in no event later than ninety (90) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion; (E) Lender shall be satisfied that any operating deficits and all scheduled payments under this Agreement and the other Loan Documents (including scheduled payments of principal and interest) will be paid during the period required for Restoration from (1) the Net Proceeds, (2) the Insurance Proceeds of the business or rental interruption or other loss of income insurance specified in Section 5.1(a)(iii) hereof or (3) other funds of Borrower; (F) Lender shall be satisfied that following the completion of the Restoration, the Debt Service Coverage Ratio shall not be less than 1.85:1.00; (G) Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) the date that is six (6) months prior to the Stated Maturity Date, (2) [intentionally omitted], (3) [intentionally omitted], (4) the date required for such completion under the terms of the Franchise Agreement, (5) the date, if any, required under the applicable Legal Requirements for such completion, or (6) six (6) months prior to the expiration of the insurance coverage specified in Section 5.1(a)(iii) hereof; (H) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; (I) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; (J) such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the Improvements; (K) the Franchise

-59-

Agreement shall remain in full force and effect during and after the completion of the Restoration; (L) Lender shall be satisfied that, upon the completion of the Restoration, the loan-to-value ratio of the Loan (as so determined by Lender) shall not be greater than the lesser of (1) 62.1%, and (2) the loan-to-value ratio of the Loan (as so determined by Lender) immediately prior to such Casualty or Condemnation; and (M) Lender shall be satisfied that, upon the completion of the Restoration, (i) the use and operation of the Property as conducted immediately prior to such Casualty or Condemnation may and shall be resumed in compliance with all applicable Legal Requirements (including, without limitation, all zoning, building, land use and similar codes, ordinances and laws), and (ii) the Property will contain substantially the same area, footprint, occupancy capacity, size, density and dimensions as existed immediately prior to such Casualty or Condemnation (i.e., the same number of buildings with substantially the same rentable square footage, and substantially the same number of parking spaces).

(ii)     The Net Proceeds shall be held by Lender in an interest bearing account and, until disbursed in accordance with the provisions of this Section 5.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior and reasonable review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant. Borrower shall deliver, or cause to be delivered, to Lender a signed, detailed budget approved in writing by Borrower's architect or engineer stating all of the costs and expenses of completing the Restoration, which budget shall be acceptable to Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration,

-60-

as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b) and that all approvals necessary for the occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)  Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than twice every calendar month.

(vi)  If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)  The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall exist.

-61-

(iii)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 5.4(b)(vii) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. Provided no Event of Default exists, Borrower shall not be obligated to pay any prepayment premium or other prepayment consideration in connection with a prepayment resulting from the application of Net Proceeds to the Debt pursuant to the preceding sentence.

(iv)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Security Instrument following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the Net Proceeds, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the loan to value ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument. If and to the extent the preceding sentence applies, only such amount of the Net Proceeds, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower as otherwise expressly provided in this Section 5.4.

## VI.     CASH MANAGEMENT AND RESERVE FUNDS

Section 6.1     Cash Management.

6.1.1     Clearing Account.  On or before the date hereof, Borrower shall establish an account with Clearing Account Bank (the "**Clearing Account**") into which all Rents shall be deposited in accordance with Section 6.1.2(a) below. The Clearing Account shall be an Eligible Account and shall be established under Borrower's federal tax identification number. Borrower acknowledges and agrees that the Clearing Account is and shall be subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof and the terms of the Clearing Account Agreement. The Clearing Account shall not be commingled with other monies held by Borrower or Clearing Account Bank. All costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower.

6.1.2     Instruction Notices; Deposits. (a) (i) Borrower shall, or shall cause Manager to, within five (5) Business Days after the date hereof deliver to each present Tenant, and shall upon its entry into each new Lease of the Property deliver to the Tenant thereunder, a notice in the form attached hereto as Exhibit A ("**Tenant Instruction Notice**"). Borrower hereby ratifies and confirms that any and all Rents due Borrower under any and all Leases shall be made payable to

-62-

Clearing Account Bank in accordance with this <u>Section 6.1.2</u>. If Borrower or Manager fails to provide any such notice (and without prejudice to Lender's rights with respect to such default), Lender shall have the right, and Borrower hereby grants to Lender a power of attorney (which power of attorney shall be coupled with an interest and irrevocable so long as any portion of the Debt remains outstanding), to sign and deliver a Tenant Instruction Notice. Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall terminate, amend, revoke or modify any Tenant Instruction Notice in any manner whatsoever or direct or cause any Tenant to pay any amount in any manner other than as provided in the related Tenant Instruction Notice. Borrower shall, or shall cause Manager to, cause each present and future Tenant of the Property to pay all Rents directly to the lockbox established in connection with the Clearing Account (if payment is made by check, money order or similar instrument) or directly to the Clearing Account (if payment is made by wire transfer) in accordance herewith. Further, if at any time the Clearing Account and/or Clearing Account Bank shall change, Borrower shall, or shall cause Manager to, send out such replacement Tenant Instruction Notices or amendments or supplements thereto to Tenants as soon as is practicable and in any event within five (5) Business Days after the date of such change (with Lender's counter-signature or acknowledgement thereon). If Borrower or any agent of Borrower shall at any time hereafter receive from any Tenant or any other party any Rents or other charges related to the Property, Borrower shall immediately, and in any event within one (1) Business Day, remit or cause its agent to remit such receipts to Clearing Account Bank for deposit into the Clearing Account, or immediately, and in any event within one (1) Business Day, wire transfer such sums directly into the Clearing Account.

(ii)     Borrower shall, or shall cause Manager to, within five (5) Business Days after date hereof deliver to each bank, issuer, processor or other entity (a "**Credit Card Company**") with which Borrower has entered into merchant's or other agreement with respect to the processing of charge card, credit card, debit card or comparable forms of payment (a list of such Credit Card Companies as of the date hereof is attached hereto as <u>Schedule XI</u>), and shall upon its entry into each new agreement deliver to the Credit Card Company thereunder, a notice in the form attached hereto as <u>Exhibit B</u> ("**Credit Card Instruction Notice**"). Borrower hereby ratifies and confirms that all Rents payable with respect to the Property, in accordance with such merchant's agreements or otherwise, shall be transferred instead by wire transfer or the ACH System to Clearing Account Bank in accordance with this <u>Section 6.1.2</u>. If Borrower or Manager fails to provide any such notice (and without prejudice to Lender's rights with respect to such default), Lender shall have the right, and Borrower hereby grants to Lender a power of attorney (which power of attorney shall be coupled with an interest and irrevocable so long as any portion of the Debt remains outstanding), to sign and deliver a Credit Card Instruction Notice. Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall terminate, amend, revoke or modify any Credit Card Instruction Notice in any manner whatsoever or direct or cause any Credit Card Company to pay any amount in any manner other than as provided in the related Credit Card Instruction Notice. Furthermore, Borrower shall, and shall cause Manager to, instruct all Persons that maintain open accounts with Borrower with respect to the Property or with whom Borrower does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Account. If at any time the Clearing Account and/or Clearing Account Bank shall change, Borrower shall, or shall cause Manager to, send out such replacement Credit Card Instruction Notices or amendments or supplements thereto to Credit Card Companies as soon as is practicable and in any event within

-63-

five (5) Business Days after the date of such change (with Lender's counter-signature or acknowledgement thereon).  If Borrower or any agent of Borrower shall at any time hereafter receive from any Credit Card Company or any other party any Rents or other charges payable or other charges related to the Property, Borrower shall immediately, and in any event within one (1) Business Day, remit or cause its agent to remit such receipts to Clearing Account Bank for deposit into the Clearing Account, or immediately, and in any event within one (1) Business Day, wire transfer such sums directly into the Clearing Account.

(iii)     Notwithstanding anything to the contrary set forth herein, neither Borrower nor Manager (nor any Tenant) shall be required to remit Cash Receipts to the Clearing Account unless a Cash Management Trigger Event Period has occurred and is then in effect.  So long as a Cash Management Trigger Event Period is not in effect, Borrower shall maintain all Cash Receipts in the Borrower Account (as defined in the Cash Management Agreement) and apply same to the payment of Debt Service, Reserve Account Deposits and Operating Expenses in accordance with the terms and conditions hereof and in the other Loan Documents.  It is hereby acknowledged and agreed that this clause (iii) shall apply only to Rents which are Cash Receipts and shall not apply to any other Rents, all of which shall be deposited into the Clearing Account in accordance with the other terms and conditions of this Section 6.1.  At all times during the existence of a Cash Management Trigger Event Period, Borrower shall cause all Cash Receipts to be deposited into the Clearing Account in accordance with the other terms and conditions of this Section 6.1.

(b)     Borrower shall at all times cause there to be a Clearing Account Agreement in effect with Clearing Account Bank.  So long as no Event of Default shall then exist at the time, Borrower shall have the right at any time to designate an Eligible Institution as successor Clearing Account Bank to hold the Clearing Account upon fifteen (15) days prior written notice to Lender and Clearing Account Bank and Lender's confirmation that accounts at such successor Clearing Account Bank satisfy the requirements of this Section 6.1.2(b) and shall otherwise be reasonably acceptable to Lender.  No such designation shall become effective until (i) Borrower has (1) delivered to Lender a written Clearing Account Agreement which has been duly executed and delivered to Lender by Borrower and the successor Clearing Account Bank and (2) prepared, executed, and filed such financing statements as Lender may reasonably deem necessary or appropriate, and (ii) the successor Clearing Account Bank has been approved by Lender, which approval shall not be unreasonably withheld if Clearing Account Bank is an Eligible Institution.  Upon receipt by Lender of the items complying with the requirements specified in the preceding sentence, Lender shall promptly deliver to the predecessor Clearing Account Bank (with a copy to Borrower) instructions to close the Clearing Account at the predecessor institution and to withdraw and transfer the funds on deposit therein directly to Lender for deposit into the new Clearing Account at the successor Clearing Account Bank.

(iii)     If at any time Clearing Account Bank shall cease to be an Eligible Institution, Lender may instruct Borrower to appoint a successor Clearing Account Bank designated by Lender that is an Eligible Institution to hold the Clearing Account, whereupon Borrower shall, within thirty (30) days of such instruction, (i) deliver to Lender a Clearing Account Agreement which has been duly executed and delivered to Lender by Borrower and the successor Clearing Account Bank and (2) prepare, execute and file such financing statements as Lender may deem reasonably necessary or appropriate.  Upon receipt by Lender of the items complying with the requirements specified in the preceding sentence, Lender shall promptly deliver to the predecessor Clearing

-64-

Account Bank (with a copy to Borrower) instructions to close the Clearing Account (if then open and activated) at the predecessor institution and to withdraw and transfer the funds on deposit therein directly to Lender for deposit into the new Clearing Account at the successor Clearing Account Bank.

6.1.3   Disbursements from the Clearing Account and Cash Management Account.   (a) Pursuant to the Clearing Account Agreement, on each Business Day, Clearing Account Bank shall be authorized to disburse all final and collected funds on deposit in the Clearing Account (the "**Available Funds**") as follows:   (i) prior to the provision by Lender of Cash Management Activation Notice, or if a Cash Management Activation Notice has been previously issued, after Clearing Account Bank's receipt of a Cash Management De-Activation Notice, all Available Funds shall be disbursed on each Business Day via ACH System, if available, or otherwise by wire transfer, to an account to be designated in writing by Borrower to Clearing Account Bank or as otherwise designated by Borrower to Clearing Account Bank from time to time; and (ii) upon receipt of a Cash Management Activation Notice and until receipt of a Cash Management De-Activation Notice, all Available Funds shall be disbursed via ACH System, if available, or otherwise by wire transfer, to an account under Lender's sole dominion and control to be designated in writing by Lender to Clearing Account Bank (the "**Cash Management Account**") at the Cash Management Bank (in each case without notifying, or obtaining the consent of, Borrower).   Borrower agrees to cooperate with Lender and Cash Management Bank at any time during the term of this Agreement to execute any additional documents and take all additional actions which may be reasonably necessary or proper to establish the Cash Management Account.

(b)   Provided no Event of Default shall have occurred and is continuing, on each Payment Date, fund deposited in the Cash Management Account shall be applied in accordance with the terms of the Cash Management Agreement.

6.1.4   Limitation of Liability.   Borrower by executing this Agreement hereby consents to the use of the Clearing Account and Cash Management Account and the selection of Clearing Account Bank and Cash Management Bank and any successors to Clearing Account Bank and/or Cash Management Bank appointed in accordance with the terms of this Agreement and the Cash Management Agreement.   Lender shall not be liable for any claims, suits, actions, costs, damages, liabilities and expenses (collectively, the "**Account Liabilities**") in connection with the subject matter of this Agreement or the Cash Management Agreement or its obligations hereunder or thereunder, including, without limitation, any Account Liabilities arising out of the use of the lockbox, the Clearing Account or the Cash Management Account, the selection of Clearing Account Bank or Cash Management Bank, Clearing Account Bank's or Cash Management Bank's failure to comply with the terms and provisions of this Agreement or the Cash Management Agreement, the failure of the Clearing Account or Cash Management Account to produce a return on the investment of monies deposited therein or the loss of any monies as the result of the insolvency of Clearing Account Bank or Cash Management Bank, provided Lender shall be liable for Account Liabilities caused by Lender or Lender's agents gross negligence or willful misconduct.

6.1.5   Application After Event of Default.   Upon the occurrence and during the continuation of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any amounts then on deposit in the Clearing Account and/or

the Cash Management Account to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.

6.1.6   <u>Payments Received Under Cash Management Agreement</u>.  The insufficiency of funds on deposit in the Clearing Account and/or Cash Management Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement, the Note and the other Loan Documents, and such obligation shall be separate and independent, and not conditioned on any event or circumstance whatsoever.  Notwithstanding anything to the contrary contained in this Agreement, the Note or the other Loan Documents, and provided that no Event of Default shall have occurred and remain outstanding, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Accounts, if any, shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such obligations pursuant to the Cash Management Agreement on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

6.1.7   <u>Security Interest; Perfection of Accounts</u>.  Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Clearing Account and the Cash Management Account as additional security for the performance of the Obligations. Further, Borrower hereby represents, warrants and covenants that:

(i)       This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Clearing Account and the Cash Management Account in favor of Lender, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents, Borrower has not sold, pledged, transferred or otherwise conveyed the Clearing Account and the Cash Management Account;

(ii)      The Clearing Account and the Cash Management Account constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code;

(iii)     Pursuant and subject to the terms of this Agreement and the other Loan Documents, Clearing Account Bank and Cash Management Bank have agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Clearing Account and the Cash Management Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities;

(iv)     The Clearing Account and the Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.  Borrower has not consented to Clearing Account Bank or Cash Management Bank complying with instructions with respect to the Clearing Account or the Cash Management Account from any Person other than Lender; and

(v)      Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach

-66-

thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

Section 6.2    Required Repair Funds.

6.2.1    Deposit of Required Repair Funds.    Borrower shall perform the repairs at the Property as more particularly set forth on Schedule IV hereto (such repairs, collectively, the "**Required Repairs**"), and shall complete each of the Required Repairs on or before the respective deadline as set forth on Schedule IV. On the Closing Date, Borrower shall deposit with Lender an amount equal to the Required Repair Deposit. Amounts deposited pursuant to this Section 6.2.1 are referred to herein as the "**Required Repair Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Required Repair Account.**"

6.2.2    Release of Required Repair Funds.    Lender shall disburse to Borrower the Required Repair Funds to pay or reimburse Borrower for the cost of Required Repairs upon delivery to Lender of a request for disbursement in form specified or approved by Lender and accompanied by a certification from Borrower and evidence reasonably satisfactory to Lender of the incurrence of the related expenditure and, if applicable, completion of any related work lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements, and the satisfaction of such other conditions as Lender may reasonably require. Lender shall not be required to disburse Required Repair Funds more frequently than once each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Required Repair Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Required Repair Funds shall be made). Upon completion of all Required Repairs and provided no Event of Default shall have occurred and be continuing, any Required Repair Funds remaining in the Required Repair Account shall be remitted to Borrower. Additionally, any Required Repair Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.3    Tax Funds.

6.3.1    Deposits of Tax Funds.    On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Tax Deposit and, on each Payment Date, Borrower shall deposit with Lender an amount equal to one-twelfth (1/12) of the Taxes (the "**Monthly Tax Deposit**") that Lender from time to time estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates. Amounts deposited pursuant to this Section 6.3.1 are referred to herein as the "**Tax Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Tax Account.**" If at any time Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes at least thirty (30) days prior to the respective due dates, Lender shall notify Borrower in writing of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the respective due dates for the Taxes; provided that if Borrower receives notice of any such deficiency after the date that is thirty (30) days prior to the date that Taxes are due, Borrower will deposit such amount within three (3) Business Days after its receipt of such written notice.

-67-

6.3.2   <u>Release of Tax Funds</u>. Lender will apply the Tax Funds to payments of Taxes required to be made by Borrower pursuant to <u>Section 4.1.2</u> and under the Security Instrument. Borrower shall furnish Lender with all bills, statements and estimates for Taxes at least thirty (30) days prior to the date on which such Taxes first become payable. In making any payment relating to Taxes, Lender may do so according to any bill, statement or estimate procured from the public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax Funds shall exceed the amounts due for Taxes, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds. Any Tax Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.4     Insurance Funds.

6.4.1   <u>Deposits of Insurance Funds</u>. On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Insurance Deposit and, on each Payment Date, Borrower shall deposit with Lender an amount equal to one-twelfth (1/12) of the Insurance Premiums (the "**Monthly Insurance Deposit**") that Lender estimates will be payable for the renewal of the coverages afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Amounts deposited pursuant to this <u>Section 6.4.1</u> are referred to herein as the "**Insurance Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Insurance Account**." If at any time Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums at least thirty (30) days prior to the expiration of the Policies, Lender shall notify Borrower in writing of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies; provided that if Borrower receives notice of any such deficiency after the date that is thirty (30) days prior to expiration of the Policies, Borrower will deposit such amount within three (3) Business Days after its receipt of such written notice.

6.4.2   <u>Release of Insurance Funds</u>. Lender will apply the Insurance Funds to payments of Insurance Premiums for the Policies required to be maintained by Borrower pursuant to <u>Section 5.1</u> hereof. Borrower shall furnish Lender with all bills, invoices and statements for Insurance Premiums at least thirty (30) days prior to the date on which such Insurance Premiums first become payable. In making any payment relating to Insurance Premiums, Lender may do so according to any bill, invoice or statement procured from the insurance company or its agent, without inquiry into the accuracy of such bill, invoice or statement. If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds. Any Insurance Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.5     Capital Expenditure Funds.

6.5.1   <u>Deposits of Capital Expenditure Funds</u>. On the Closing Date, Borrower shall deposit with Lender an amount equal to the Initial Capital Expenditure Deposit and, on each

-68-

Payment Date, Borrower shall deposit with Lender an amount equal to the Monthly Capital Expenditure Deposit for annual Capital Expenditures approved by Lender, which approval shall not be unreasonably withheld or delayed ("**Approved Capital Expenditures**").   Amounts deposited pursuant to this Section 6.5.1 are referred to herein as the "**Capital Expenditure Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Capital Expenditure Account**." Lender may reassess its estimate of the amount necessary for Capital Expenditures from time to time and may require Borrower to increase the monthly deposits required pursuant to this Section 6.5.1 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary for proper maintenance and operation of the Property.

6.5.2   Release of Capital Expenditure Funds.   Lender shall disburse to Borrower the Capital Expenditure Funds to pay or reimburse Borrower for Approved Capital Expenditures upon delivery to Lender of a request for disbursement in form specified or approved by Lender and accompanied by a certification from Borrower and evidence reasonably satisfactory to Lender of the incurrence of the related expenditure and, if applicable, completion of any related work lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements, and the satisfaction of such other conditions as Lender may reasonably require. Lender shall not be required to disburse Capital Expenditure Funds more frequently than twice each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Capital Expenditure Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Capital Expenditure Funds shall be made). Any Capital Expenditure Funds remaining after the Debt has been paid in full shall be returned to Borrower.

      Section 6.6     [Intentionally Omitted].

      Section 6.7     [Intentionally Omitted].

      Section 6.8     [Intentionally Omitted].

      Section 6.9     Excess Cash Flow Funds.

6.9.1   Deposits of Excess Cash Flow Funds.   During a Cash Sweep Event Period, except during any period that Borrower is required to deposit Excess Cash Flow pursuant to Section 6.11.1 below, Borrower shall deposit with Lender all Excess Cash Flow, which sums shall be held by Lender as additional security for the Loan. Amounts so deposited shall hereinafter be referred to as the "**Excess Cash Flow Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Excess Cash Flow Account**."

6.9.2   Release of Excess Cash Flow Funds.   Upon the termination of a Cash Sweep Event Period and provided that no other Cash Sweep Event shall have occurred and remain outstanding, all funds on deposit in the Excess Cash Flow Account shall be deposited into the Cash Management Account and applied in accordance with this Agreement and the Cash Management Agreement.

-69-

Section 6.10  Scheduled PIP Reserve Funds.

6.10.1  Deposits of Scheduled PIP Reserve Funds. On the Closing Date, Borrower shall deposit with Lender an amount equal to the Scheduled PIP Deposit to pay or reimburse Borrower for the Approved PIP Expenditures incurred in the performance of the Scheduled PIP Work. Amounts deposited pursuant to this Section 6.10.1 are referred to herein as the "**Scheduled PIP Reserve Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Scheduled PIP Reserve Account**." Borrower covenants and agrees that all Scheduled PIP Work shall be completed and paid for in accordance with Section 6.10.2 below (and accepted by the applicable Franchisor) on or prior to the date required by Franchisor for the completion of all of such Scheduled PIP Work, which such completion date may be subject to extension by Franchisor.

6.10.2  Release of Scheduled PIP Reserve Funds. (a) Lender shall disburse to Borrower the Scheduled PIP Reserve Funds to pay or reimburse Borrower for Approved PIP Expenditures incurred in the completion of Scheduled PIP Work upon satisfaction of the following conditions:

(i)  Borrower shall submit to Lender a request for payment or reimbursement at least fifteen (15) days prior to the date on which Borrower requests such payment or reimbursement to be made and which specifies in reasonable detail the Approved PIP Expenditures (and the related Scheduled PIP Work) to be paid or reimbursed;

(ii)  on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Event of Default shall have occurred and remain outstanding;

(iii)  Lender shall have received an Officer's Certificate (A) stating that all items to be funded by the requested disbursement are Approved PIP Expenditures and identifying the related Scheduled PIP Work, (B) stating that all Scheduled PIP Work to be funded by the requested disbursement has been completed lien-free, in a good and workmanlike manner and in accordance with all applicable Legal Requirements and the Scheduled PIP, such certificate to be accompanied by a copies of all licenses, permits and/or other approvals required by any Governmental Authority in connection with the commencement and completion of such Scheduled PIP Work, if required, (C) identifying each Person that supplied materials or labor in connection with such Scheduled PIP Work to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien releases or lien waivers (which lien waivers may be conditioned upon payment from the Scheduled PIP Reserve Funds for which release is sought) or other evidence of payment satisfactory to Lender, and (E) stating that the Approved PIP Expenditures and the related Scheduled PIP Work to be funded by the requested disbursement have not been the subject of a previous disbursement;

(iv)  at Lender's option, a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender;

-70-

(v)      Lender shall have received such other evidence as Lender shall reasonably request that such Scheduled PIP Work to be funded by the requested disbursement has been completed and the related Approved PIP Expenditures are paid for or will be paid for in full upon such disbursement to Borrower;

(vi)     if such disbursement is the final disbursement, confirmation from Franchisor that all Scheduled PIP Work required under the Scheduled PIP has been completed and accepted by Franchisor; and

(vii)    the satisfaction of such other conditions as Lender may reasonably require.

(b)      Nothing in this Section 6.11 shall (i) make Lender responsible for making or completing any work to be performed in connection with the Scheduled PIP Work; (ii) obligate Lender to commence or proceed with any Scheduled PIP Work; (iii) require Lender to expend funds in addition to the Scheduled PIP Reserve Funds to complete any Scheduled PIP Work; or (iv) obligate Lender to demand from Borrower additional sums to perform or complete any Scheduled PIP Work.

(c)      If a disbursement of Scheduled PIP Reserve Funds will exceed the Minimum Disbursement Amount, Lender may require an inspection of the Property prior to such disbursement in order to verify completion of the Scheduled PIP Work for which reimbursement is sought. Lender may require that such inspection be conducted by an independent professional selected by Lender and may require a certificate of completion by an independent professional acceptable to Lender prior to such disbursement of Scheduled PIP Reserve Funds.

(d)      Borrower shall permit Lender and its agents and representatives (including, without limitation, Lender's engineer or architect) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Scheduled PIP Work and all materials being used in connection therewith and to examine all plans, specifications and shop drawings relating to such Scheduled PIP Work. Borrower shall cause all contractors, subcontractors and materialmen to cooperate with Lender and its agents and representatives or such other Persons described above in connection with the inspections, if any, required by Lender in accordance with this Section 6.10.

(e)      All Scheduled PIP Work and all materials, FF&E or any other item comprising a part of the Scheduled PIP Work shall be constructed, installed and/or completed, as applicable, free and clear of all liens, claims and other encumbrances not previously approved by Lender.

(f)      The performance and completion of the Scheduled PIP Work shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the Property and all applicable insurance requirements (including, without limitation, applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters).

(g)      Notwithstanding anything else stated to the contrary in this Agreement, Borrower may not request any funds from the Scheduled PIP Reserve Account be used to pay for Capital Expenditures which are not also Approved PIP Expenditures.

-71-

(h)     Lender shall not be required to disburse Scheduled PIP Reserve Funds more frequently than twice each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Scheduled PIP Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Scheduled PIP Reserve Funds shall be made).  Provided that no other Cash Sweep Event shall have occurred and remain outstanding, any remaining Scheduled PIP Reserve Funds shall be released to Borrower upon (i) the completion of and payment in full for the Scheduled PIP in accordance with the terms hereof and (ii) Lender's receipt of an acceptable comfort letter from Franchisor.  Further, any Future PIP Reserve Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.11    Future PIP Reserve Funds.

6.11.1  Deposits of Future PIP Reserve Funds.  On each Payment Date during the occurrence of a Franchise Trigger Event Period, Borrower shall deposit with Lender all Excess Cash Flow to be held and disbursed in accordance with this Section 6.11. Amounts deposited pursuant to this Section 6.11.1 are referred to herein as the "**Future PIP Reserve Funds**" and the account in which such amounts are held by Lender shall hereinafter be referred to as the "**Future PIP Reserve Account**."

6.11.2  Release of Future PIP Reserve Funds.  (a) Lender shall disburse to Borrower the Future PIP Reserve Funds to pay or reimburse Borrower for Approved PIP Expenditures incurred in the completion of Future PIP Work upon Lender's prior written approval of the Future PIP and the Future PIP Budget (and the related Approved PIP Expenditures) and upon satisfaction of the following conditions:

(i)     Borrower shall submit to Lender a request for payment or reimbursement at least fifteen (15) days prior to the date on which Borrower requests such payment or reimbursement to be made and which specifies in reasonable detail the Approved PIP Expenditures (and the related Future PIP Work) to be paid or reimbursed;

(ii)     on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Event of Default shall have occurred and remain outstanding;

(iii)     Lender shall have received an Officer's Certificate (A) stating that all items to be funded by the requested disbursement are Approved PIP Expenditures and identifying the related Future PIP Work, (B) stating that all Future PIP Work to be funded by the requested disbursement has been completed lien-free, in a good and workmanlike manner and in accordance with all applicable Legal Requirements and the related Future PIP, such certificate to be accompanied by a copies of all licenses, permits and/or other approvals required by any Governmental Authority in connection with the commencement and completion of such Future PIP Work, if required, (C) identifying each Person that supplied materials or labor in connection with such Future PIP Work to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien releases or lien waivers (which lien waivers may be conditioned upon payment from the Future PIP Reserve Funds

-72-

for which release is sought) or other evidence of payment satisfactory to Lender, and (E) stating that the Approved PIP Expenditures and the related Future PIP Work to be funded by the requested disbursement have not been the subject of a previous disbursement;

(iv)    at Lender's option, a title search for the Property indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender;

(v)    Lender shall have received such other evidence as Lender shall reasonably request that such Future PIP Work to be funded by the requested disbursement has been completed and the related Approved PIP Expenditures are paid for or will be paid for in full upon such disbursement to Borrower;

(vi)    if such disbursement is the final disbursement, confirmation from Franchisor that all Future PIP Work required under the related Future PIP has been completed and accepted by Franchisor; and

(vii)    the satisfaction of such other conditions as Lender may reasonably require.

(b)    Nothing in this Section 6.11 shall (i) make Lender responsible for making or completing any work to be performed in connection with the Future PIP Work; (ii) obligate Lender to commence or proceed with any Future PIP Work; (iii) require Lender to expend funds in addition to the Future PIP Reserve Funds to complete any Future PIP Work; or (iv) obligate Lender to demand from Borrower additional sums to perform or complete any Future PIP Work.

(c)    If a disbursement of Future PIP Reserve Funds will exceed the Minimum Disbursement Amount, Lender may require an inspection of the Property prior to such disbursement in order to verify completion of the Future PIP Work for which reimbursement is sought. Lender may require that such inspection be conducted by an independent professional selected by Lender and may require a certificate of completion by an independent professional acceptable to Lender prior to such disbursement of Future PIP Reserve Funds.

(d)    Borrower shall permit Lender and its agents and representatives (including, without limitation, Lender's engineer or architect) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Future PIP Work and all materials being used in connection therewith and to examine all plans, specifications and shop drawings relating to such Future PIP Work. Borrower shall cause all contractors, subcontractors and materialmen to cooperate with Lender and its agents and representatives or such other Persons described above in connection with the inspections, if any, required by Lender in accordance with this Section 6.11.

(e)    All Future PIP Work and all materials, FF&E or any other item comprising a part of any Future PIP Work shall be constructed, installed and/or completed, as applicable, free and clear of all liens, claims and other encumbrances not previously approved by Lender.

(f)    The performance and completion of all Future PIP Work shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the Property and all applicable insurance requirements (including, without limitation, applicable

-73-

building codes, special use permits, environmental regulations, and requirements of insurance underwriters).

(g)     Notwithstanding anything else stated to the contrary in this Agreement, Borrower may not request any funds from the Future PIP Reserve Account be used to pay for Capital Expenditures which are not also Approved PIP Expenditures.

(h)     Lender shall not be required to disburse Future PIP Reserve Funds more frequently than twice each calendar month, and each disbursement must be in amounts not less than the Minimum Disbursement Amount (or a lesser amount if the total remaining balance of the Future PIP Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount of the remaining balance of the Future PIP Reserve Funds shall be made).   Any remaining Future PIP Reserve Funds shall be released to Borrower upon the expiration of the related Franchise Trigger Event Period, provided that no other Cash Sweep Event shall have occurred and remain outstanding.   Further, any Future PIP Reserve Funds remaining after the Debt has been paid in full shall be returned to Borrower.

Section 6.12    Reserve Funds, Generally.

6.12.1    Security Interest.    Borrower hereby pledges to Lender, and grants a security interest in, any and all monies now or hereafter deposited in the Reserve Funds as additional security for the performance of the Obligations.   Until expended or applied as provided in this Agreement, the Reserve Funds shall constitute additional security for the performance of the Obligations.   Lender shall have no obligation to release any of the Reserve Funds while any Event of Default has occurred and remains outstanding.   Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence of an Event of Default, Lender shall not be required to make disbursements from any Reserve Accounts and may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in the Reserve Funds to the payment of the Debt in any order, proportion and priority as Lender may determine in its sole and absolute discretion.   Borrower shall not further pledge, assign or grant any security interest in any Reserve Accounts or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.12.2    Investments; Income Taxes.    The Reserve Funds shall be held in Lender's name and may be commingled with Lender's own funds at financial institutions selected by Lender in its sole discretion.   The Reserve Funds may be invested in Permitted Investments as directed by Lender.   Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds.   In connection with the liquidation and transfer of any amounts then invested in Permitted Investments to the applicable Reserve Funds or reinvestment of such amounts in other Permitted Investments as Lender may reasonably determine to be necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to any Reserve Funds, Borrower shall deposit with Lender an amount equal to the actual losses sustained on such liquidation within one (1) Business Day of Lender's notice.   All interest on Reserve Funds shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender.

-74-

6.12.1 <u>Costs</u>. All costs and expenses incurred by Lender in connection with holding and disbursing the Reserve Funds (including, without limitation, the costs and expenses of the inspections, if any, required hereunder) shall be paid by Borrower.

Section 6.13   <u>Letter of Credit</u>.

Delivery of Letter of Credit. This Section shall apply to any Letters of Credit which are permitted to be delivered pursuant to the express terms and conditions hereof. No party other than Lender shall be entitled to draw on any such Letter of Credit. In the event that any disbursement of any Reserve Funds relates to a portion thereof provided through a Letter of Credit, any "disbursement" of said funds as provided above shall be deemed to refer to (i) Borrower providing Lender a replacement Letter of Credit in an amount equal to the original Letter of Credit posted less the amount of the applicable disbursement provided hereunder and (ii) Lender, after receiving such replacement Letter of Credit, returning such original Letter of Credit to Borrower.

<u>Additional Security; Lender's Right to Draw</u>. Each Letter of Credit delivered hereunder shall be additional security for the payment of the Debt. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine. Any such application to the Debt shall be subject to the terms and conditions hereof relating to application of sums to the Debt. Lender shall have the additional rights to draw in full any Letter of Credit: (i) if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least forty five (45) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (ii) if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least forty five (45) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least forty five (45) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (iii) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions hereof or a substitute Letter of Credit is provided by no later than forty five (45) days prior to such termination); (iv) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not substituted a Letter of Credit from an Eligible Institution within fifteen (15) days after notice; and/or (v) if the bank issuing the Letter of Credit shall fail to (A) issue a replacement Letter of Credit in the event the original Letter of Credit has been lost, mutilated, stolen and/or destroyed or (B) consent to the transfer of the Letter of Credit to any Person designated by Lender. If Lender draws upon a Letter of Credit pursuant to the terms and conditions of this Agreement, provided no Event of Default exists, Lender shall apply all or any part thereof for the purposes for which such Letter of Credit was established. Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in (i), (ii), (iii), (iv) or (v) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the Letter of Credit.

<u>Transfer of Letter of Credit</u>. In the event Lender shall assign the Loan, at the request of Lender, Borrower shall, at Borrower's sole cost and expense, cause to be delivered to such

-75-

assignee, within five (5) Business Days of demand, an endorsement to each Letter of Credit, in form satisfactory to Lender, naming such assignee as the beneficiary under such Letter of Credit, together with a cash deposit in the amount of the fee payable for any successive assignment of the Letter of Credit.

6.13.4  <u>Waiver of Rights of Subrogation</u>.  Each Letter of Credit must be accompanied by an instrument acceptable to Lender whereby the applicant/obligor under the Letter of Credit shall have waived all rights of subrogation against Borrower until the Debt has been paid in full. Borrower shall also pay to Lender all of Lender's reasonable out-of-pocket costs and expenses in connection therewith.

## VII.  **DEFAULTS**

Section 7.1  <u>Event of Default</u>.  Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"): (i) if any portion of the Debt is not paid on or before the date the same is due and payable or if the entire Debt is not paid on or before the Maturity Date; (ii) if any of the Taxes or Other Charges is not paid prior to the date the same becomes delinquent except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement; (iii) if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in this Agreement; (iv) if any breach of any provision of <u>Section 3.1.15</u>, <u>Section 4.1.12</u> or <u>Section 8.5</u> shall occur; (v) if any representation or warranty made by Borrower or any Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made; provided, however, it shall not constitute an Event of Default  under this clause (v) in the event that any such false or misleading representation or warranty (1) was not intentional and was made as an honest mistake, (2) is immaterial and does not and, in Lender's reasonable judgment, could not, adversely impact Lender's rights, remedies, interests, security and/or Liens under the Loan Documents (including, without limitation, Lender's ability to sell  or market the Loan or any portion thereof in a Secondary Market Transaction or otherwise), (3) is curable, and (4)  shall be cured to Lender's satisfaction within a timely manner and in any event within ten (10) days of Lender's request therefor; (vi) if (A) Borrower, any SPC Party or any Guarantor shall commence any case, proceeding or other action (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, division, dissolution or other relief with respect to it or its debts, or (2) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Borrower, any SPC Party or any Guarantor shall make a general assignment for the benefit of its creditors; or (B) there shall be commenced against Borrower, any SPC Party or any Guarantor any case, proceeding or other action of a nature referred to in clause (A) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed or undischarged for a period of sixty (60) days; (C) there shall be commenced against Borrower, any SPC Party or any Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any

-76-

order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (D) Borrower, any SPC Party or any Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (A), (B), or (C) above; or (E) if Borrower, any SPC Party or any Guarantor fails or admits its inability to pay debts generally as they become due (provided that, with respect to any Guarantor, the events or occurrences set forth in this clause shall constitute an Event of Default only if Lender elects to declare the same as an Event of Default in Lender's sole and absolute discretion); (vii) if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument; (viii) if the Property becomes subject to any Lien other than a lien for local real estate taxes and assessments not then delinquent and such Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower has first received notice thereof; provided that there shall be no Event of Default pursuant to this clause (viii) so long as such Lien is being contested in good faith pursuant to a bona-fide dispute in accordance with the applicable terms and conditions of <u>Section 4.1.2(b)</u> hereof; (ix) if within three (3) days of Lender's demand therefor Borrower fails to comply with any of its obligations under <u>Section 8.1</u>, <u>Section 8.2</u> and/or <u>Section 8.4</u>, (x) with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement and/or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice and/or the expiration of such grace period; (xi) [intentionally omitted]; (xii) [intentionally omitted]; (xiii) if a material default has occurred and continues beyond any applicable cure period under the Franchise Agreement; (xiv) if Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation); (xv) if any default beyond any applicable notice or cure period occurs under any guaranty or indemnity executed in connection with the Loan and such default continues after the expiration of applicable grace periods, if any; or (xvi) if Borrower shall continue to be in default under any other term, covenant or condition of this Agreement, the Note, the Security Instrument or the other Loan Documents not specified above for more than (y) ten (10) days after notice from Lender, in the case of any default which can be cured by the payment of a sum of money, or (z) thirty (30) days after notice from Lender, in the case of any other default, provided that, in the case of any default referred to in clause (z), if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

Section 7.2    <u>Remedies</u>.  Upon the occurrence of an Event of Default and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and or any part of the Property, including, without limitation, all rights or remedies available at law or in equity.  Upon the occurrence of an Event of Default,

-77-

all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Legal Requirement, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Legal Requirement, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

     Section 7.3   <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## VIII.   SPECIAL PROVISIONS

     Section 8.1   <u>Sale of Mortgage and Securitization</u>. (a) Lender shall have the right (i) to sell or otherwise transfer the Loan as a whole loan or sell or otherwise transfer any portion thereof or any interest therein, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof or any interest therein in one or more private or public securitizations. (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "**Secondary Market Transaction**" and the transaction referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**." Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**.")

     (b)     Lender may forward to each actual or prospective purchaser, transferee, assignee, servicer, participant, investor in such Securities or any Rating Agency rating such Securities (each, an "**Investor**"), all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor and the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable. If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender

customarily adheres or which may be required in the marketplace, by the Rating Agencies, Investors or prospective Investors or by any Legal Requirements in connection with any Secondary Market Transactions. Borrower shall cooperate, and shall cause each Guarantor to cooperate, with Lender in connection with any Secondary Market Transactions. Borrower shall also promptly furnish and shall cause each Guarantor to consent to Lender furnishing to any actual or prospective Investors and Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower or any Guarantor as may be requested by Lender, any Investor, prospective Investor, Rating Agency or prospective Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any Secondary Market Transaction.

Section 8.2    Securitization Indemnification. Borrower understands that all information provided to Lender by Borrower, its Affiliates or their respective agents, counsel and representatives, including information provided (y) in connection with a Secondary Market Transaction or the underwriting or closing of the Loan or (z) at any time after the date hereof (including financial statements of Borrower, operating statements and rent rolls with respect to the Property) ("**Provided Information**") may be included in written materials (including a prospectus, private placement memorandum or other marketing or offering documentation) ("**Disclosure Documents**") used or provided to Investors or Rating Agencies in connection with a Secondary Market Transaction and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), and may be made available to Investors, Rating Agencies and other advisory and service providers relating to Secondary Market Transactions. Borrower hereby agrees to indemnify Lender, Rialto Mortgage Finance, LLC ("**RIALTO**"), any Affiliate of Lender or RIALTO that has filed any registration statement relating to a Securitization or has acted as the issuer, sponsor, depositor or seller in connection with a Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in connection with a Securitization, any other issuers, depositors, underwriters, placement agents or initial purchasers of Securities issued in connection with a Securitization, and each of their respective officers, directors, partners, employees, representatives, agents and Affiliates, and each Person that controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Securitization Indemnified Parties**") for any Losses (collectively, the "**Securitization Indemnification Liabilities**") to which any Securitization Indemnified Party may become subject insofar as the Securitization Indemnification Liabilities arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any Provided Information or the omission or alleged omission to state in any Provided Information a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, (ii) a breach of the representations and warranties made by Borrower in Sections 3.1.20 hereof, (iii) any untrue statement or alleged untrue statement of a material fact in any Disclosure Document, or any omission or alleged omission to state a material fact required to be stated in any Disclosure Document or necessary in order to make the statements in any Disclosure Document, in light of the circumstances under which they were made, not misleading, (iv) any Exchange Act Filings and information therein or other reports containing comparable information that are required to be made "available" to holders of the Securities under applicable Legal Requirements, as it relates to the Property, Borrower, Guarantor, Manager or any Affiliate of Borrower, Guarantor, Manager or

-79-

any other aspect of the Loan or (v) any indemnification made by any Securitization Indemnified Party to the Rating Agencies in connection with issuing, monitoring or maintaining the securities issued in connection with any securitization of the Loan (in the case of clauses (iii)-(v), to the extent such Losses arise out of or are based upon an untrue statement or omission made therein in reliance upon and in conformity with Provided Information). To the extent that any undertaking to indemnify, defend and hold harmless set forth in this Section 8.2 may be unenforceable because it violates any law or public policy, Borrower shall pay or contribute the maximum portion that it is permitted to pay or contribute and satisfy under applicable law to the payment and satisfaction of all Securitization Indemnification Liabilities incurred by the Securitization Indemnified Parties. Borrower agrees that the obligations set forth in this Section 8.2 shall apply whether or not any Securitization Indemnified Party is a formal party to any claim, action, suit or proceeding. Borrower further agrees that the Securitization Indemnified Parties are intended third party beneficiaries under this Section 8.2. The liabilities and obligations of Borrower and the Securitization Indemnified Parties under this Section 8.2 shall survive the satisfaction and discharge of the Debt.

Section 8.3    Servicer. At the option of Lender, the Loan may be serviced by a servicer, master servicer, primary servicer, special servicer and/or trustee (any such servicer, master servicer, primary servicer, special servicer and trustee, together with its agents, nominees or designees, are collectively referred to herein as "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one (1) or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer. Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and Guarantor pursuant to the provisions of this Agreement and the other Loan Documents. Borrower shall be responsible for (i) any reasonable set-up fees or any other initial costs and expenses relating to or arising under the Servicing Agreement and (ii) any fees and expenses of Servicer (including, without limitation, attorneys' fees and disbursements) in connection with any release of the Property, any prepayment, defeasance, assumption, amendment or modification of the Loan, any documents or matters requested by Borrower, special servicing or work-out of the Loan or enforcement of the Loan Documents. Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto under this Agreement and the other Loan Documents.

Section 8.4    Mezzanine Loan; Components. Lender shall have the right, at any time to modify the Loan in order to (i) create one or more senior, pari-passu and/or subordinate notes (each a "**Replacement Note**"), create one or more components of the Note or any Replacement Note or reduce the number of components of the Note or any Replacement Note, or (ii) create one or more mezzanine loans (each, a "**Mezzanine Loan**") made to a newly formed single purpose, bankruptcy remote entity acceptable to Lender (each, a "**Mezzanine Borrower**") that will own one hundred percent (100%) of the direct or indirect ownership interests in Borrower (as designated by Lender) to be secured by a first priority perfected security interest on all such interests, and, in the case of both (i) and (ii), revise the interest rate, reallocate the principal balances of the Note, any Replacement Note or any component (or, in the case of any Mezzanine Loan, of the Loan and any Mezzanine Loan(s)), increase or decrease the monthly debt service payments for the Note, any Replacement Note or any component (or, in the case of any Mezzanine Loan, for the Loan and any

-80-

Mezzanine Loan(s)) or eliminate all or any part of the component structure, the multiple note structure or the Mezzanine Loan structure (including the elimination of the related allocations of principal and interest payments), provided that, in each of the foregoing instances, (1) the outstanding principal balance of the Note and all Replacement Notes (or, in the case of any Mezzanine Loan, of the Loan and all Mezzanine Loans) immediately after the effective date of such modification equals the outstanding principal balance of the Note and all Replacement Notes (or, in the case of any Mezzanine Loan, of the Loan and all Mezzanine Loans) immediately prior to such modification and (2) the weighted average of the interest rates for the Note and all Replacement Notes, including all components thereof (or, in the case of any Mezzanine Loan, for the Loan and all Mezzanine Loans) immediately after the effective date of such modification equals the weighted interest rate of the Note and all Replacement Notes, including all components thereof (or, in the case of any Mezzanine Loan, for the Loan and all Mezzanine Loans) immediately prior to such modification. At Lender's election, the Note, any Replacement Note, any Mezzanine Loan or any component of any of the foregoing may be subject to one or more Secondary Market Transactions. Lender shall have the right to modify the Note, any Replacement Note, any Mezzanine Loan or any components thereof in accordance with this Section 8.4 and, provided that such modification shall comply with the terms of this Section 8.4 it shall become immediately effective. Borrower shall promptly execute (and cause each Mezzanine Borrower to execute) such documents and instruments, cause its counsel to deliver such opinion letters, execute such amendments to the Loan Documents and any Mezzanine Loan documents, and deliver such amendments or updates to the title insurance policy insuring the lien of this Agreement as Lender may request to effectuate the purpose of this Section 8.4. All costs and expenses incurred by Borrower in connection with this Section 8.4 shall be paid by Borrower.

Section 8.5    Single Purpose Entity.  Until the Debt has been paid in full, Borrower hereby represents, warrants and covenants that since its formation it has always been and shall continue to be a Single Purpose Entity.

Section 8.6    Exculpation.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note or the Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note and the Security Instrument, agrees that it shall not, except as otherwise provided in the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the other Loan Documents or the Security Instrument. The provisions of this Section 8.6 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the other Loan Documents or the Security Instrument; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (c) affect the validity or enforceability of any indemnity (including, without limitation, the

-81-

Environmental Indemnity), guaranty (including without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (f) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the Security Instrument; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards, or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Losses arising out of or in connection with the following:

      (i)     fraud, intentional or material misrepresentation by Borrower, Guarantor or any of their respective Affiliates, agents or representatives in connection with the Loan;

      (ii)     the gross negligence or willful misconduct by or on behalf of Borrower, Guarantor or any of their respective Affiliates, agents or representatives in connection with the Loan;

      (iii)     the removal or disposal of any portion of the Property after an Event of Default, unless any personal property that is removed or disposed of is replaced with personal property of the same utility and the same or greater value;

      (iv)     the misappropriation, misapplication or conversion by Borrower of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Awards or other amounts received in connection with a Condemnation of all or a portion of the Property, or (C) any Rents collected and not applied in accordance with the Loan Documents;

      (v)     the failure to deliver to Lender upon a foreclosure of the Security Instrument any security deposits, advance deposits or any other deposits collected with respect to the Property, except to the extent any such security deposits were applied in accordance with the terms and conditions of the applicable Leases prior to such foreclosure or action in lieu thereof;

      (vi)     Borrower's failure to obtain and maintain in full force and effect fully paid for Policies as required by this Agreement or to pay any Taxes or assessments affecting the Property, provided that Borrower will not be liable under this clause (vi) to the extent that (x) the Property does not generate sufficient cash flow to pay such sums during the applicable period or (y) sufficient funds have been deposited in the applicable Reserve Fund, Lender's access to such funds is not restricted by court order or any actions of Borrower or Guarantor, Lender is obligated to apply or make available such funds for such purposes and Lender does not apply or make available such funds for the payment of Taxes or assessments or premiums for Policies, as applicable;

      (vii)     failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property, provided that Borrower will not be liable under this

-82-

clause (vii) to the extent that the Property does not generate sufficient cash flow to pay such sums unless such charges were incurred in violation of the Loan Documents;

(viii)   Borrower's breach of any of its obligations set forth in Section 8.2 hereof;

(ix)   the occurrence of any material physical waste at the Property;

(x)   Borrower's or Guarantor's commission of a criminal act which results in seizure or forfeiture of the Property or any portion thereof;

(xi)   the breach of Section 8.5 in any material respect;

(xii)   upon a Casualty or Condemnation, (A) the inability of the Property to be restored due to circumstances or facts beyond the reasonable control of Borrower, Guarantor, and their Affiliates, to (i) the same use and operation as conducted immediately prior to such Casualty or Condemnation, and/or (ii) substantially the same area, footprint, occupancy capacity, size, density and dimensions as existed immediately prior such Casualty or Condemnation (i.e., the same number of buildings with substantially the same rentable square footage, and substantially the same number of parking spaces), in each case, in compliance with all applicable Legal Requirements (including, without limitation, all zoning, building, land use and similar codes, ordinances and laws); and/or (B) increased costs of any Restoration to comply with then-current zoning, building, land use and similar codes, ordinances and laws;

(xiii)   Borrower's failure to permit on-site inspections of the Property or to provide financial information (which such failure continues for ten (10) days following delivery by Lender to Borrower of written notice therefor), or to appoint a new property manager upon written request of Lender, in each case as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents;

(xiv)   [intentionally omitted];

(xv)   if (i) the Franchise Agreement is amended, modified or terminated without Lender's prior written consent other than as expressly permitted by this Agreement, (ii) Borrower fails to pay for and complete any and all work required under any PIP pursuant to the Franchise Agreement or any replacement franchise agreement during the term of the Loan or (iii) Borrower breaches any of its obligations set forth in Section 4.1.9 hereof; or

(xvi)   any liabilities of Borrower existing as of the date of the closing of the Loan due to the failure of Borrower to comply with the Single Purpose Entity requirements set forth herein prior to such date.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b) or 1111(b) or any other provisions of the U.S. Bankruptcy Code or any other Bankruptcy Law to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that any of the following occur:

-83-

(1)     Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, this Agreement and the other Loan Documents, and such failure is a factor in the consolidation of the assets and liabilities of Borrower and any other Person;

(2)     Borrower fails to obtain Lender's prior consent to any Indebtedness except to the extent expressly permitted by this Agreement;

(3)     Borrower fails to obtain Lender's prior consent to any Transfer except to the extent expressly permitted by this Agreement;

(4)     Borrower files a voluntary petition under the Bankruptcy Law;

(5)     Guarantor or an Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person;

(6)     Borrower files, without the prior written consent of Lender, an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it by any other Person under the Bankruptcy Law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person but expressly permitting Borrower to appear in any proceeding relating to the foregoing to assert defenses to, and to dismiss or stay, such action within the time periods provided under the Loan Documents;

(7)     Guarantor or any Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property;

(8)     Borrower makes an assignment for the benefit of creditors, or admits, in writing (except to Lender or its successors or assigns) or in any action or proceeding, its insolvency or inability to pay its debts as they become due;

(9)     Any expiration or termination of the Franchise Agreement for any reason until such time as a replacement franchise agreement acceptable to Lender has been entered Into with a franchisor acceptable to Lender, all related PIP Work has been completed and paid for and Lender has received an executed comfort letter from such replacement franchisor acceptable to Lender;

(10)    In the event a PIP is entered into by Borrower (including any PIP existing as of the Closing Date), either voluntarily or as required by the Franchisor, provided that Borrower's liability under this clause (10) shall terminate at such time as Borrower completes the related PIP Work, including the payment of any amounts payable with respect thereto; or

(11)    any litigation or other legal proceeding related to the Debt filed by, or any other act or omission by, any Restricted Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein or in any other Loan Document or to realize on any collateral for the Loan, including, without limitation, the assertion by any Restricted Party of any defenses (other than defenses raised in good faith) or counterclaims against Lender.

-84-

## IX.   MISCELLANEOUS

Section 9.1    Survival.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 9.2    Lender's Discretion.  Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove any matter, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove such matter or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.  Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove any matter, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove such matter, or to decide whether arrangements or terms are satisfactory or not satisfactory, shall be substituted therefor, which such decision shall be based upon Lender's determination of Rating Agency criteria (unless Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement, in which case the discretion afforded to Lender in connection with such independent approval right shall apply instead).

Section 9.3    Governing Law.  (i) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO ARE DEEMED TO HAVE BEEN DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL

LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

Section 9.4    Modification, Waiver in Writing.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 9.5    Delay Not a Waiver.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 9.6    Notices.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:          RKJ Hotel Management LLC
4558 Sherman Oaks Avenue
Sherman Oaks, California 91043
Attention: Jeff Katofsky
Facsimile No.: (818) 990-1477

If to Lender:           Rialto Mortgage Finance, LLC
600 Madison Avenue, 12th Floor
New York, New York 10022
Attention: Kenneth M. Gorsuch, Managing Director
Facsimile No.: (212) 415-4841

with a copy to:        Lennar Corporation
700 NW 107 Avenue
Miami, Florida 33172
Attention: Alexandra Lumpkin, Counsel
Facsimile No.: (305) 485-2797

                       And

                       Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas Texas 75201
Attention:  John J. Tucker, Esq.
Facsimile No.:  (214) 545-3473

or addressed as such party may from time to time designate by written notice to the other parties. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

Section 9.7   <u>Trial by Jury</u>.  BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 9.8   <u>Headings</u>.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 9.9   <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under Legal Requirement, such

-87-

provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 9.10 <u>Preferences</u>. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 9.11 <u>Waiver of Notice</u>. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 9.12 <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 9.13 <u>Expenses; Indemnity</u>. (i) Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance of and compliance with all agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents and any other documents or matters requested by Borrower or any Guarantor; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to the Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the

-88-

Property or any other security given for the Loan; and (vi) enforcing any Obligations of or collecting any payments due from Borrower or Guarantor under the Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any Bankruptcy Action; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, as determined by a final non-appealable judgment of a court of competent jurisdiction.  Any costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account.

(ii)    Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all Losses that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any default or breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, the Loan Documents, (ii) the use or intended use of the proceeds of the Loan, (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument, the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) any failure of the Property to comply with any Legal Requirement; (ix) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against such Indemnified Party with respect thereto; (x) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; and (xi) any indemnification to the Rating Agencies in connection with issuing, monitoring or maintaining the Securities insofar as such Losses arise out of any untrue statement of any material fact in any materials or information provided by or on behalf of Borrower or arise out of the omission to state a material fact in such materials or information required to be stated therein or necessary in order to make the statements in such materials or information, in light of the circumstances under which they were made, not misleading (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction.  Borrower hereby fully and unconditionally releases each of the Indemnified Parties from and against any and all Losses that may be or may have previously been imposed on, incurred by, or asserted against any Indemnified Party by Borrower or any affiliate of Borrower in any manner relating to or arising out of the origination, underwriting or processing of the Loan by Lender.  The provisions of Section 9.13(a), this Section 9.13(b), Section 9.13(c) and Section 9.13(d) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.

(iii)    Borrower shall, at its sole cost and expense, indemnify, defend and hold harmless Indemnified Parties from and against any and all Losses imposed on, incurred by, or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to

any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

(iv)     Borrower shall, at its sole cost and expense, indemnify, defend and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 3.1.15.

(v)     Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

(vi)     Borrower hereby agrees to pay for or, if Borrower's fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

Section 9.14     Schedules and Exhibits Incorporated.  The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 9.15     Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 9.16     No Joint Venture or Partnership; No Third Party Beneficiaries.  Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.  This Agreement and the other Loan Documents are solely for the benefit of Lender and

-90-

Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 9.17   Publicity. All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Borrower, to Lender, RIALTO, or any of their Affiliates shall be subject to the prior written approval of Lender and Borrower, which shall not be unreasonably withheld. Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written approval of Lender.

Section 9.18   Waiver of Marshalling of Assets. To the fullest extent permitted by applicable Legal Requirements, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 9.19   Waiver of Counterclaim. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 9.20   Conflict; Construction of Documents; Reliance. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense

-91-

or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 9.21  <u>Brokers and Financial Advisors</u>. Borrower agrees to pay and to indemnify and hold Lender harmless from any all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property (each, a "**Broker**"). It is possible that a Broker or its affiliate shall receive consideration from Lender in connection with the Loan (including incentive fees based on loan origination volume, additional brokerage fees or servicing rights or fees) and that such consideration may be based on the profitability of the Loan to Lender. Borrower acknowledges and agrees that it has made and will make such inquiries of each Broker, if any, as it deems necessary with respect to the nature or existence of any such arrangement. No agreement by Lender to pay any such fees or compensation to such Broker (if any) shall be binding upon Lender unless it is set forth in separate written instrument that has been duly executed by Lender and such Broker.

Section 9.22  <u>Joint and Several Liability</u>.  If Borrower consists of more than one (1) Person, the representations, warranties, covenants, obligations and liabilities of each Person shall be joint and several.

Section 9.23  <u>Limitation on Liability</u>.  Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's interest in the Property only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, any other asset or property of Lender or the asset or property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

Section 9.24  <u>Prior Agreements</u>.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

### [NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**RKJ HOTEL MANAGEMENT LLC,**
a Nevada limited liability company

By:   WOFM Inc, a Nevada corporation

By: _____
Name:   Jeff Katofsky
Title:   President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Loan Agreement

LENDER:

RIALTO MORTGAGE FINANCE, LLC,
a Delaware limited liability company

By:

Name:      Shanna Vidal-Pope
Title:       Authorized Signatory

## SCHEDULE I

### (SINGLE PURPOSE ENTITY)

A "**Single Purpose Entity**" means a corporation, limited liability company or limited partnership that:

(a)      is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; (ii) acting as a managing member of the limited liability company that owns the Property; or (iii) acting as a general partner of the limited partnership that owns the Property;

(b)      has not engaged and will not engage in any business or activity unrelated to (i) the acquisition, development, ownership, management or operation of the Property, (ii) acting as a managing member of the limited liability company that owns the Property; or (iii) acting as a general partner of the limited partnership that owns the Property;

(c)      has not owned and will not own any assets other than (i) the Property, (ii) such incidental Personal Property as may be necessary for the operation of the Property, (iii) the membership interest in the limited liability company that owns the Property; or (iv) the general partnership interest in the limited partnership that owns the Property;

(d)      has not engaged in, sought or consented to and will not engage in, seek or consent to any dissolution, division, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, or transfer of its partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company);

(e)      has preserved and will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation and will not without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents, or consent to or suffer the amendment, modification, termination or breach of any of the Organizational Documents, or amend, modify, terminate or fail to comply with, or consent or suffer the amendment, modification, termination or breach of any Organizational Documents of any entity in which it owns an interest;

(f)      has not owned and will not own any subsidiary or make any investment in, any person or entity;

(g)      has not commingled and will not commingle its assets with the assets of any of its general partners, managing members, shareholders, Affiliates, principals or of any other person or entity;

(h)      has not incurred and will not incur any Indebtedness, other than, with respect to Borrower and, if Borrower is a limited partnership, its Single Purpose Entity general partner, the following: (i) the Debt and, prior to the date hereof, the Prior Loan, (ii) Permitted Equipment

Leases, and (iii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount, together with Permitted Equipment Leases, not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to clause (iii) shall be (A) outstanding not more than sixty (60) days and (B) incurred in the ordinary course of business. No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Property;

(i)      has maintained and will maintain its financial statements, accounting records, bank accounts and other entity documents separate and apart from those of the partners, members, shareholders, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(j)      has not entered into or been a party to and will not enter into or be a party to any contract or agreement with any general partner, managing member, shareholder, principal or Affiliate of Borrower, any Guarantor, or any general partner, managing member, shareholder, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties;

(k)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(l)      has not made and will not make any loans to any third party;

(m)      has held itself out and identified itself and will hold itself out and identify itself to the public as a legal entity separate and distinct from any other Person;

(n)      has conducted and will conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that such entity is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or Affiliate of such entity, but not including any Single Purpose Entity limited partnership of which such entity is expressly permitted to be a general partner in accordance with the terms hereof);

(o)      is and will endeavor to remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(p)      has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(q)      has filed and will file its own tax returns, if any, as may be required under applicable law, to the extent such entity is (1) not part of a consolidated group filing a consolidated return or

returns or (2) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(r)    has allocated and will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(s)    has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and pay the salaries of its own employees from its own funds;

(t)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(u)    has held and will hold its assets in its own name and has conducted and will conduct its business in its own name;

(v)    has paid and will pay its own liabilities and expenses;

(w)    has observed and will observe all corporate, limited liability company or limited partnership formalities, as applicable;

(x)    has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except by virtue of its status as a Single Purpose Entity general partner of a Single Purpose Entity limited partnership that has been approved by Lender;

(y)    has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(z)    maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name;

(aa)    has not pledged and will not pledge its assets for the benefit of any other Person;

(bb)    has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(cc)    except for Guarantor's obligations under the Loan Documents and Permitted Equipment Leases, does not and will not have any of its obligations guaranteed by any Affiliate of such entity;

(dd)    has complied and will comply with all of the terms and provisions contained in its Organizational Documents;

(ee)   has acted and will continue to act in a manner to make the statement of facts contained in its Organizational Documents true and correct;

(ff)   has considered and will continue to consider the interests of its creditors in connection with all actions;

(gg)   if such entity is a corporation, has as of the date hereof, and will continue to have, at least the Required Number of Independent Directors, each of which shall be a duly appointed Independent Director (hereinafter defined), and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless each Independent Director shall have participated in such vote;

(hh)   if such entity is a limited partnership, does not and will not have any general partner that is not a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the partnership interests in such limited partnership;

(ii)   if such entity is a limited liability company, has and will continue to have at least one (1) managing member that is a Single Purpose Entity that owns at least one-half of one percent (0.5%) of the membership interests of the limited liability company ("**SPC Party**") or, if such entity does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes the last remaining member of such entity or the sole member of such entity if such entity is a single member limited liability company (such last remaining member or single member shall be referred to herein as "**Sole Member**") to cease to be a member of such entity (other than (i) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), a Person which may be the Independent Director, that has signed the operating agreement of such limited liability company, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such entity, automatically be admitted as a member of such entity (a "**Special Member**") and shall preserve and continue the existence of such entity without dissolution. The Organizational Documents of such entity shall further provide that for so long as any portion of the Debt is outstanding, no Special Member may resign or transfer its rights as a Special Member unless (A) a successor Special Member has been admitted to such entity as a Special Member, and (B) such successor Special Member has also accepted its appointment as an Independent Director of such entity; Further, if such entity is a Delaware limited liability company, the Organizational Documents of such entity shall contain the following provision: "The Members agree that the Company shall not have the power to divide as set forth in Section 217(k) of the Act. In furtherance of the foregoing, the Company shall not enter into a "plan of division" or file a "certificate of division", and the Company may not become a "dividing company" or effect a "division" (as such terms are defined in Section 217 of the Act). This provision shall remain in effect for so long as the Loan remains outstanding, and Lender is intended as a third-party beneficiary thereof.";

(jj)    if such entity is a limited liability company that does not have a SPC Party, is as of the date hereof, and will continue to be, a Delaware limited liability company that has Organizational Documents that provide that, as long as any portion of the Debt remains outstanding: (i) such entity shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such entity or the occurrence of any other event which terminates the continued membership of the last remaining member of such entity in such entity unless the business of such entity is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "Act"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) except as expressly permitted pursuant to the terms of the Loan Documents, (y) Sole Member may not resign (in the case of a single member limited liability company), and (z) no additional member shall be admitted to such entity; (iii) upon the occurrence of any event that causes the last remaining member of such entity to cease to be a member of such entity or that causes Sole Member to cease to be a member of such entity (other than (A) upon an assignment by Sole Member of all of its limited liability company interests in such entity and the admission of the transferee, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of such entity, if permitted pursuant to the Organizational Documents of such entity and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (1) to continue the existence of such entity, and (2) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such entity, effective as of the occurrence of the event that terminated the continued membership of such member in such entity; (iv) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member to cease to be a member of such entity and upon the occurrence of such event, the business of such entity shall continue without dissolution; (v) in the event of the dissolution of such entity, such entity shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets and properties in an orderly manner), and its assets and properties shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; (vi) to the fullest extent permitted by applicable law, each member and Special Members shall irrevocably waive any right or power that they might have to cause such entity or any of its assets or properties to be partitioned, to cause the appointment of a receiver for all or any portion of the assets or properties of such entity, to compel any sale of all or any portion of the assets or properties of such entity pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such entity; and (vii) that the member(s) agree that such entity shall not have the power to divide as set forth in Section 217(k) of the Act and in furtherance of the foregoing, such entity shall not enter into a "plan of division" or file a "certificate of division", and such entity may not become a "dividing company" or effect a "division" (as such terms are defined in Section 217 of the Act). Further, the Organizational Documents of such entity shall contain the following provision: "The Members agree that the Company shall not have the power to divide as set forth in Section 217(k) of the Act. In furtherance of the foregoing, the Company shall not enter into a "plan of division" or file a "certificate of division", and the Company may not become a "dividing company" or effect a "division" (as such terms are defined in Section 217 of the Act).

This provision shall remain in effect for so long as the Loan remains outstanding, and Lender is intended as a third-party beneficiary thereof.";

(kk)    if such entity is a limited liability company, has as of the date hereof, and will continue to have, Organizational Documents that provide that the SPC Party of such entity or the board of directors or managers of such entity (as applicable) shall not take any action which, under the terms of any Organizational Documents (including, if applicable, any voting trust agreement with respect to any common stock), requires a unanimous vote of the board of directors or managers of such entity or its SPC Party (as applicable) unless, at the time of such action, there shall be at least the Required Number of Independent Directors of the board of directors or managers of such entity or its SPC Party (as applicable) each of whom is an Independent Director (and each such Independent Director has participated in such vote);

(ll)    the Organizational Documents of such entity shall from and after the date hereof provide that no Independent Director of such entity or any SPC Party or general partner of such entity, as applicable, may be removed or replaced except after the occurrence of one or more of the following with respect to any Independent Director: (i) any act or omission by such Independent Director that constitutes systematic, persistent or willful disregard of such Independent Director's duties, or (ii) such Independent Director has been indicted or convicted for any crime or crimes of moral turpitude or dishonesty or for any violation of any applicable legal requirements, and unless such entity provides Lender with not less than three (3) Business Days' prior notice of (1) any proposed removal of any Independent Director, together with a statement as to the reasons for such removal, and (2) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the Organizational Documents of such entity relating to an Independent Director;

(mm)    the Organizational Documents of such entity shall from and after the date hereof provide that such entity will not (and such entity agrees that it will not), without (i) the unanimous consent of its board of directors or managers, including the consent of each Independent Director or (ii) if such entity is a limited liability company with a SPC Party or a limited partnership, the unanimous consent of the board of directors or managers, including the consent of each Independent Director of its SPC Party or each of its general partner (as applicable), (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (B) seek or consent to the appointment of a receiver, liquidator or any similar official for such entity or a substantial portion of its assets or properties, (C) take any action that might cause such entity to become insolvent, (D) make an assignment for the benefit of creditors, (E) admit in writing such entity's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action in furtherance of any of the foregoing. In addition, the Organizational Documents of such entity shall provide that, when voting with respect to any of the matters set forth in the immediately preceding sentence of this definition each Independent Director shall consider only the interests of such entity, including its creditors; and

(nn)    the Organizational Documents of such entity shall provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" and "separateness" provisions of such Organizational Documents.

As used herein, the term "**Independent Director**" shall mean an individual who (i) has at least three (3) years prior employment experience and continues to be employed as an independent director, independent manager or independent member by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional independent directors, independent managers and independent members, another nationally-recognized company that provides such services and which is reasonably approved by Lender; (ii) is not on the board of directors or managers of more than two (2) Affiliates of the related Single Purpose Entity; and (iii) is not, and has never been, and will not, while serving as an Independent Director, be, any of the following: (A) a stockholder, director, manager, officer, employee, partner, member, attorney or counsel of such entity, any Affiliate of such entity or any direct or indirect equity holder of any of them, (B) a creditor, customer, supplier, service provider (including provider of professional services) or other Person who derives any of its purchases or revenues from its activities with such entity or any Affiliate of such entity (other than a nationally-recognized company that routinely provides professional independent directors, independent managers or independent members and other corporate services to such entity or any Affiliate of such entity in the ordinary course of its business), (C) a member of the immediate family of any such stockholder, director, manager, officer, employee, partner, member, creditor, customer, supplier, service provider or other Person, or (D) a Person controlling or under common control with any of (A), (B) or (C) above. A natural person who satisfies the foregoing definition other than clause (iii)(A) or (iii)(B) shall not be disqualified as a result of clause (iii)(A) or (iii)(B) by reason of (I) being an Independent Director, or having been or becoming an Independent Director of, an Affiliate of such entity that is not in the chain of ownership of such entity and that is required by a creditor to be a "single purpose entity" or (II) being, having been or becoming a member of such entity pursuant to an express provision in such entity's operating agreement providing for the appointment of such Independent Director as a member of such entity upon the occurrence of any event pursuant to which Sole Member ceases to be a member of such entity (including the withdrawal or dissolution of Sole Member); provided that, in the case of (I) and (II) above, such Independent Director has and/or will at all times be employed by a company that routinely provides professional independent directors, independent managers or independent members and the fees or other compensation that such individual earns by serving as an Independent Director of one or more Affiliates of such entity in any given year constitute, in the aggregate, less than five percent (5%) of such individual's income for such year.

<u>SCHEDULE II</u>

(ORGANIZATIONAL CHART)



# RKJ HOTEL MANAGEMENT LLC ORGANIZATION CHART

**RKJ HOTEL MANAGEMENT LLC**

a Nevada limited liability company

**Formed June 19, 2013**

46-3015551

**WOFM INC**

a Nevada corporation

Manager and Member

1% Interest

84-2830072

Jeff Katofsky,
President and Director

100%

**Katofsky Family Trust**

Member

39% Interest

Trustees:
Jeff Katofsky
Jyllian Katofsky

**SRG, LLC**

a California limited liability company

5% Interest

Sole Member and Manager
Bahzad Soofer

**Alexis Ariella, LLC**

a California limited liability company

20% Interest

Sole Member and Manager
Sean Leoni

**Weisman Holdings, LLC**

a Delaware limited liability company

20% Interest

Sole Member and Manager
Sharon Golshan

**Samra, LLC**

a California limited liability company

15% Interest

Sole Member and Manager
Dr. Jalil Rashti

## SCHEDULE III

### (RENT ROLL)

None.

## SCHEDULE IV

### (REQUIRED REPAIRS – DEADLINES FOR COMPLETION)

| Property | Required Repair | Deadline | Deposit Amount |
|---|---|---|---|
| Delta Marriott | Replace concrete flatwork | 90 days | $7,500.00 |

## SCHEDULE V

(O&M PROGRAM)



GRS
G R O U P
LOCAL KNOWLEDGE | GLOBAL PERSPECTIVE

877 GRS CREI
+1 213 908 2173
www.grs-global.com

Los Angeles

New York

Chicago

San Francisco

San Diego

Phoenix

Atlanta

Richmond

Dallas

London

**Assessment**

**Title Insurance**

**Financial Advisory**

**Transaction Management**

# OPERATIONS AND MAINTENANCE PLAN

PROPERTY REFERENCE:
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



LOCAL KNOWLEDGE | GLOBAL PERSPECTIVE

# ASBESTOS OPERATIONS AND MAINTENANCE PLAN

**Property Identification:**

Delta by Marriott

31500 Wick Road

Romulus, MI 48174

**Prepared by:**

GRS Group

300 Spectrum Center Drive, Suite 145, Irvine, California 92618

877 GRS CRE1 | +1 213 908 2173 | www.grs-global.com

January 13, 2020

GRS Project #: 19-40571.3

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



## Contents

INTRODUCTION ........................................................................................................... 1

Objective ................................................................................................................. 2

Identification of Materials ...................................................................................... 3

Participants ............................................................................................................. 3

Notification ............................................................................................................. 3

Surveillance ............................................................................................................ 4

Training ................................................................................................................... 4

Work Practices ........................................................................................................ 4

Record Keeping ....................................................................................................... 5

Worker Protection .................................................................................................. 5

Controls .................................................................................................................. 5

Certification ............................................................................................................ 5

APPENDIX ............................................................................................................... 6

APPENDIX A – Contacts ..................................................................................... 7

APPENDIX B – Inspection Form ......................................................................... 8

APPENDIX C – Work Evaluation Form ............................................................... 9

APPENDIX D – Maintenance Work Authorization Form .................................. 10

APPENDIX E – Fiber Release Log ...................................................................... 11

APPENDIX F – Training Log .............................................................................. 12

APPENDIX G - Glossary of Asbestos Terms ..................................................... 13

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



---

## INTRODUCTION

**Asbestos** is the name given to a number of naturally occurring, fibrous silicate minerals mined for their useful properties such as thermal insulation, chemical and thermal stability, and high tensile strength. Asbestos is commonly used as an acoustic insulator, and in thermal insulation, fire proofing and other building materials. Many products in use today contain asbestos.

Asbestos is made up of microscopic bundles of fibers that may become airborne when asbestos-containing materials are damaged or disturbed. When these fibers get into the air they may be inhaled into the lungs, where they can cause significant health problems.

Exposure to airborne friable asbestos may result in a potential health risk because persons breathing the air may breathe in asbestos fibers. Continued exposure can increase the amount of fibers that remain in the lung. Fibers embedded in lung tissue over time may cause serious lung diseases including: asbestosis, lung cancer, or mesothelioma. Smoking increases the risk of developing illness from asbestos exposure. Three of the major health effects associated with asbestos exposure includes:

> **Asbestosis** – Asbestosis is a serious, progressive, long-term non-cancer disease of the lungs. It is caused by inhaling asbestos fibers that irritate lung tissues and cause the tissues to scar. The scarring makes it hard for oxygen to get into the blood. Symptoms of asbestosis include shortness of breath and a dry, crackling sound in the lungs while inhaling. There is no effective treatment for asbestosis.

> **Lung Cancer** – Lung cancer causes the largest number of deaths related to asbestos exposure. People who work in the mining, milling, manufacturing of asbestos, and those who use asbestos and its products are more likely to develop lung cancer than the general population. The most common symptoms of lung cancer are coughing and a change in breathing. Other symptoms include shortness of breath, persistent chest pains, hoarseness, and anemia.

> **Mesothelioma** – Mesothelioma is a rare form of cancer that is found in the thin lining (membrane) of the lung, chest, abdomen, and heart and almost all cases are linked to exposure to asbestos. This disease may not show up until many years after asbestos exposure. This is why great efforts are being made to prevent school children from being exposed.

Exposure to asbestos increases your risk of developing lung disease. That risk is made worse by smoking. In general, the greater the exposure to asbestos, the greater the chance of developing harmful health effects. Disease symptoms may take several years to develop following exposure. If you are concerned about possible exposure, consult a physician who specializes in lung diseases (pulmonologist).

Asbestos has been commonly used as an acoustic insulator, thermal insulation, fire proofing and in other building materials. Asbestos fibers are incredibly strong and have properties that make them resistant to heat. Many products are in use today that contain asbestos. Most of these are materials used in heat and acoustic insulation, fire proofing, and roofing and flooring.

There are steps which a building owner can take to prevent asbestos fiber releases or resuspension of already-released fibers, or control fiber releases quickly and safely if they occur. Operations and Maintenance programs are designed to achieve both these goals. This guide's purpose, therefore, is to inform building owners about how to develop, implement and manage effective Operations and Maintenance programs, and to encourage their use. EPA recommends a pro-active, in-place management program whenever asbestos is discovered. In many buildings, a well-run Operations and

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



Maintenance program may be all that is necessary to control the release of asbestos fibers until the ACM in the building is abated through renovation or demolition activities. Also, an emergency repair to equipment or building services, or an unexpected incident such as ACM falling from a surface could necessitate a different control strategy However, barring such events, if ACM is properly managed, release of asbestos fibers into the air is minimized. The exposure to asbestos fibers, and therefore the risk of asbestos related disease, can be reduced to a negligible level for all building occupants.

An Operations and Maintenance program may also provide an effective, less costly alternative to wholesale removal operations. Applicable regulations may require ACM removal prior to renovation and/or demolition projects, to prevent significant asbestos releases into the air (see Chapter 6). Additionally removal of some ACM in a building will be necessary if the material has been damaged beyond repair. However, at other times, removal is often not a building owner's best course of action to reduce asbestos exposure. (Extraneous factors – for example, difficulty in obtaining insurance, or obtaining financing relative to a real estate transaction-may actually represent the driving forces in a decision to remove all ACM, rather than a health-based need for removal.) In fact, unless all safeguards are properly applied by trained, experienced individuals, removing ACM can actually increase building occupants' risk of asbestos-related disease.

This Operations and Maintenance Plan includes:

- Identification: identification of building materials known to contain asbestos.
- Notification: A program to tell workers, tenants, and building occupants where ACM is located, and how and why to avoid disturbing the ACM. All persons affected should be properly informed.
- Surveillance: Regular ACM surveillance to note, assess, and document any changes in the ACM's condition.
- Controls: Work control/permit system to control activities which might disturb ACM.
- Work Practices: Operations and Maintenance work practices to avoid or minimize fiber release during activities affecting ACM.
- Recordkeeping: To document Operations and Maintenance activities.
- Worker Protection: Medical and respiratory protection programs, as applicable.
- Training: Asbestos Program Manager, custodial and maintenance staff training.

## Objective

The principal objective of an Operations and Maintenance program is to minimize exposure of all building occupants to asbestos fibers. To accomplish this objective, an Operations and Maintenance program includes work practices to (1) maintain ACM in good condition, (2) ensure proper cleanup of asbestos fibers previously released, (3) prevent further release of asbestos fibers, and (4) monitor the condition of ACM. This Operations and Maintenance program provides guidance to accomplish these objectives within criteria established by the Environmental Protection Agency. Implementation of this plan will help to protect against the impacts of a release of asbestos fibers, but it is not intended as a guarantee that such release will not occur.

This Operations and Maintenance plan is intended to assist in the management of ACMs known to exist at the subject property, however it is important to recognize that ACMs may occur in other materials as well, and that regulatory requirements may mandate special handling of materials <u>presumed</u> to contain asbestos.

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



## Identification of Materials

During the completion of a Phase I Environmental Site Assessment in January, 2020 GRS Group identified the following suspect asbestos at the Property:

- Vinyl floor tile and mastic, drywall and joint compound, as well as roofing felt and coatings

The EPA has provided the following partial list of materials frequently found to contain asbestos. All suspect ACMs should be managed in accordance with the provisions of this plan.

| | | |
|---|---|---|
| Base Flashing | Taping Compounds (thermal) | Thermal Paper Products |
| Blown-in Insulation | Roofing Felt | Fireproofing Materials |
| Breaching Insulation | Vinyl Floor Tile | Ductwork |
| Cement Pipes | Cement Wallboard | HVAC Duct Insulation |
| Cement Siding | Boiler Insulation | Asphalt Floor Tile |
| Chalkboards | Spray-Applied Insulation Roofing | Shingles |
| Electrical Panel Partitions | Decorative Plaster | Electrical Cloth |
| Flexible Fabric Connections | Vinyl Sheet Flooring | Cooling Towers |
| Flooring Backing | Pipe Insulation (corrugated air-cell, block, etc.) | Construction Mastics (floor tile, carpet, ceiling tile, etc.) |
| Heating and | Electrical Ducts | Acoustical Plaster |
| Packing Materials (for wall/floor penetrations) | Fire Doors | Caulking/Putties |
| Textured Paints/Coatings | Electric Wiring Insulation | Ceiling Tiles and Lay-in Panels |
| Vinyl Wall Coverings | Elevator Equipment Panels | Spackling Compounds |
| Wallboard | Fire Blankets | Joint Compounds |

## Participants

The form provided at Appendix A, or equivalent documentation, will be used to identify a property manager, an asbestos program manager and an Authorized Asbestos Professional. The property manager shall be responsible for implementation and oversight of the Operations and Maintenance program. The asbestos program manager shall be responsible for day-to-day execution of the plan, and the authorized asbestos professional shall serve as a resource as necessary to maintain this plan and to assure appropriate handling of ACMs at the Property. At the discretion of the Property Manager, responsibilities of the Asbestos Program Manager (APM) may be assigned to the Authorized Asbestos Professional (AAP).

## Notification

At minimum, the property manager or asbestos program manager shall consult the Authorized Asbestos Professional to determine notifications required under applicable laws, rules and regulations and, accordingly, shall implement a program to assure that all workers, tenants, and building occupants are informed of the location of ACMs and how and why to avoid disturbing the ACM.

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



## Surveillance

Twice each year, a qualified individual, usually the Asbestos Program Manager, will observe a representative sampling of identified suspect ACMs to determine the current condition of each material.

Not less than every three years, a representative sampling of suspect ACMs at the Property must be inspected by an Accredited Asbestos Professional. Concurrent with that inspection, the AAP assess compliance with record keeping requirements and submit a report to the Property Manager identifying any conditions which require immediate attention or monitoring as well as any appropriate revision of the Operations and Maintenance program.

## Training

Appropriate training must be provided to all workers at the Property. At minimum, all maintenance and janitorial workers who will be employed in an area in which suspect ACMs are present must receive Level 1 Awareness Training. Such training may range may include such topics as:

- Background information on asbestos
- Health effects of asbestos
- Worker protection programs
- Locations of ACM in the building
- Recognition of ACM damage and deterioration
- The asbestos management program for that building
- Proper response to fiber release episodes

## Work Practices

All activities shall be conducted so as to minimize any disturbance of or damage to ACMS.

If a release of friable or non-friable ACM occurs:

- Any release which results in visible debris must be properly cleaned up
- If dust has been released in the area, turn off the HVAC system immediately
- Keep people away from the area in which the release has occurred
- Contact the AAP to obtain appropriate supervision and advice
- Document every release in accordance with the requirements of this plan

The Environmental Protection Agency has classified activities involving asbestos as follows:

- Class I asbestos work involves the removal of TSI and surfacing ACM and presumed asbestos-containing material (PACM). Training for Class I work is either 32 hours in order to be accredited at the worker level, or 40 hours in order to be accredited at the contractor/supervisor level and function as a competent person. An annual 8-hour refresher course is required for both the worker and contractor/supervisor level of training.

- Class II asbestos work involves the removal of ACM which is not thermal system insulation or surfacing material. This includes the removal of asbestos-containing wallboard, floor tile and sheeting, roofing and siding shingles, and construction mastics. Training for Class II work may be the same as for Class I work (asbestos worker or contractor/supervisor) or may be 8 hours of training, including hands-on training, in the specific type of material to be removed. Removal of

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



the following materials falls under the 8-hour class listing: roofing materials, flooring materials, siding materials, ceiling tiles, and transite panels. An annual refresher is required for all workers.

- Class III asbestos work involves repair and maintenance operations where ACM including TSI and surfacing ACM and PACM may be disturbed. Training for Class III work is 16 hours with an annual 4-hour refresher course.

- Class IV asbestos work involves maintenance and custodial activities during which employees contact but do not disturb ACM and PACM. Asbestos awareness training with an annual refresher is required for all custodial, maintenance, housekeeping and service personnel who work in buildings that may contain asbestos.

Class IV activities may be performed by any individual who has completed Level 1 Awareness Training.

All work relative to Class I, Class II and Class III activities shall be completed by, or at the direction of the AAP and in accordance with applicable laws, rules and regulations.

## Record Keeping

This Operations and Maintenance plan, along with records of all activities required under the plan must be retained in perpetuity. Sample forms are provided in the appendix; however, equivalent documentation may be maintained at the user's discretion.

## Worker Protection

Worker protections will not be necessary for Class IV activities. Protections required during the completion of Class I, Class II and Class III activities shall be determined by the AAP in accordance with applicable laws, rules and regulations at the time such work is performed.

## Controls

The AAP shall be consulted to determine appropriate protective measures prior to any demolition or repair activity impacting materials known or suspected to contain asbestos.

A full asbestos survey compliant with NESHAPS and other regulatory requirements shall be conducted as required by law prior to demolition of any known or presumed ACMs.

The AAP is required to supervise all Class I, II or III activities.

## Certification

This plan was prepared in accordance with a contract governing the nature and extent of work performed and may be used in the day-to-day management of known and suspected asbestos-containing materials. Any user of this plan is required to evaluate the appropriateness of the plan for their intended use, and agrees to hold GRS Group harmless from any and claims resulting from such use. Use of and reliance on this plan shall be unrebuttable evidence of the acceptance of these conditions of use.

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



# APPENDIX

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



**APPENDIX A – Contacts**

| Property Manager | Name |
| --- | --- |
| | Address |
| | Contact info |
| | |
| Asbestos Program Manager | Name |
| | Address |
| | Contact info |
| | |
| Accredited          Asbestos Professional | Name |
| | Address |
| | Contact info |
| | |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



### APPENDIX B – Inspection Form

| | |
|---|---|
| Location of asbestos-containing material (address, building, room, or general description] | |
| **Type of asbestos-containing material(s):** | |
| 1. Sprayed-or troweled-on ceilings or walls | |
| 2. Sprayed-or troweled-on structural members | |
| 3. Insulation on pipes, tanks, or boiler | |
| 4. Other (describe) | |
| **Abatement Status:** | |
| 1. The material has been encapsulated , enclosed , neither , removed . | |
| **Assessment:** | |
| Evidence of physical damage | |
| Evidence of water damage: | |
| Evidence of delamination or other damage: | |
| Degree of accessibility of the material: | |
| Degree of activity near the material: | |
| Location in an air plenum, air shaft, or airstream: | |
| Other observations (including the condition of the encapsulant or enclosure, if any): | |
| *Recommended Action: | |
| | |
| Signature | |
| Name | **Date** |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



**APPENDIX C – Work Evaluation Form**

| | |
|---|---|
| Work Covered | |
| Location | |
| Dates | |
| Description | |
| Evaluation | |
| Minimized disturbance | |
| Appropriate Work Practices | |
| Equipment and Procedures | |
| Air Monitoring Results | |
| Worker Name | |
| Waste Handling | |
| | |
| Signature | |
| Name | Date |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



**APPENDIX D – Maintenance Work Authorization Form**

| | |
|---|---|
| Proposed work | |
| Presence of ACMs | ___Asbestos-containing materials are not present in the vicinity of the maintenance work.<br><br>___ACM is present, but its disturbance is not anticipated however, if conditions change, the Asbestos Program Manager will re-evaluate the work request prior to proceeding.<br><br>___ACM is present, and maybe disturbed. |
| Required Work Practices | |
| AAP Oversight required? | |
| | |
| Signature | |
| Name | Date |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



APPENDIX E – Fiber Release Log

| Date | Material | Location | Description | Status |
|------|----------|----------|-------------|--------|
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |
|      |          |          |             |        |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



## APPENDIX F – Training Log

| Date | Name | Description | Status |
|------|------|-------------|--------|
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |
|      |      |             |        |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



## APPENDIX G - Glossary of Asbestos Terms

ACM — Asbestos Containing Material

Acoustical Insulation — The general application or use of asbestos mixed with a binder for the control of sound due to the absorption communities of its usually rough surface.

Acoustical Tile — A finishing material in building usually found in the ceiling or walls for the purpose of noise control.

Action-Level — A level of airborne fibers specified by OSHA as a warning or alert level. It is 0.1 fibers per cubic centimeter of air, 8 hour time weighted average, as measured by phase contrast microscopy.

AFD — Air filtration Device. Usually refers to machines used to provide ventilation and a negative static pressure differential within a completely enclosed asbestos work area. AFDs usually consist of a fan system to draw air through a special set of filters - a gross pre-filter, an intermediate filter and a HEPA filter - and exhaust clean air to the outside. AFDs are rated by the amount of air that can be drawn through them in a given amount of time, which is expressed in cubic feet of air per minutes (e.g., 2000 CFM). Loaded or clogged filters can seriously affect the displacement volume capability or the efficiency of these devices.

Air-purifying Respirator — A respirator that relies on filters to remove a particular contaminant(s) from the ambient air. They include both negative-pressure and powered respirators. No type of air-purifying respirator will protect the wearer from low oxygen atmospheres.

Aggressive Sampling — A common technique of disturbing all previously abated and cleaned surfaces in an asbestos work area to re-inject any settled dust into the air so that it can be sampled. Opposite of static sampling. Aggressive sampling is used to measure the "worst case" concentration of airborne asbestos fibers in the area. Usually an electric blower, such as a leaf blower, brooms and fans are used to disturb surfaces; fans are left running during the sampling period to circulate the air and prevent the rapid settling of any dust that may be present.

AHERA — Asbestos Hazard Emergency Response Act. Refers to authorizing legislation and administrative rules promulgated by the U.S. EPA

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



to control asbestos in all schools, public and private, non-profit, grades K-12. AHERA required all school-owned buildings to be physically inspected for asbestos-containing materials and a suitable, building-specific asbestos management plan be drafted and implemented. Refer to 40 CFR Part 763 for further information.

Air Monitoring
- The process of measuring the airborne filter contaminant concentration from a specific quantity of air over a given amount of time, usually expressed in fibers per cubic centimeter.

Air Plenum
- Any space used to convey air in a building or structure. The space above a suspended ceiling is often used as an air plenum.

Alveoli
- Air sacs located in clusters around the respiratory bronchioles of the lungs. This is the area in which true respiration takes place.

Amended Water
- Water to which a chemical wetting agent (surfactant) has been added to improve penetration into asbestos-containing materials that are being removed. The surfactant reduces surface tension of the water.

Amosite
- An asbestiform of the amphibole group containing approximately 50% silic and 40% iron (II) oxide, and is made up of straight, brittle fibers, light gray to pale brown in color. It is often called "brown" asbestos, and is often found in pipe and boiler insulation.

APM
- Asbestos Program Manager. A building owner or designated representative who supervises all aspects of the facility asbestos management and control program.

Asbestos
- A generic name given to a number of naturally occurring hydrated mineral silicates that possess a unique crystalline structure, are incombustible in air, and are separable into filaments.

Asbestos Abatement
- Procedures to control fiber release from asbestos-containing materials in buildings or to remove it entirely.

Asbestos Control
- Minimizing the generation of airborne asbestos fibers until a permanent solution is developed (removal).

Asbestos Fibers
- Fibers with a length to width ratio of 3:1 or more, generated from an asbestos-containing material.

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



| | |
|---|---|
| Asbestosis | - A non-malignant progressive, irreversible lung disease caused by the inhalation of asbestos dust and characterized by diffuse fibrosis (scarring of the lungs). |
| ASHARA | - Asbestos School Hazard Abatement Reauthorization Act. Passed in November of 1992, and EPA regulation. An important component of ASHARA is the extension of accreditation requirements for individuals performing asbestos-related activities in buildings other than school buildings. |
| Boiler Insulation | - Insulating material packed on the exterior of boilers and their fittings. Often it was held in place by a chicken-wire mesh and/or a "skin" of canvas or other coating that would give the surface stability and impermeability. Prior to the late 1970's, it commonly contained high percentages of asbestos. |
| Bridging Encapsulant | - The application of a sealant over the surface of asbestos-containing material to reduce or prevent the release of asbestos fibers. Paint has often been used for this purpose. |
| Bulk Samples | - Samples of bulk material; in the case of an asbestos survey, bulk samples are taken of suspect materials. |
| Chrysotile | - The only asbestiform of the serpentine variety which contains approximately 40% each of silica and magnesium oxide. It is the most common form of asbestos used in buildings, and is often called "white" asbestos. |
| Cilia | - Tiny hairlike structures in the windpipe and bronchi of the lung passages that help force undesirable particles and liquids up and out of the lungs. Cigarette smoking incapacitates these cilia for a period of time. |
| Cementitious | - Asbestos-containing materials that are densely packed and non-friable. From the word "cement". |
| Crocidolite | - An asbestiform of the amphibole variety containing approximately 50% silica and nearly 40% of the combined iron II and iron III. It is often called "blue" asbestos. |
| Delamination | - The separation of one layer from another. When a surface coating, e.g. acoustical plaster finish coat, separates or loses adhesion to underlying material, e.g. brown coat layer. A peeling away. |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



| | |
|---|---|
| Dust Mask | - Single use or disposable dust respirator having very little protective value. They are <u>not</u> acceptable for use in asbestos-contaminated environments. |
| Encapsulation | - The coating of asbestos-containing materials with a bonding or sealing agent to reduce or prevent the release of airborne fibers. |
| Enclosure | - An abatement method that involves enclosing the ACM in an airtight enclosure to prevent fiber release. Such enclosures must be checked periodically to make sure they are undamaged. They should be labeled so that the enclosure is not inadvertently breached. |
| EPA | - Environmental Protection Agency. |
| EPA Regulations | - Regulatory standards which cover emissions into the outside environment from a work place and disposal of hazardous wastes from job sites. |
| FAM | - Fibrous Aerosol Monitor. A device that draws air into a detection chamber and uses a pulsed laser beam system to detect and measure airborne particles and record their concentration in the air on a real-time basis. FAMS do not identify the type or particulate, only their size and concentration. |
| F/CC | - Fibers per cubic centimeter of air. |
| Fiber Control | - Minimizing the amount of airborne fiber generation through the application of amended water onto asbestos-containing material, or enclosure (isolation)) of the material, or through other engineering methods. |
| Final Clearance Air Sample | - An air sample(s) collected to determine whether or not a particular abatement work area has met preset criteria for airborne fiber concentrations, so that unprotected persons may reenter the work area and the area enclosure, decontamination units, etc. may be dismantled. Final clearance samples are analyzed by either phase contrast microscopy or, preferably, by TEM. |
| Fireproofing | - Spray-applied or trowel-applied fire resistant materials, prior to 1975, asbestos was often used as the primary ingredient. |
| Fit Test | - A method to determine if a particular respirator fits a particular person properly, so that adequate respiratory protection is |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



assured. Two methods are used. *Qualitative* fit tests place the subject in a test chamber and introduce an odorous or irritating substance to the chamber; if the respirator fits properly, no odor or irritation will be experienced by the wearer. *Quantitative* fit tests put the subject in a respirator fitted with a probe to measure the fiber level inside the facepiece. The subject is placed in a sealed chamber and an aerosol mixture with a known fiber concentration is introduced.

| | |
|---|---|
| Friable Asbestos | - Any material that contains 1% or more asbestos by area when analyzed, and can be crumbled, pulverized, or reduced to powder by finger pressure. |
| Glovebag | - A heavy gauge, polyethylene, PVC or other material fitted with a set of arms with gloves attached and used for removal of small amounts of asbestos-containing thermal system insulation (especially pipe insulation) and valve packings. The glovebag is designed so that it can be sealed airtight around the pipe or valve, thereby preventing the release of asbestos fibers from the bag during removal. |
| HEPA Filter | - High Efficiency Particulate Air (Filter). |
| HEPA Filtered Vacuum | - A high efficiency particulate (HEPA) filtered vacuum capable of trapping and retaining 99.97% of all particles larger than 0.3 microns. |
| Homogeneous Area | - An area of surfacing material, thermal system insulating material, or miscellaneous material that is uniform in color and texture, and was constructed or installed at the same time. |
| HVAC System | - Heating, Ventilation, and Air Conditioning system usually found in large business and industrial facilities as well as schools and residences. |
| Joists | - The structural building components upon which the flooring or roof rests. They may have a fireproofing applied depending on local fire codes. |
| Lung Cancer | - An uncontrolled growth of abnormal cells in the lungs which may result in the death of the host. Unprotected exposure to asbestos fibers can increase the risk of contracting lung cancer. |
| Mastic | - A glue used for numerous applications such as holding in place floor tile, linoleum, carpet, cove base, and as a sealant on pipe |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



|  | and duct insulation. It is still being sold and installed in the U.S.A, often with an asbestos content. |
|---|---|
| Mesothelioma | - A relatively rare form of cancer which develops in the lining of the pleura or peritoneum with no known cure. Unprotected exposure to asbestos fibers can cause this disease. |
| Micron | - One millionth of a meter. |
| Mineral Wool | - A commonly used substitute for asbestos. |
| MSDS | - Material Safety Data Sheet, required by OSHA on all new materials/chemicals used by employees on a job site. |
| NAM | - Negative Air Machine. A common term referring to HEPA-filtered air filtration devices used on asbestos abatement projects. So-called because running these machines inside a sealed enclosure and exhausting them to the outside, places the enclosed area under a negative static pressure differential. |
| Negative Pressure | - An atmosphere created in a work area enclosure such that airborne fibers will tend to be drawn through the filtration system rather than leak out into the surrounding areas. The air pressure inside the work area is less than that outside the work area. |
| NESHAP | - National Emission Standard for Hazardous Air Pollutants. Authorized under the Clean Air Act and administered by the U.S. EPA, the NESHAP rules cover a wide variety of substances, including asbestos. The asbestos NESHAP requires formal notification of EPA for renovation projects that disturb friable ACM above a certain amount and all demolition operations, wet removal methods and disposal of ACM in an approved landfill with standardized recording procedures. Refer to 40 CFR Parts 61 and 763. |
| NIOSH | - The National Institute for Occupational Safety and Health which was established by the Occupational Safety and Health Act of 1970. NIOSH approves various respirator and HEPA filters. |
| Non-friable | - Material that cannot be crushed, pulverized or reduced to powder by normal hand pressure when dry. E.g., asbestos cement board or pipe. Nonfriable ACM can be rendered friable by cutting, sanding, grinding or otherwise abrading the material so that significant amounts of asbestos fibers are released. |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



| | |
|---|---|
| O & M Plan | - <u>Operation and Maintenance Plan</u>  A plan that manages ACM in a facility to: 1. Maintain ACM in good condition; 2. Ensure proper cleanup of asbestos fibers previously released; 3. prevent further release of asbestos fibers; and 4. monitor the condition of the ACM. |
| OSHA | - The Occupational Safety and Health Administration which was created by the Occupational Safety and Health Act of 1970; serves as the enforcement agency for safety and health in the privately-owned workplace environment. |
| PACM | - Presumed Asbestos-Containing Material.  Defined by OSHA as "...Thermal system insulation and surfacing material found in buildings constructed no later than 1980."  This term is also commonly used to refer to vinyl floor tile or linoleum of any vintage until it has been sampled and analyzed. |
| PEL | - Permissible Exposure Limit as stated by OSHA. |
| Penetrating Encapsulant | - Liquid material applied to asbestos-containing material to control airborne fiber release by penetrating into the material and binding its components together. |
| Phase Contrast Microscopy (PCM) | - A microscopic technique used for the counting of fibers in air samples, but which does not distinguish fiber types.  All fibers of 5 microns and longer are counted. |
| Pipe Lagging | - The insulation or wrapping around a pipe.  In years past it often contained asbestos materials. |
| Polarized Light Microscopy (PLM) | - A microscopic technique used to distinguish between different types of asbestos fibers by their shape and unique optical communities.  It is used in bulk sample identification. |
| Powered Air Purifying Respirator (PAPR) | - Either a facepiece, helmet, or hooded respirator that has the breathing air powered through a fan to the wearer after it has been purified through a filter. |
| Posting | - Refers to caution or warning signs which should be posted in any area in which asbestos removal is taking place, or where airborne fiber levels may present a health hazard. |
| Protective Clothing | - Protective, lightweight garments worn by workers performing asbestos abatement to keep gross contamination off the body.  Usually, but not always, disposable. |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



| | |
|---|---|
| Pulmonary Function Test | - A part of the medical examination required to determine the health status of a person's lungs. |
| Qualitative Fit Test | - A method of testing a respirator's face-to-facepiece seal by covering the inhalation or exhalation valves and either breathing in or out to determine the presence of any leaks. |
| Record keeping | - Detailed documentation of all program activities, decisions, analyses, and any other pertinent information to a project. Much asbestos-related documentation must be kept for at least thirty years. |
| Regulated Areas | - Areas where fiber levels may or are likely to exceed OSHA's permissible exposure limit (PEL). |
| Respirator Program | - A written program established by an employer which provides for the safe use of respirators on their job sites. |
| Steel Beams | - Building components which support the joists and decking above it, often insulated with fireproofing materials. |
| Structural Member | - Any load-supporting member such as beams or load supporting walls of a facility.  Demolition means one or more such members will be removed. |
| Substrate | - The material or existing surface to which the asbestos-containing material is attached. |
| Supplied Air Respirator | - A respirator that has a central source of breathing air which is supplied to the wearer by means of an airline. |
| Surfacing ACM | - Asbestos-containing material that is sprayed-on, troweled-on or otherwise applied to surfaces. E.g., acoustical plasters on ceilings, fireproofing on structural members, or other materials on surfaces for acoustical, fireproofing or other purposes. |
| Suspect ACM | - Any untested material that resembles a similar material known to have been manufactured with an asbestos content exceeding 1% by area, or (California only 1/10% of 1% by area. |
| Suspect Friable ACM | - Any material that meets the definition of "Suspect ACM" and, in addition, can be crumbled or pulverized into a dust by finger pressure alone, or through disturbance of some other kind has become dusty. |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



| | |
|---|---|
| Transite | - A name given to an asbestos product that is very cementitious, hard and dense, usually containing from 30% to 80% asbestos. It can be in the form of flat or scored panels, a corrugated product used as roofing or wallboard, or pipes of various diameters for carrying water, cable or conduit. |
| Transmission Electron Microscopy | - A method of microscopic analysis which utilizes an electron beam (TEEM) that is focused onto a thin sample. As the beam penetrates (transmits) through the sample, the difference in densities produces an image on a fluorescent screen from which samples can be identified and counted. Asbestos fibers can be identified with certainty this method. |
| TSI | - Thermal System Insulation. ACM applied to pipes, fittings, boilers, breeching tanks, ducts or other interior structural components to prevent heat loss or gain or water condensation. Higher temperature insulation like that found on thermal system components is more likely to contain amosite and crocidolite asbestos. |
| TWA | - Time-Weighted Average, as in air sampling. Normally, this refers to the average air count during an eight hour workday. |
| Type C Supplied-Air Respirator | - A respirator designed to provide a very high level of protection which supplies air to the wearer from an outside source such as a compressor. |
| VAT | - Vinyl Asbestos Tile. Floor tile that is in squares ranging from 9" to 12" on a side. It can be of any color, and is still being manufactured, sold and installed in the U.S.A. |
| Visible Emission | - Airborne fibers given off from an asbestos-containing source that are visible to the human eye. EPA requires there be no "visible emissions" of asbestos dust on a removal or disposal site. |
| Visual Inspection | - A thorough inspection of all surfaces in an asbestos work area conducted prior to the start of final clearance air sampling. Surfaces are checked for dust, dirt or debris. Any such material found is assumed to be asbestos-containing and the surfaces must be recleaned. |
| Water Damage | - Deterioration or delamination of ceiling or wall materials due to leaks from plumbing or cracks in the roof. This is often a source of disturbance to otherwise sound and intact ACM. |

Asbestos Operations and Maintenance Plan
Delta by Marriott
31500 Wick Road
Romulus, MI 48174



Wet Cleaning  - The process of eliminating asbestos contamination from surfaces and object by using cloths, mops, or other cleaning tools which have been dampened with amended water. The intention is to reduce dust in the air.

SCHEDULE VI

(CREDIT CARD COMPANIES)

1.      Chase Paymentech Solutions LLC
        900 W. Valley Road
        Wayne, PA 19087

## SCHEDULE VII

### (SCHEDULED PIP)

| Property | Scheduled PIP Work | Scheduled PIP Expenditures |
|---|---|---|
| Delta Marriott | Electronic lockset with RFITD w/ BLE technology | $60,000.00 |
| Delta Marriott | Closet Doors to Brand Standards | $55,000.00 |
| Delta Marriott | Miscellaneous Boardroom & Welcome Area updates | $15,000.00 |
| Delta Marriott | Labor | $40,000.00 |
| | Subtotal | $170,000.00 |
| | 110% Contingency | $17,000.00 |
| | Total Scheduled PIP Deposit | $187,000.00 |

**(Scheduled PIP attached)**

ATTACHMENT FOUR
TO EXHIBIT C

## PROPERTY IMPROVEMENT PLAN

*All items must be completed by the two-year anniversary of the Effective Date, unless otherwise noted with respect to a particular item.*

*All work is to meet Delta Hotels Design Standards and related supplements and guidelines as updated from time to time. All work shall be completed, and accepted by Marriott Global Design and Delta Hotels Brand and Operations Management. All work is to be provided for review and approval prior to commencement of work.*

*Prior to commencing any work please contact Marriott Global Design - Design Management (Sharmin Davoodian at 301-380-0152) to setup a kick-off meeting. This meeting will be used to discuss this document's requirements, the design and submittal process as well as a proposed construction schedule. When appropriate, construct model rooms onsite reflecting the guestroom work outlined in this document. A model rooms review with Delta Hotels Brand and Operations Team and Marriott Global Design will be conducted and comments from that review will be incorporated into the final design of the guestroom package.*

### 1.0 Site / Building Exterior

**1.1 Site Design**
   .1   Provide architectural or landscape elements such as architectural walls, decorative fences and hedgerows elements to direct the guest's view to the hotel along the existing entry drive.

**1.2 Paving & Hardscape**
   .1   Repair & Seal all asphalt/concrete walkways and curbing.

**1.3 Landscaping**
   .1   Provide brightly colored foliage and lush plantings in large scaled planters at Porte Cochere.
   .2   Provide three layers of seasonal color at planting beds adjacent to the Front Door, Meeting Room Entry and Convention Center Entry.
   .3   Provide three layers of seasonal color at planting beds around the flagpoles.
   .4   Provide three layers of seasonal color at planting beds around the monument sign.
   .5   Remove any decaying trees from the site.

**1.4 Building Envelope**
   .1   Provide a thorough cleaning of the building exterior.

**1.5 Porte Cochere**
   .1   The Porte Cochere should be well lighted and complement the buildings overall aesthetic to elevate guest experience. Modify with lighting.
   .2   Power wash, rake & re-grout stone pavers at the passenger drop off area.
   .3   Provide streetscape elements such as ashtrays, trash receptacles and benches.

**1.6 Exterior Signage**

.1   Provide exterior building and site signage. All signage is to be design and provided by a Marriott/Delta approved sign vendor. Submit signage package to Marriott for review and comment prior to fabrication. **Complete prior to Opening Date**

.2   Replace Monumental Pylon Signage by approved Delta Signage. **Complete prior to Opening Date**

### 1.7 Exterior Building Lighting

.1   Provide decorative lighting at the entrance to the hotel. Provide timers or sensors so that systems are energy efficient and controllable

## 2.0 Public Spaces

### 2.1 General Comments

.1   Provide a supplemental softgoods replacement that incorporates the Delta Hotels design strategy. Provide solar shades & area rugs.

.2   Touch-up millwork to like new condition as required.

.3   Where feasible, conceal all exposed conduits.

### 2.2 Hotel Entrance

.1   Replace Bell stand, or remove. Bell Stand not a brand standard.

.2   Upgrade all secondary entrances.

### 2.3 Welcome Area

.1   Refer to Public Spaces "General Comments" for typical requirements.

.2   Remove mirrors at Check-in Pods, add new finishes to achieve a contemporary aesthetic.

.3   Remove film from windows behind check-in pods and provide window treatment to defuse light/glare. See softgoods replacement under General Comments.

### 2.4 Business Center,

.1   Implement Business Center functions within the lobby to supplement the existing Business Center located at Pre-Function. Provide a new library communal table and include power/USB and relocate printer for guest access to meet Delta brand standards.

### 2.5 Elevator Lobby

.1   Replace all damaged floor tiles.

.2   Recondition and paint all previously painted surfaces to like new condition, e.g. hoistway frame and door, wall base, etc.

.3   Remove phone from wall location and locate on a console.

### 2.6 Public Restrooms (All Sets)- No requirements.

## 3.0 Food & Beverage

### 3.1 General Comments

.1   Provide millwork surrounds around all floating T.V.

### 3.2 Restaurant

.1    Provide a solution that enables the restaurant to be closed during off-peak capacity, and shield/conceal guest sight lines seated in bar/bar lounge area, e.g. half wall separating restaurant from primary corridor/lobby area.

.2    Provide additional seating groups (Soft seating & Dining) to provide a mix of height in lounge area for groups and individuals.

### 3.3   Concept Bar
.1    Refer to Food & Beverage "General Comments" for typical requirements.
.2    Provide foot rail at bar to complement other finishes.
.3    Replace under bar lighting.
.4    Provide an additional layer of architectural detail to enhance the Bar experience. Provide a dynamic back bar, a statement decorative light & ceiling detail.

### 3.4   Grab & Go- No Requirements.

## 4.0 Recreation Facilities

### 4.1   Fitness Center, complete current renovation and include the following.
.1    Provide areas for cardio, strength and core training with no less than 30 SF of space for flexibility/stability/core mat activities. Provide storefront doors/frames and hardware, RFID electronic lock with BLE technology, colorful graphics/artwork, mirrored walls, audio system, coordinating millwork for amenities, filtered water dispensing station and accessories.
.2    Current exercise equipment does not meet Delta standard types, layout, or approved vendor. Where needed, replace exercise equipment with new cardio, strength and flexibility/stability/core equipment to meet Delta Standards. If feasible, provide an integral "cardio theatre" with each piece of existing cardio equipment. If not feasible, replace cardio equipment.

### 4.2   Locker Rooms, complete current renovation and include the following.
.1    Locker Rooms are not a brand standard and can be closed/removed.
.2    Provide a full renovation, to include but not limited to ceilings, walls, toilet partitions, lockers, doors and hardware, plumbing fixtures, wall base and flooring, architectural lighting, mirrors, millwork, vanity and accessories.

### 4.3   Indoor Pool, complete current renovation and include the following.
.1    Indoor Pools are not a brand standard and can be closed/removed.
.2    Provide a comprehensive renovation of Indoor Pool to meet Delta brand standards.
.3    Refinish wood beam & slat ceiling structure to like new condition.
.4    Confirm all skylights, storefront glass and doors are in quality working order and finish. If not, repair/replace.
.5    Provide all pool furniture with an upgraded combination of chairs, tables and chaise Lounges.
.6    Repair/re-grout deck. Provide a finish to whirlpool infill concrete patch.
.7    Recondition and paint all previously painted surfaces to like new condition.
.8    Repair wall tile and grout wainscot and shower as required.
.9    Provide direct and indirect lighting to meet required foot candles.
.10   Repair/replace water line tile, skimmer, basket devices and copings.
.11   Provide towel racks with upgraded spa-type towel dispensers/hampers.

.12 Provide decorative planters and foliage with mixture of full, lush foliage, floral plantings and accent lighting.

.13 Provide required "No Diving" and pool depth signage in a permanent finish or as part of the coping.

.14 Resurface/replace pool interior.

.15 Provide transfer lift or roll-in entry at pool for handicap accessibility.

.16 Provide new entry doors, hardware and RFID locks w/BLE capability.

**4.4 Outdoor Pool,** complete current renovation and include the following.

.1 Outdoor pools are not a brand standard and can be closed/removed.

.2 Provide a comprehensive renovation of Outdoor Pool to meet Delta brand standards.

.3 Provide outdoor seating and tables with new outdoor dining chairs, chaise Lounges, dining tables, occasional tables, and umbrellas. Add cabanas and sectional seating when appropriate.

.4 Repair deck and base.

.5 Repair/replace water line tile, skimmer, basket devices and copings.

.6 Resurface/replace pool interior.

.7 Provide new lighting system including overall lighting and accent lighting.

.8 Provide new sound system with concealed speakers.

.9 Provide new decorative planters and foliage. Create upgraded concept with mixture of full, lush foliage and floral plantings with accent lighting.

.10 Provide required "No Diving" and pool depth signage in a permanent finish or as part of the coping.

.11 Provide transfer lift at pool for handicap accessibility.

## 5.0 Retail Spaces

### 5.1 Sundry

.1 Reposition merchandise & shelving. ATM to be relocated to an obscure location.

## 6.0 Function Spaces

### 6.1 General Comments

.1 Provide door closers, continuous architectural type hinges, door seals, bottom seals, threshold and electronic operated lock access compatible with guest room lock system (RFID) with concealed vertical rods.

.2 Complete combining light controls on single dimmer panels with current renovation. Ensure that lighting controls are zoned and on separate dimmer controls for flexibility to accommodate social gatherings, business meetings and presentations. Re-lamp all architectural lighting throughout. Dimmer to be minimum 4-scene preset system.

.3 Complete upgrading existing light dimming system in ballroom and meeting rooms. All Function spaces must have the lighting controlled by a programmable 4 scene dimming system.

.4 Refinish/Repair millwork to remain.

.5 Where needed, provide additional power outlets, USB ports and technology throughout spaces.

.6 Replace all banquet chairs with hidden ganging device.

.7 Recondition and paint all previously painted surfaces as required.

.8   Refinish FOH / BOH damaged doors and door surrounds throughout.
.9   Provide door viewers at all doors including Pre-Function space to Function Spaces and Function Space to BOH.
.10   If function space interior graphics were purchased with current renovation signage package, it can remain. If function space signage is original to last renovation or brand specific; replace signage. Provide interior graphics package to meet current Brand Standards. Submit graphics package to Global Design for review and comment prior to fabrication.
.11   Where feasible, provide new ACT tiles and Ceiling grid.

6.2   **Pre-Function Area**
.1   Refer to Function Spaces "General Comments" for typical requirements.
.2   Provide space planning in the Pre-Function areas that support social business and relaxing work including communal tables, laptop tables and lounge seating.
.3   Remove or conceal glass window displays.

6.3   **Ballroom**
.1   Refer to Function Spaces "General Comments" for typical requirements.
.2   Provide a full renovation that incorporates all elements of the Delta ballroom, to include but not limited to low profile tegular ceiling tile and grid system, doors and hardware, walls and wall finishes, wall base and flooring, architectural lighting, mill work. Re-concept architectural features to align with new design.
.3   Provide a full softgoods replacement to include but not limited to carpet, decorative lighting, vinyl wallcovering, art and accessories.
.4   Provide a full casegoods replacement to include but not limited to tables and stack chairs with ganging device.
.5   Repair operable walls with new to meet current Delta brand standards.

6.4   **Meeting Rooms**
.1   Refer to Function Spaces "General Comments" for typical requirements.
.2   Provide a full renovation that incorporates all elements of the Delta ballroom, to include but not limited to low profile tegular ceiling tile and grid system, doors and hardware, walls and wall finishes, wall base and flooring, architectural lighting, mill work. Re-concept architectural features to align with new design.
.3   Provide a full softgoods replacement to include but not limited to carpet, decorative lighting, vinyl wallcovering, art and accessories.
.4   Provide a full casegoods replacement to include but not limited to tables and stack chairs with ganging device.

6.5   **Boardroom**
.1   Refer to Function Spaces "General Comments" for typical requirements.
.2   Provide a full renovation that incorporates all elements of Delta boardrooms, to include but not limited to ceiling design - creating decorative soffits, doors and hardware, walls and wall finishes, wall base and flooring, architectural lighting, millwork. Re-concept architectural features to align with new design.
.3   Provide a full casegoods replacement, to include but not limited to conference table with electrical, data and telephone connectivity and executive style chairs.
.4   Provide a full softgoods replacement, to include but not limited to carpet, decorative lighting, vinyl wallcovering, art and accessories.

.5    Provide a dimming package and A/V systems package meeting Delta's brand standards.

## 7.0 Guest Accommodations

### 7.1 General Comments

.1    Quality level in all rooms (materials, fixtures and finishes) is presumed equivalent to quality level in rooms as seen during PIP survey. Any lesser quality conditions to be brought up to the quality level as seen during PIP survey, as part of required renovations.

.2    Design and planning to be developed in conjunction with Global Design guidance.

.3    Provide Delta branded elements throughout all guestrooms including; greet ledge or beverage ledge according to space restrictions, three coat hooks at guestroom entry door and amenity shelf within guest bathrooms to keep vanity free and clean of clutter.

.4    Ensure that renovation quality in under renovation North Tower incorporates all elements of the Delta guestroom standards including but not limited to lighting, millwork, walls and wall finishes, wall base and flooring, softgoods & casegoods.

.5    Where feasible, conceal all exposed conduits.

### 7.2 Typical Guestrooms & Suites   Complete 180 days after the Opening Date

.1    Refer to Guest Accommodations "General Comments" for typical requirements.

.2    Incorporate guestroom safe into casegoods. If Safes not included, provide an enclosed room to permit guests to store and privately view their valuables. The viewing room should be attached with a glass pass-thru window and stone counter.

.3    Recondition and repaint all previously painted surfaces as required.

.4    Remove existing closet doors and tracks. Provide new frame/solid core swing closet doors and hardware to meet Delta brand standards. Alternatively, eliminate doors and create open closet with custom millwork storage unit to match new/existing casegoods. Provide a built-in solution for ADA rooms.

.5    Provide sound proofing at connector doors, including threshold, continuous sound seals and door sweep.

.6    Locate evacuation plan on inside of door. Coordinate with door design.

.7    Replace electronic locksets with RFID w/ BLE technology.

.8    Ensure light levels as per Delta Brand Standard are achieved.

.9    Provide the new Delta Guestroom Entertainment package. Provide a net connected set top box from Integrator. Provide an interactive program guide, digital compendium and channel banner. Provide full high-definition line up of programming with a minimum channel lineup as defined by Delta is required. Submit system specifications to Global Design for review and approval.

.10    Provide new bedding package as per Delta standard.

.11    Touch-up casegoods as required.

.12    Provide 55" flat panel HDTV for all guestrooms in the North Tower.

.13    *Safes to be provided within casegoods in each Guestroom.*

.14    Side table with inset tiles to be removed.

### 7.3 Typical Guest Baths & Suite Baths   Complete 180 days after the Opening Date

.1    Recondition and repaint all previously painted surfaces as needed.

.2    Touch-up casegoods as required.

### 7.4 Guest Corridor & Elevator Lobbies

.1 Refer to Guest Accommodations "General Comments" for typical requirements.

.2 Recondition and repaint all painted surfaces e.g. elevator hoistway frame and door, etc.

.3 Touch-up/Paint door and door frames finishes to like-new condition.

.4 Provide a partial softgoods replacement, to include but not limited to full height 3/4" corner guards that blend with adjacent wall finishes, artwork, sheer window treatments and decorative cornice at all windows.

.5 Existing light levels in the South Tower is low and undesirable. Replace or modify existing sconces to provide a new lighting solution that has an indirect light source. Provide lighting solution that meets a minimum of 10 foot candles.

.6 Construction markings on the wallcovering in the South Tower adjacent to Guestroom doors has bled through the surface and is visible to guests. This will be visible upon increasing the light levels in the corridors. Clean/ Replace wallcovering where this occurs to avoid future guest complains.

.7 Provide lighting solution that meets a minimum of 10 foot candles in the under construction North Tower.

.8 Remove phone & conduit or provide console with concealed phone wiring.

### 7.5 Guest Floor Pantry

.1 Providing a Pantry; a 24 hour self-serve pantry offering hot and cold grab & go beverages and a selection of complementary food items, accessible to Marriott Rewards Gold/Platinum Elite members. The Elite Pantry is approximately one guestroom bay in size and centrally located for easy guest access and adjacent to service circulation. Requirements include: Storefront key card (RFID) access, telephone, surveillance/CCTV, millwork displays and shelving, countertop with sink and adequate space for self-serve beverages, refrigeration and freezer(s). Consult with Global Design for further details.

### 7.6 Vending

.1 Provide concealed/plumbed filtered water dispenser next to ice machine locations for guest use (Brita Hydration Station, Elkay Bottle Filling Station or approved equal). Note: Eliminate 'vending' machine in favor of increased Sundry/Gift Shop sales.

## 8.0 Administration & Employee Facilities- No Requirements.

## 9.0 Engineering & Maintenance

### 9.1 General Comments

.1 Ensure renovation in under construction North Tower is same or "equals" current Delta Standards.

## 10.0 Food Production

### 10.1 General Comments

.1 Provide an equipment assessment to determine end of serviceable life for all equipment; determine timetable and strategy for implementing equipment replacement recommendations.

**11.0  Laundry & Housekeeping**

**11.1  General Comments**
 .1 No requirements.

**12.0  Elevators & Escalators**

**12.1  General Comments**
 .1 With the help of a qualified elevator consultant, assess the existing elevator call times and all hoist ways and perform an equipment assessment to determine end of serviceable life for all major and minor pieces of equipment.

**12.2  Public Elevators**
 .1 Provide updated design for all guest elevator cab interiors to include walls, ceilings, floors, lighting, handrails and operating panel.
 .2 Since no service elevators in existing hotel, provide an operational solution to manage guest expectations of elevator access during peak hours. Provide a solution to protect finishes when hotel functions as a service elevator

**13.0   Property Systems**

**13.1  General Comments**
 .1 Ensure PCI (Payment Card Industry) compliance and Marriott International GPNS (Global Property Network Standard) certifications per current Delta Brand Standards. **Complete prior to Opening Date**
 .2 Ensure PMS-POS (currently Opera & Micros), data, CCTV & Access Control (security) systems are compliant with current Delta Brand Standards.
 .3 Confirm public space and guestroom wireless/wiring system is compliant with current Delta Design Standards. Develop solution to meet performance expectations of public space Wi-Fi, guestroom data access, and HDTV package.
 .4 Replace electronic locksets with RFID w/ BLE technology.

**14.0   Fire Protection and Life Safety**

 **Complete prior to Opening Date, unless another timeframe is provided below.**
 *For work under this Fire Protection and Life Safety section that provides for a completion date after the Opening Date, by the Opening Date, Franchisee must have executed agreements with the professionals who will complete the required work.*

**14.1  General**
 .1 The Detroit Airport Radisson, MI, Hotel was surveyed on December 6th, 2017. This project has been surveyed with the understanding that the work performed in this building meets renovation as defined as refinishing, replacement, bracing, strengthening, or upgrading of existing materials, elements, equipment, or fixtures without involving the reconfiguration of spaces. If any other work in the building is performed, such as reconfiguration, change of use, additions, etc., Marriott Fire Protection & Life Safety (FLS) must be contacted for a reassessment of the fire and life safety requirements.

General Information:

- Built 1974, was a shell in 2015 and the interior built new
- One story building consisting of BOH (laundry, mechanical, offices), lobby, pool, restaurant,
  fitness, 11k sqft of meeting space, and guestrooms on the 1st floor; two guestroom towers 4
  floors each
- 271 guest rooms
- Multiple stairwells (44" wide)
- Simplex 4100e fire alarm system installed in 2015
- Guestrooms have system photoelectric smoke detectors and quick response fire sprinklers.
  Hearing-impaired/ADA rooms have strobes in the sleeping area (15cd) and bathrooms and
  strobes (cd?) within line-of-site from the bed.
- Hotel sprinkler system is fed from one stair with remote inspector's test connections
- No generator or fire pump
- Hood suppression is Ansul R-102 with gas and electrical shutoff
- No carbon monoxide detectors
- Linen chute sprinklered but not vented through the roof

**14.2  Fire Alarm**

.1   Install 120v standalone carbon monoxide detectors in all areas with fuel fired appliances. The detector shall have an integrated test button and local sounder, and shall be connected to an un-switched power source.

.2   Provide magnetic door hold open devices connected to the FACP and electric service to hold doors open and to automatically release doors when a general alarm is activated in meeting rooms larger than 700 SF. **Complete within 90 days from the Opening Date.**

.3   Provide documentation from a licensed fire alarm contractor of a successful and approved fire alarm test that has been completed within 12 months prior to the agreement execution date.

**14.3  Life Safety**

.1   Vent the linen chute through the roof in accordance with NFPA 82 - Incinerators and Waste and Linen Handling Systems and Equipment. Above the top service opening the shaft may decrease to 12 inches by 12 inches in cross-section and may have to change direction slightly (up to 45 degrees) to accommodate the roof structure. The shaft above the top service opening must also have a 1-hour rating (3 stories or less) or 2-hour rating (4 stories or more), which may be accomplished with a rated insulated wrap. **Complete within 180 days from the Opening Date.**

.2   Install emergency lighting with battery backup, or on the emergency generator circuit if available on the exterior of the building at each exit discharge. **Complete within 180 days from the Opening Date.**

.3   All ballroom bays created by moveable wall partitions or meeting room spaces of more than 32.5 m2 (350 SF) with only one corridor access door must be posted for a

maximum capacity of 49 persons. This will include the De La 1 and De La 4 meeting rooms. The change must be posted on signage inside the meeting room and be reflected in all marketing or sales literature.

.4 Provide exit signs for the Grand River and Lafayette doors to the back of house.

.5 Remove the exit sign above the doors to the back of house in room De La 4. This door may not be used as an exit due to missing panic hardware. To be completed prior to Opening Date.

.6 Remove all barrel bolt locks (De La 4) and hasps (kitchen to the exterior) from doors in the means of egress.

.7 Ensure all stairwell doors close and latch (south tower end stair on level 4).

.8 Provide a pair of exit doors with panic hardware and exit sign, leading to the exterior, directly across from the Gratiot Board Room, to eliminate the pre-function dead-end corridor. A hard-surface walkway will also be required to eliminate the grass. **Complete within 180 days from the Opening Date.**

### 14.4 Kitchen Hoods

.1 The existing wet chemical suppression system can remain, provided that the following occurs when the system activates:

\*\* Send fire alarm signal to FACP
\*\* Automatically activate electrical or mechanical solenoid to shutoff gas to affected cooking
     lines
\*\* Automatically trip breaker to shut off electric to cooking appliances
\*\* Shut off hood makeup air handler
\*\* Start or continue to run the exhaust hood.
If the existing suppression system cannot provide the above functions, provide a UL300 certified system.

### 14.5 Sprinkler

.1 Install permanent FDC (Fire Department Connection) signage above the sprinkler system siamese fire hose connection that uses 6 inch white letters on a red background or as specified by the local authority.
Provide documentation from a licensed sprinkler contractor of a successful and approved annual sprinkler system test that has been completed within 12 months prior to the Effective Date.

## 15.0 Mechanical Plumbing Electrical

### 15.1 General Comments

.1 Hire a re-commissioning firm to perform an HVAC, electrical and plumbing equipment assessment to determine end of serviceable life for all major and minor pieces of equipment.

.2 Upgrade existing light dimming system in ballroom and meeting rooms. All public spaces must have the lighting controlled by a programmable 4 scene dimming system

*End of Report*

## EXHIBIT A

### Form of Tenant Instruction Notice
TENANT DIRECTION LETTER

_____, 20__

[Addressee]

Re:   Payment Direction Letter for _____
       _____, _____, _____ (the "**Property**")

Dear [_____]:

_____, a _____ ("**Borrower**"), the owner of the Property, has granted a security interest in the Property to Rialto Mortgage Finance, LLC, a Delaware limited liability company (together with its successors and assigns, "**Lender**") and has agreed that all rents due for the Property will be paid directly to a bank selected by Borrower and approved by Lender. Therefore, from and after the date hereof, all rent to be paid by you under the Lease between Borrower and you (the "**Lease**") should be sent directly to the following address:

> [CLEARING ACCOUNT BANK'S ADDRESS]
> or by wire transfer to:
> Bank:
> ABA No.:
> Account No.:
> Account Name:   _____ Clearing Account,
>                  [_____, as Secured Party]

All checks should be made out to "_____".

These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("**Servicer**"), or pursuant to a joint written instruction from Borrower and Lender or Servicer. Until you receive written instructions from Lender or Servicer, continue to send all rent payments due under the Lease to _____. All rent payments must be delivered to _____ no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact _____ of Borrower at _____ or [_____] of Lender at _____ or _____ of Servicer at _____. We appreciate your cooperation in this matter.

_____,
a _____

By: _____
     Name:
     Title:

## EXHIBIT B

### Form Of Credit Card Instruction Notice

_____, 20__

To:    [Name and Address of Credit Card Processor]
      ("**Processor**")

Re:    _____ ("**Borrower**")
      Merchant Account Number:

Dear Sir/Madam:

Under various agreements among Borrower and Rialto Mortgage Finance, LLC, a Delaware limited liability company, having an address at 600 Madison Avenue, 12th Floor, New York, New York 10022 ("**Lender**"), Borrower has granted to the Lender a security interest in and to Borrower's inventory, accounts, general intangibles, equipment, and other assets, including, without limitation, all amounts due or to become due from the Processor to Borrower.

Under the terms and provisions of such agreements, Borrower is obligated to deliver all of the Borrower's accounts, accounts receivable, and proceeds of inventory to a deposit account designated by the Lender (the "**Clearing Account**"). Such accounts include all credit card charges (the "**Charges**") submitted by Borrower to the Processor for processing and the amounts which the Processor owes to Borrower on account thereof (the "**Credit Card Proceeds**").

This letter clarifies the respective interests and rights of Lender and Processor in and to the Charges and the Credit Card Proceeds and provides, subject to the conditions hereof, for the transmittal by Processor to the Clearing Account of the Credit Card Proceeds, as well as any other proceeds of Lender's collateral received by Processor.

      1.    Processor recognizes that all Charges and Credit Card Proceeds constitute collateral granted by Borrower to Lender.

      2.    Processor recognizes that Borrower has granted the Lender a security interest in, and collaterally assigned to Lender, the contents of any reserve accounts or the like maintained by Borrower with Processor in respect of Borrower's credit card arrangements with Processor and as well as in and to any right to payment now or hereafter arising from Processor to Borrower.

      3.    Until Processor receives written notification from Lender that the interest of Lender in the Charges and the Credit Card Proceeds has been terminated, all amounts as may become due from time to time from Processor to Borrower shall be transferred only to the Clearing Account as follows:

            Bank:
            ABA No.:
            Account No.:
            Account Name:    _____ Clearing Account,
                          [_____, as Secured Party]

Any such transfers shall be initiated no later than 10:00AM on each business day on which any

amount is owed by Processor to Borrower and shall be for the full amount then so owed, without set off or reduction.

    4.    A copy of each periodic statement issued by Processor to Borrower shall be provided to the Lender at the following address (which address may be changed upon seven (7) days written notice given to Processor by Lender):

           _____

           _____

           _____

    Attn: _____

    5.    Processor shall not provide any loans, advances, or financial accommodations to Borrower and shall not amend Processor's agreements with the Borrower without the prior written consent of Lender.

    6.    The Processor will:

        (a)    Provide Lender with written notice upon the establishment of any escrow, reserve, or other account which the Processor has, or proposes to establish, with respect to its credit card relationship with Borrower.

        (b)    Release any funds which it may hold in any such escrow, reserve, or other account no later than thirty (30) days after the sooner of the termination of that account or the termination of the credit card relationship between Processor and Borrower.

    7.    Processor shall be fully protected in acting on any order or direction by Lender respecting the Charges and the Credit Card Proceeds without making any inquiry whatsoever as to Lender's right or authority to give such order or direction or as to the application of any payment made pursuant thereto.

    8.    These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("**Servicer**"), or pursuant to a joint written instruction from Borrower and Lender or Servicer. If you have any questions concerning this letter, please contact _____ of Borrower at _____ or [_____] of Lender at _____ or _____ of Servicer at _____. We appreciate your cooperation in this matter.

                    _____,

              a _____

              By:   _____

                    Name:

                    Title:

# Exhibit B

**PROMISSORY NOTE**

$20,500,000.00

New York, New York
January 14, 2020

**FOR VALUE RECEIVED RKJ HOTEL MANAGEMENT LLC**, a Nevada limited liability company, as maker, having its principal place of business at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403 ("**Borrower**"), hereby unconditionally promises to pay to the order of **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, as lender, having an address at 590 Madison Avenue, 9th Floor, New York, New York 10022 ("**Lender**"), or at such other place as the holder hereof may from time time designate in writing, the principal sum of TWENTY MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($20,500,000.00), in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note and that certain Loan Agreement dated the date hereof between Borrower and Lender (the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**ARTICLE: 1 PAYMENT TERMS**

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article II of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

**ARTICLE: 2 DEFAULT AND ACCELERATION**

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

**ARTICLE: 3 SECURITY**

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

**ARTICLE: 4 SAVINGS CLAUSE**

Notwithstanding anything to the contrary contained herein or in any other Loan Document, (a) all agreements between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest on account of the Debt, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender so that the rate of interest does not exceed the Maximum Legal Rate, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to be immediately reduced to such Maximum Legal Rate and any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

**ARTICLE: 5 NO ORAL CHANGE**

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

0139458.0721479    4827-7699-1897v6

### ARTICLE: 6  WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  Nothing in the foregoing sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.  If Borrower consists of more than one Person, the obligations and liabilities of each such person hereunder shall be joint and several.

### ARTICLE: 7  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

### ARTICLE: 8  EXCULPATION

The provisions of <u>Section 8.6</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

### ARTICLE: 9  GOVERNING LAW

(A)    THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THIS NOTE ARE DEEMED TO HAVE BEEN DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO

2

PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

## ARTICLE: 10 NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 9.6 of the Loan Agreement.

## [NO FURTHER TEXT ON THIS PAGE]

3

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER**:

**RKJ HOTEL MANAGEMENT LLC,**
a Nevada limited liability company

By:   WOFM Inc, a Nevada corporation

By: _____
Name:   Jeff Katofsky
Title:    President

Promissory Note

# Exhibit C

2020020117   L: 55537 P: 530   MTG
01/22/2020 08:01:39 AM  Total Pages: 22
Bernard J. Youngblood, Register of Deeds - Wayne County, MI
ELECTRONICALLY RECORDED

 **ORIGINAL**

**RKJ HOTEL MANAGEMENT LLC**, as mortgagor
(Borrower)

to

**RIALTO MORTGAGE FINANCE, LLC**, as mortgagee
(Lender)

---

### MORTGAGE

---

Dated:        As of January 14, 2020

Location:     Delta by Marriott Hotel
              31500 Wick Road
              Romulus, Michigan  48174

County:       Wayne

Tax Parcel ID: 80-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-701

PREPARED BY AND UPON
RECORDATION RETURN TO:

Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201

Attention:  John J. Tucker, Esq.

THIS SECURITY INSTRUMENT IS A FUTURE ADVANCE
MORTGAGE UNDER APPLICABLE MICHIGAN LAW

THIS SECURITY INSTRUMENT COVERS FIXTURES AND IS
INTENDED TO BE FILED AS A UCC FINANCING STATEMENT
WITH THE REGISTER OF DEEDS FOR WAYNE COUNTY,
MICHIGAN

RECORDING REQUESTED BY
FIRST AMERICAN TITLE CO.
NATIONAL COMMERCIAL SERVICES
NCS- 964390

**RKJ HOTEL MANAGEMENT LLC**, as mortgagor
(Borrower)

to

**RIALTO MORTGAGE FINANCE, LLC**, as mortgagee
(Lender)

---

## MORTGAGE

---

| | |
|---|---|
| Dated: | As of January 14, 2020 |
| Location: | Delta by Marriott Hotel |
| | 31500 Wick Road |
| | Romulus, Michigan  48174 |

County:     Wayne

Tax Parcel ID: 80-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-701

PREPARED BY AND UPON
RECORDATION RETURN TO:

Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201

Attention: John J. Tucker, Esq.

THIS SECURITY INSTRUMENT IS A FUTURE ADVANCE
MORTGAGE UNDER APPLICABLE MICHIGAN LAW

THIS SECURITY INSTRUMENT COVERS FIXTURES AND IS
INTENDED TO BE FILED AS A UCC FINANCING STATEMENT
WITH THE REGISTER OF DEEDS FOR WAYNE COUNTY,
MICHIGAN

RECORDING REQUESTED BY
FIRST AMERICAN TITLE CO.
NATIONAL COMMERCIAL SERVICES
NCS- 964390

**THIS MORTGAGE** (this "**Security Instrument**") is made as of the 14th day of January, 2020, by **RKJ HOTEL MANAGEMENT LLC**, a Nevada limited liability company, having an address at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403, as mortgagor ("**Borrower**") to **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, having an address at 590 Madison Avenue, 9th Floor, New York, New York 10022, as mortgagee ("**Lender**").

RECITALS:

This Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of TWENTY MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($20,500,000.00) made pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender (such Promissory Note, together with all extensions, renewals, replacements, restatements, amendments, supplements, severances or modifications thereof being hereinafter referred to as the "**Note**").

Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement) and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents (as herein defined). All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement.

## ARTICLE 1 - GRANTS OF SECURITY

Section 1.1    PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, pledge, assign and warrant to and grant a security interest to Lender and its successors and assigns in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    Land. The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b)    Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)    Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "**Improvements**");

(d)    Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)    Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures, inventory and goods), inventory and articles of personal property and accessions thereof and renewals, replacements thereof and substitutions therefor (including, but not limited to, beds, bureaus, chiffonniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches,

0139458.0721479    4816-6969-5641v6

luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, silverware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers), other customary hotel equipment and other tangible property and all other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(f)     Leases and Rents.  All leases, subleases, rental agreements, registration cards and agreements, if any, and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, payments in connection with any termination, cancellation or surrender of any Lease, revenues, issues registration fees, if any and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and/or the Improvements, all income, rents, room rates, issues, profits, revenues, deposits, accounts and other benefits from the operation of the hotel on the Land and/or the Improvements, including, without limitation, all revenues and credit card receipts collected from guest rooms, restaurants, bars, mini-bars, meeting rooms, banquet rooms and recreational facilities and otherwise, all receivables (including Accounts Receivable), customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Land and/or Improvements, or personalty located thereon, or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others including, without limitation, from the rental of any office space, retail space, commercial space, guest room or other space, halls, stores or offices, including any deposits securing reservations of such space, exhibit or sales space of every kind, license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance relating to the use, enjoyment or occupancy of the Land and/or the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases (the "**Rents**") and the right to receive and apply the Rents to the payment of the Debt;

-2-

(g)     Condemnation Awards.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(h)     Insurance Proceeds.  All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(i)     Tax Certiorari.  All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Conversion.  All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(m)     Intangibles.  All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records, tenant or guest lists, advertising materials, telephone exchange numbers identified in such materials and all other general intangibles relating to or used in connection with the operation of the Property;

(n)     Accounts.  All accounts, account collateral, reserves, escrows and deposit accounts maintained by Borrower with respect to the Property including, without limitation, the Clearing Account, the Reserve Accounts, the Cash Management Account, and all complete securities, investments, property and financial assets held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(o)     Causes of Action.  All causes of action and claims (including, without limitation, all causes of action or claims arising in tort, by contract, by fraud or by concealment of material fact) against any Person for damages or injury to the Property or in connection with any transactions financed in whole or in part by the proceeds of the Loan ("**Cause of Action**");

(p)     Accounts Receivables.  All right, title and interest of Borrower arising from the operation of the Land and the Improvements in and to all payments for goods or property sold or leased or for services rendered, whether or not yet earned by performance, and not evidenced by an instrument or chattel paper, (hereinafter referred to as "**Accounts Receivable**") including, without limiting the generality of the foregoing, (i) all accounts, contract rights, book debts, and notes arising from the operation of a hotel on the Land and the Improvements or arising from the sale, lease or exchange of goods or other property and/or the performance of services, (ii) Borrower's rights to payment from any consumer credit/charge card organization or entities which sponsor and administer such cards as the American Express Card, the Visa Card and the Mastercard, (iii) Borrower's rights in, to and under all purchase orders for goods, services or other property, (iv) Borrower's rights to any goods, services or other property represented by any of the foregoing, (v) monies due to or to

-3-

become due to Borrower under all contracts for the sale, lease or exchange of goods or other property and/or the performance of services including the right to payment of any interest or finance charges in respect thereto (whether or not yet earned by performance on the part of Borrower) and (vi) all collateral security and guaranties of any kind given by any person or entity with respect to any of the foregoing. Accounts Receivable shall include those now existing or hereafter created, substitutions therefor, proceeds (whether cash or non-cash, movable or immovable, tangible or intangible) received upon the sale, exchange, transfer, collection or other disposition or substitution thereof and any and all of the foregoing and proceeds therefrom; and

(q)   Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (p) above.

Section 1.2   ASSIGNMENT OF LEASES AND RENTS. Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2, the Loan Agreement and the Cash Management Agreement, Lender grants to Borrower a revocable license to collect and receive the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

Section 1.3   SECURITY AGREEMENT. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations, (as herein defined) a security interest in the Property to the full extent that the Property may be subject to the Uniform Commercial Code.

Section 1.4   FIXTURE FILING. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, described or referred to in this Security Instrument, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

Section 1.5   PLEDGE OF MONIES HELD. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any Reserve Funds, the Clearing Account, the Cash Management Account, the Net Proceeds and the Net Proceeds Deficiency, as additional security for the Obligations until expended or applied as provided in the Loan Agreement or this Security Instrument.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever WITH POWER OF SALE;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as herein defined) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the Loan Agreement, these presents and the estate hereby granted shall cease, terminate and be void.

ARTICLE 2 - DEBT AND OBLIGATIONS SECURED

Section 2.1   DEBT. This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt.

-4-

Section 2.2   OTHER OBLIGATIONS.  This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)   the performance of all other obligations of Borrower contained herein;

(b)   the performance of each obligation of Borrower contained in any other agreement given by Borrower to Lender which is for the purpose of further securing the obligations secured hereby, and any renewals, extensions, substitutions, replacements, amendments, modifications and changes thereto; and

(c)   the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

Section 2.3   DEBT AND OTHER OBLIGATIONS.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively below as the "**Obligations**."

### ARTICLE 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1   PAYMENT OF DEBT.  Borrower will pay the Debt at the time and in the manner provided in the Note, the Loan Agreement and in this Security Instrument.

Section 3.2   INCORPORATION BY REFERENCE.   All the covenants, conditions and agreements contained in the Loan Agreement, the Note and all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3   PAYMENT FOR LABOR AND MATERIALS.  Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

Section 3.4   PERFORMANCE OF OTHER AGREEMENTS.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of the Loan Agreement, any other Loan Documents and any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing the Obligations and any amendments, modifications or changes thereto.

-5-

## ARTICLE 4 - OBLIGATIONS AND RELIANCES

Section 4.1    RELATIONSHIP OF BORROWER AND LENDER.    The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 4.2    NO RELIANCE ON LENDER.    The general partners, officers, shareholders, members, principals and/or other beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 4.3    NO LENDER OBLIGATIONS.  (a) Notwithstanding the provisions of Subsections 1.1(f) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 4.4    RELIANCE.    Borrower recognizes and acknowledges that in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, (i) Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 3 of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; (ii) that such reliance existed on the part of Lender prior to the date hereof; (iii) that the warranties and representations are a material inducement to Lender in accepting the Note, the Loan Agreement, this Security Instrument and the other Loan Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 3 of the Loan Agreement.

## ARTICLE 5 - FURTHER ASSURANCES

Section 5.1    RECORDING OF SECURITY INSTRUMENT, ETC.    Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Loan Agreement, this Security Instrument, the other Loan Documents, and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, the other Loan Documents, or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2    FURTHER ACTS, ETC.    Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds,

-6-

conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements, and Borrower hereby authorizes Lender to execute any of the foregoing in the name of Borrower or without the signature of Borrower to the extent that Lender may lawfully do so. Borrower hereby authorizes Lender to file in the appropriate filing or recording offices, with or without the signature of Borrower, one or more financing statements (including any amendment or continuation thereof), chattel mortgages or other instruments to establish, maintain, or evidence more effectively the validity, perfection or priority of the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 5.2.

Section 5.3   CHANGES IN TAX, DEBT CREDIT AND DOCUMENTARY STAMP LAWS.

(a)   If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than one-hundred twenty (120) days to declare the Debt immediately due and payable, without prepayment penalty or premium.

(b)   Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, exercisable by written notice of not less than one-hundred twenty (120) days, to declare the Debt immediately due and payable, without prepayment penalty or premium.

(c)   If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Loan Agreement, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 5.4   REPLACEMENT DOCUMENTS. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Documents, Borrower will issue, in lieu thereof, a replacement Note or other Loan Documents, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Documents in the same principal amount thereof and otherwise of like tenor.

Section 5.5   PERFORMANCE AT BORROWER'S EXPENSE. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above shall be called an "**Event**"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether

-7-

required by law, regulation, Lender or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 5.6 LEGAL FEES FOR ENFORCEMENT. (a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with the preparation of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property (including commencing any foreclosure action), whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

Section 5.7 SPLITTING OF MORTGAGE. This Security Instrument and the Note shall, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender.

## ARTICLE 6 - DUE ON SALE/ENCUMBRANCE

Section 6.1 LENDER RELIANCE. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

Section 6.2 NO SALE/ENCUMBRANCE. Neither Borrower nor any Restricted Party shall Transfer the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be Transferred other than as expressly permitted pursuant to the terms of the Loan Agreement.

## ARTICLE 7 - PREPAYMENT

Section 7.1 PREPAYMENT. The Debt may not be prepaid in whole or in part except in accordance with the express terms and conditions of the Loan Agreement.

## ARTICLE 8 - RIGHTS AND REMEDIES

Section 8.1 REMEDIES. Upon the occurrence of any Event of Default, Borrower agrees that Lender may, take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

-8-

0139458.0721479 4816-6969-5641v6

(a)     declare the entire unpaid Debt to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement, or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor or of any person, firm or other entity liable for the payment of the Debt and whose appointment Borrower expressly consents to take possession of and to operate the Property, to collect Rents and to otherwise protect and preserve the Property;

(h)     the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct business thereon; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of any Property (including, without limitation, the Personal Property) or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection

-9-

and preservation of the Property (including without limitation, the Personal Property), and (ii) request Borrower at its expense to assemble the Property, including without limitation, the Personal Property, and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Property, including without limitation, the Personal Property, sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)      apply any sums then deposited in the Accounts and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument, the Loan Agreement, or any other Loan Documents to the payment of the following items in any order in its sole discretion:

        (i)      Taxes and Other Charges;

        (ii)     Insurance Premiums;

        (iii)    interest on the unpaid principal balance of the Note;

        (iv)     amortization of the unpaid principal balance of the Note; or

        (v)      all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)      surrender the Policies, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums;

(l)      apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion;

(m)      foreclose by power of sale or otherwise and apply the proceeds of any recovery to the Debt in accordance with Section 8.2 or to any deficiency under this Security Instrument;

(n)      exercise all rights and remedies under any Causes of Action, whether before or after any sale of the Property by foreclosure, power of sale, or otherwise and apply the proceeds of any recovery to the Debt in accordance with Section 8.2 or to any deficiency under this Security Instrument; or

(o)      pursue such other remedies as Lender may have under applicable law.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 8.2      APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument, the Loan Agreement, or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 8.3      RIGHT TO CURE DEFAULTS. Upon the occurrence of any Event of Default Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. The

-10-

cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest as provided below, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default shall bear interest at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender and shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 8.4    ACTIONS AND PROCEEDINGS.  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and, after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 8.5    RECOVERY OF SUMS REQUIRED TO BE PAID.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for an Event of Default existing at the time such earlier action was commenced.

Section 8.6    OTHER RIGHTS, ETC.  (a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any Guarantor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, the Loan Agreement, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to the Property or any other Property not in Lender's possession.

(c)    Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 8.7    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

-11-

Section 8.8 VIOLATION OF LAWS. If the Property is not in compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 8.9 RIGHT OF ENTRY. Subject to the terms of the Loan Agreement, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 8.10 SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, and the performance and discharge of the Obligations.

Section 8.11 RECOURSE AND CHOICE OF REMEDIES. Notwithstanding any other provision of this Security Instrument and the Loan Agreement, including, without limitation, Section 8.6 of the Loan Agreement, Lender and other Indemnified Parties are entitled to enforce the obligations of Borrower contained in Section 9.13(c) and (d) of the Loan Agreement without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower and any guarantor or indemnitor with respect to the Loan. The provisions of Section 9.13(c) and (d) of the Loan Agreement are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Security Instrument or the other Loan Documents, and Borrower is fully and personally liable for the obligations pursuant to Section 9.13(c) and (d) of the Loan Agreement. The liability of Borrower with respect to the Loan pursuant to Section 9.13(c) and (d) of the Loan Agreement is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower pursuant to Section 9.13(c) and (d) of the Loan Agreement, whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions.

## ARTICLE 9 - WAIVERS

Section 9.1 WAIVER OF COUNTERCLAIM. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, the Loan Agreement, any of the other Loan Documents, or the Obligations.

Section 9.2 MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by Legal Requirements.

Section 9.3 WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument, the Loan Agreement or any other Loan Document, specifically and expressly provides for the giving of notice by Lender to Borrower, and (b) with respect to matters for which Lender is required by any

-12-

applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 9.4 WAIVER OF STATUTE OF LIMITATIONS. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 9.5 WAIVER OF TRIAL BY BURY. BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THIS ASSIGNMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 9.6 WAIVER OF FORECLOSURE DEFENSE. Borrower waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## ARTICLE 10 - EXCULPATION

Section 10.1 EXCULPATION. Notwithstanding anything to the contrary contained in this Security Instrument, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Note, the Loan Agreement and the other Loan Documents shall be limited as set forth in Section 8.6 of the Loan Agreement.

## ARTICLE 11 - APPLICABLE LAW

Section 11.1 GOVERNING LAW. (1) THIS SECURITY INSTRUMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY ARE DEEMED TO HAVE BEEN DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY INSTRUMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS

-13-

ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, AND THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(2)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS SECURITY INSTRUMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

## ARTICLE 12 - DEFINITIONS

Section 12.1    GENERAL DEFINITIONS.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note," shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "legal fees", "attorneys' fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, reasonable fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

Section 12.2    HEADINGS, ETC.  The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 13 - MISCELLANEOUS PROVISIONS

Section 13.1    NO ORAL CHANGE.  This Security Instrument and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 13.2    LIABILITY.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 13.3    INAPPLICABLE PROVISIONS.  If any term, covenant or condition of this Security Instrument or any other Loan Document, is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument or the other Loan Documents, as the case may be, shall be construed without such provision.

Section 13.4    DUPLICATE ORIGINALS; COUNTERPARTS.  This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Security Instrument may be executed in several counterparts, each of which

-14-

counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 13.5   NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 13.6   NOTICE.  All notices required or permitted under this Security Instrument shall be given and be effective in accordance with Section 9.6 of the Loan Agreement.

## ARTICLE 14 - [INTENTIONALLY OMITTED]

## ARTICLE 15 - STATE SPECIFIC PROVISIONS

Section 15.1   INCONSISTENCIES.  In the event of any inconsistencies between the terms and conditions of this Article 15 and the other provisions of this Security Instrument, the terms and conditions of this Article 15 shall control and be binding.

Section 15.2   LEASES AND RENTS.  The following sentence is hereby added at the end of Section 1.1, subparagraph (f) entitled "Leases and Rents" and after the first sentence of Section 1.2 hereof entitled "Assignment of Rents":

Lender shall also be entitled to all the rights and remedies conferred by Act No. 210 of the Michigan Public Acts of 1953 as amended by Act No. 151 of the Michigan Public Acts of 1966 (M.C.L.A. Section 554.231, et seq.), or Act No. 228 of the Michigan Public Acts of 1925, as amended by Act No. 55 of the Michigan Public Acts of 1933 (M.C.L.A. Section 554.211, et seq.), whichever is applicable, and pursuant to Act No. 66 of the Michigan Public Acts of 1956 (M.C.L.A. 565.81, et seq.) (collectively and as they may be amended from time-to-time, the "Assignment Statutes"). Such assignment shall run with the land and be good and valid as against Borrower and those claiming by, under or through Borrower, from the date of recording of this Security Instrument. Such assignment shall continue to be operative during the foreclosure or any other proceedings taken to enforce this Security Instrument. In the event of a foreclosure sale which results in a deficiency, this assignment shall stand as security during the redemption period for the payment of such deficiency. Such assignment is given as collateral security only and does not and shall not be construed as obligating Lender to perform any of the covenants or undertakings required to be performed by Borrower as landlord in, under or pursuant to any leases. The assignment of leases and rents provided for in this Security Instrument shall, notwithstanding anything to the contrary contained herein, constitute an assignment of rents pursuant to M.C.L.A. 554.231 et seq. or M.C.L.A. 554.211 et seq., whichever is applicable, and shall be interpreted and applied in accordance therewith. The assignment of rents provisions set forth herein are not intended to evidence an additional recordable event, as may be prohibited by Act 459 of the Public Acts of Michigan of 1996, but rather are included herein for purposes of complying with any applicable requirements of the Assignment Statutes.

The Property includes (without limitation upon the description of the Property in the foregoing provisions of this Security Instrument) (i) all rents, issues, profits, income, proceeds and security deposits (in accordance with the Assignment Statutes), and (ii) all or any part of the oil and gas located in, on or under oil and gas properties, and all or any of the rents and profits from oil and gas properties, and the income from the sales of oil and gas produced or to be produced form oil and gas properties (in accordance with Act No. 66 of the Michigan Public Acts of 1956 (MCL §565.81 et seq.)).

-15-

BORROWER HEREBY WAIVES ANY RIGHT TO NOTICE, OTHER THAN SUCH NOTICE AS MAY BE PROVIDED IN ACT 210 OF THE PUBLIC ACTS OF MICHIGAN OF 1953 AND ACT 66 OF THE PUBLIC ACTS OF MICHIGAN OF 1956, EACH AS AMENDED OR SUPERSEDED, AND WAIVES ANY RIGHT TO ANY HEARING, JUDICIAL OR OTHERWISE, PRIOR TO LENDER'S EXERCISE OF ITS RIGHTS WITH RESPECT TO THE ASSIGNMENT OF RENTS UNDER THIS MORTGAGE AND/OR THE SEPARATE ASSIGNMENT OF LEASES AND RENTS GRANTED TO LENDER IN CONNECTION WITH THIS SECURITY INSTRUMENT.

Section 15.3   FORECLOSURE.   The following is hereby added as a new subsection (p) of Section 8.1 entitled "Remedies":

Section 15.4   Section 8.1 entitled "Remedies".

(p)   commence (i) foreclosure proceedings against the Property through judicial proceedings or (ii) foreclosure proceedings against the Property by advertisement pursuant to the applicable statute in such case made and provided and to sell the Property or to cause the same to be sold at public sale in accordance with the applicable statute in a single parcel or in several parcels at the option of Lender.   Borrower hereby acknowledges that this Security Instrument contains a POWER OF SALE and that in the event Lender elects to foreclose by advertisement pursuant to the POWER OF SALE, in accordance with MCLA 600.3201 et seq., BORROWER, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, AFTER AN OPPORTUNITY FOR CONSULTATION WITH ITS LEGAL COUNSEL, HEREBY VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND UNDER THE CONSTITUTION AND LAWS OF THE STATE OF MICHIGAN, BOTH TO A HEARING ON THE RIGHT TO EXERCISE AND THE EXERCISE OF THE POWER OF SALE, AND TO NOTICE EXCEPT AS REQUIRED BY THE MICHIGAN STATUTE WHICH PROVIDES FOR FORECLOSURE OF MORTGAGES BY ADVERTISEMENT.

Section 15.5   APPOINTMENT OF RECEIVER.   The following is hereby added to the end of Section 8.1, subparagraph (h):

The failure of Borrower to pay any taxes or assessments assessed against the Property, or any installment thereof, or any premiums payable with respect to any Policies covering the Property or any part thereof, shall constitute waste (although the meaning of the term "waste" shall not necessarily be limited to such nonpayment) as provided by Act No. 236 of the Michigan Public Acts of 1961 as amended (M.C.L.A. 600.2927), and shall entitle Lender to all remedies provided for therein.   Borrower further hereby consents to the appointment of a receiver under said statute, should Lender elect to seek such relief thereunder;

Section 15.6   MICHIGAN LAW.   The following is hereby added to the end of Section 8.1, subparagraph (i):

In connection with the Lender's right to possession of the Property the Borrower acknowledges that it has been advised that there is a significant body of law in Michigan which purportedly provides that in the absence of a showing of waste of a character sufficient to endanger the value of the Property (or of other special factors) a person in the role of the Borrower is entitled to remain in possession of the Property and to enjoy the earnings, revenues, rents, issues, profits and income of the Property during the pendency of foreclosure proceedings and until the expiration of the redemption period, notwithstanding that the mortgage expressly provides to the contrary.   The Borrower further acknowledges that it has been advised that the Lender considers that the value of

the security granted hereby is inextricably intertwined with the effectiveness of the management, maintenance and general operation of the Property and that the Lender would not make the loan secured hereby unless it could be assured that it would have the right to take possession of the Property and manage or control management thereof and enjoy the earnings, revenues, rents, issues, profits and income of the Property therefrom immediately upon an Event of Default notwithstanding that foreclosure proceedings may not have been instituted or are pending or that the redemption period, if any, may not have expired. The Borrower hereby knowingly, intelligently and voluntarily waives all rights to possession of the Property from and after the occurrence of an Event of Default and upon demand for possession by the Lender the Borrower agrees not to assert any objection or defense to the Lender's request or to petition to a court for possession, and hereby consents to the appointment of a receiver for the Property. The rights hereby conferred upon the Lender have been agreed upon prior to the occurrence of an Event of Default and the exercise by the Lender of these rights shall not be deemed to put the Lender in the status of a "mortgagee in possession." The Borrower acknowledges that this provision is material to this transaction and that the Lender would not make the loan secured hereby but for this paragraph.

Section 15.7    RIGHT TO DEEM ALL OF MORTGAGED PROPERTY AS REAL PROPERTY. **IN ANY SALE OF THE PROPERTY MADE PURSUANT TO THIS SECURITY INSTRUMENT, LENDER, TO THE EXTENT PERMITTED BY APPLICABLE LAW, MAY ELECT TO DEEM ALL OF THE PROPERTY TO BE REAL PROPERTY FOR PURPOSES THEREOF.**

Section 15.8    FUTURE ADVANCES. (This Security Instrument is also a Future Advance Mortgage under applicable Michigan law). This Security Instrument is a "Future Advance Mortgage" under Public Act 348 of Public Acts of 1990, as amended (M.C.L.A. 565.901 et seq.). All future advances under the Note, this Security Instrument and the other Loan Documents shall have the same priority as if the future advance was made on the date that this Security Instrument was recorded. This Security Instrument shall secure all indebtedness of Borrower, its successors and assigns under the Note, this Security Instrument or any of the other Loan Documents, whenever incurred, indebtedness to be due at the times provided in the Note, the Loan Agreement and in this Security Instrument. Notice is hereby given that the indebtedness secured hereby may increase as a result of any advances, voluntary or involuntary, under the Note, the Loan Agreement, this Security Instrument or any other Loan Documents, any defaults hereunder by the Borrower due to, for example, and without limitation, unpaid interest or late charges, unpaid taxes or insurance premiums which Lender elects to advance, defaults under leases that Lender elects to cure, attorney fees or costs incurred in enforcing the Loan Documents or other expenses incurred by Lender in protecting the Property, the security of this Security Instrument or Lender's rights and interests.

[NO FURTHER TEXT ON THIS PAGE]

-17-

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower the day and year first above written.

**BORROWER**:

**RKJ HOTEL MANAGEMENT LLC**,
a Nevada limited liability company

By:   WOFM Inc, a Nevada corporation

By: _____
Name:   Jeff Katofsky
Title:   President

*[ACKNOWLEDGMENT FOLLOWS]*

Mortgage

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the Individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF California

COUNTY OF Los Angeles

On 01-08-2020

before me, Kim Taveira _____, a Notary Public, personally appeared Jeff Katofsky, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

**KIM TAVEIRA**
**Notary Public - California**
**Los Angeles County**
**Commission # 2203879**
**My Comm. Expires Jul 30, 2021**

(This area for official notarial seal)

Mortgage

PREPARED BY AND UPON
RECORDATION RETURN TO:

Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201

Attention:  John J. Tucker, Esq.

Mortgage

EXHIBIT A

(Description of Land)

Real property in the City of Romulus, County of Wayne, State of Michigan, described as follows:

A parcel of land located in the Southeast 1/4 of Section 10, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan, more particularly described as:

Beginning at a point on the South line of said Section 10 and centerline of Wick Road (66.00 feet wide), distant North 89° 40' 30" West, 60.00 feet from the Southeast corner of Section 10; proceeding thence North 89° 40' 30" West, 691.00 feet along the South line of Section 10 and centerline of Wick Road;
thence North 00° 31' 30" West, 639.36 feet;
thence South 89° 44' 55" East, 691.00 feet;
thence South 00° 31' 30" East, 640.25 feet along the West line of Wickham Road (93.00 feet wide) to the Point of Beginning.

Excepting therefrom: A parcel of land located in the Southeast 1/4 of Section 10, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan, more particularly described as:

Beginning at a point on the South line of said Section 10, distant North 89° 40' 30" West, 687.00 feet from the Southeast corner of Section 10;
thence North 89° 40' 30" West, 64.00 feet along the South line of Section 10;
thence South 00° 31' 30" West, 350.01 feet;
thence South 89° 42' 01" East, 64.01 feet;
thence South 00° 31' 30" East, 350.04 feet to the Point of Beginning.

For Informational Purposes Only:  Tax ID 80-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-701

0139458.0721479   4816-6969-5641v6

# Exhibit D

January 14, 2020

## GUARANTY OF RECOURSE OBLIGATIONS

This **GUARANTY OF RECOURSE OBLIGATIONS** (this "**Guaranty**") is executed as of January 14, 2020 by **JEFF KATOFSKY**, an individual, having an address at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403 (whether one or more collectively referred to as "**Guarantor**"), for the benefit of **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, having an address at 590 Madison Avenue, 9th Floor, New York, New York 10022 (together with its successors and assigns, "**Lender**").

### WITNESSETH:

**WHEREAS**, pursuant to that certain Promissory Note, dated of even date herewith, executed by **RKJ HOTEL MANAGEMENT LLC**, a Nevada limited liability company ("**Borrower**") and payable to the order of Lender in the original principal amount of Twenty Million Five Hundred Thousand and No/100 Dollars ($20,500,000.00) (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan (the "**Loan**") which is made pursuant to that certain Loan Agreement, dated of even date herewith, between Borrower and Lender (as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time, the "**Loan Agreement**");

**WHEREAS**, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined);

**WHEREAS**, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower; and

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

**NOW, THEREFORE**, as an inducement to Lender to make the Loan to Borrower and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE I
### NATURE AND SCOPE OF GUARANTY

Section 1.1    (a) Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.   Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.   As used herein, the term "**Guaranteed Obligations**" shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Section 8.6 of the Loan Agreement, and none other.

0139458.0721479  4824-5822-4793v7

(b)      Notwithstanding anything to the contrary in this Guaranty or in any of the other Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Obligations owing to Lender in accordance with the Loan Documents.

Section 1.2      It is expressly understood and agreed that this is a continuing guaranty and that the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Loan Agreement, the Security Instrument, or the other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

Section 1.3      Any indebtedness of Borrower to Guarantor now or hereafter existing (including, but not limited to, any rights to subrogation Guarantor may have as a result of any payment by Guarantor under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior payment in full of the Debt.  Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "**Bankruptcy Code**") which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantor agrees not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantor and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization.  Further, if Guarantor shall comprise more than one person, firm or corporation, Guarantor agrees that until payment in full of the Debt, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if any of Guarantor should receive any payment, satisfaction or security for any indebtedness of Borrower to any of Guarantor or for any contribution by the others of Guarantor for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Debt and until so delivered, shall be held in trust for Lender as security for the Debt.

Section 1.4      Guarantor agrees that, with or without notice or demand, Guarantor will reimburse Lender, to the extent that such reimbursement is not made by Borrower, for all expenses (including counsel fees) incurred by Lender in connection with the collection of the Guaranteed Obligations or any portion thereof or with the enforcement of this Guaranty.

Section 1.5      All moneys available to Lender for application in payment or reduction of the Debt may be applied by Lender in such manner and in such amounts and at such time or times and in such order and priority as Lender may see fit to the payment or reduction of such portion of the Debt as Lender may elect.

Section 1.6      Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, non-

2

performance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

Section 1.7    Guarantor further agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired (a) by reason of the assertion by Lender of any rights or remedies which it may have under or with respect to either the Note, the Loan Agreement, the Security Instrument, or the other Loan Documents, against any person obligated thereunder or against the owner of the Property, or (b) by reason of any failure to file or record any of such instruments or to take or perfect any security intended to be provided thereby, or (c) by reason of the release or exchange of any property covered by the Security Instrument or other collateral for the Loan, or (d) by reason of Lender's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy Lender may have hereunder or in respect to this Guaranty, or (e) by reason of the commencement of a case under the Bankruptcy Code by or against any person obligated under the Note, the Loan Agreement, the Security Instrument or the other Loan Documents, or the death of any Guarantor, or (f) by reason of any payment made on the Debt or any other indebtedness arising under the Note, Loan Agreement, the Security Instrument or the other Loan Documents, whether made by Borrower or Guarantor or any other person, which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Debt, nor shall it have the effect of reducing the liability of Guarantor hereunder. It is further understood, that if Borrower shall have taken advantage of, or be subject to the protection of, any provision in the Bankruptcy Code, the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to declare the Debt due and payable on the happening of any default or event by which under the terms of the Note, the Loan Agreement, the Security Instrument or the other Loan Documents, the Debt shall become due and payable, Lender may, as against Guarantor, nevertheless, declare the Debt due and payable and enforce any or all of its rights and remedies against Guarantor provided for herein.

Section 1.8    Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to any modification, extension or renewal of the Note, the Loan Agreement, the Security Instrument, or any of the other Loan Documents, that Lender shall not be under a duty to protect, secure or insure any security or lien provided by the Security Instrument or other such collateral, and that other indulgences or forbearance may be granted under any or all of such documents, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

Section 1.9    This is a guaranty of payment and not of collection and upon any default of Borrower under the Note, the Loan Agreement, the Security Instrument or the other Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrower or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying against any of the mortgaged property or other collateral for the Loan. Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

Section 1.10    The Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by

3

reason of any existing or future right of offset, claim or defense of Borrower or Guarantor against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1     Each Person constituting a Guarantor hereby warrants and represents unto Lender that (i) any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Guarantor did or will at the time of such delivery fairly and accurately present the financial condition of Guarantor, (ii) neither Guarantor nor any managing member, general partner or controlling stockholder of the Guarantor is currently a debtor in any bankruptcy, reorganization, insolvency or similar proceeding, (iii) no material adverse change in the financial condition of Guarantor or any managing member, general partner, trustee or controlling stockholder of Guarantor has occurred between the respective dates of the financial statements which were furnished to the Lender relating to such persons and the date hereof, (iv) the financial statements of Guarantor (and those of its members, general partners, trustees or controlling stockholder, as the case may be) furnished to the Lender pursuant to the commitment letter issued by Lender and accepted by Borrower in connection with the Loan, reflect in each case a positive net worth as of the date thereof, (v) Guarantor is not presently insolvent, and entering into this Guaranty will not render the Guarantor insolvent and (vi) after the Loan is made and this Guaranty is executed and delivered, Guarantor will have sufficient working capital to pay all of Guarantor's outstanding debts as they come due.  Guarantor further represents, warrants and covenants that, throughout the term of the Loan, Guarantor shall not reduce or deplete its net worth or liquidity in an effort to avoid its obligations (or contingent obligations) under this Guaranty.  As used in this Guaranty, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

Section 2.2     Guarantor (and its representative, executing below, if any) has full power, authority and legal right to execute this Guaranty and to perform all its obligations under this Guaranty.

Section 2.3     This Guaranty is a legal and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

## ARTICLE III
## FINANCIAL COVENANTS

Section 3.1     (a) Until all of the Obligations and the Guaranteed Obligations have been paid in full, each Person constituting a Guarantor (i) shall maintain (x) a Net Worth (hereinafter defined) of not less than **$20,500,000.00** and (y) Liquid Assets (hereinafter defined) of not less than **$2,050,000.00** (collectively, the "**Financial Covenants**"), (ii) within forty-five (45) days following the end of each calendar quarter from and after the occurrence of an Event of Default,

4

shall deliver to Lender, with respect to the prior calendar quarter, unaudited quarterly and year-to-date statements of income and expense and cash flow prepared on a cash basis for such Guarantor, together with a balance sheet as of the end of such prior calendar quarter for such Guarantor, together with a certificate of such Guarantor (A) setting forth in reasonable detail such Guarantor's Net Worth and Liquid Assets as of the end of such prior calendar quarter and based on the foregoing quarterly financial statements, and (B) certifying that such quarterly financial statements are true, correct, accurate and complete in all material respects and fairly present the financial condition of such Guarantor in a manner consistent with the Approved Accounting Standard, and (iii) within ninety (90) days following the end of each calendar year, shall deliver to Lender a complete copy of such Guarantor's annual financial statements prepared and reviewed by an independent certified public accountant reasonably acceptable to Lender in accordance with the Approved Accounting Standard, including statements of income and expense and cash flow and a balance sheet for such Guarantor, together with a certificate of such Guarantor (A) setting forth in reasonable detail such Guarantor's Net Worth and Liquid Assets as of the end of such prior calendar year and based on such annual financial statements, and (B) certifying that such annual financial statements are true, correct, accurate and complete in all material respects and fairly present the financial condition of such Guarantor. For the avoidance of doubt, Guarantor shall not be required to submit quarterly financial statements, as described in clause (ii) of this Section 3.1(a), unless an Event of Default shall have occurred but shall be obligated to submit annual financial statements, as described in clause (iii) of this Section 3.1(a), from and after the date hereof, so long as this Guaranty shall remain in effect.

(b) No Person constituting a Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of such Guarantor, including, without limitation, the payment of any dividend or distribution to a shareholder, partner or member as applicable, or the redemption, retirement, purchase or other acquisition for consideration of any stock or other ownership interest in such Guarantor, or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest therein, in each case on terms materially less favorable than would be obtained in an arms-length transaction.

As used herein, the following terms shall have the respective meanings set forth below:

"**Approved Accounting Standard**" shall mean GAAP or so-called "income tax basis" or "cash basis" of accounting or such other accounting standard reasonably acceptable to Lender, consistently applied.

"**GAAP**" shall mean generally accepted accounting principles, consistently applied.

"**Liquid Assets**" shall mean any of the following, but only to the extent owned individually, free of all security interests, liens, pledges, charges or any other encumbrance: (a) cash, (b) certificates of deposit (with a maturity of two years or less) issued by, or savings account with, any bank or other financial institution reasonably acceptable to Lender or (c) marketable securities listed on a national or international exchange reasonably acceptable to Lender, marked to market.

5

"**Net Worth**" shall mean, as of a given date, (i) a Guarantor's total assets as of such date less (ii) such Guarantor's total liabilities as of such date, determined in accordance with the Approved Accounting Standard.

**ARTICLE IV**
**MISCELLANEOUS**

Section 4.1     Each reference herein to Lender shall be deemed to include its successors and assigns, to whose favor the provisions of this Guaranty shall also inure. Each reference herein to Guarantor shall be deemed to refer to each and every person or entity comprising a Guarantor from time to time, as the sense of a particular provision may require, and to include the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor, all of whom shall be bound by the provisions of this Guaranty.

Section 4.2     If Guarantor is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership, and the term "Guarantor," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability.   If Guarantor is a corporation or limited liability company, the agreements contained herein shall remain in full force and applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors or managers relating to, the corporation or limited liability company, and the term "Guarantor" as used herein, shall include any alternative or successor corporation or limited liability company, but any predecessor corporation or limited liability company shall not be relieved of liability hereunder.

Section 4.3     Guarantor's liability under this Guaranty shall be in addition to any liability of Guarantor under any other guaranty or indemnity delivered by Guarantor in connection with the Loan.

Section 4.4     If Guarantor consists of more than one Person, the obligations of each such Person or party shall be joint and several.

Section 4.5     All understandings, representations and agreements heretofore had with respect to this Guaranty are merged into this Guaranty which alone fully and completely expresses the agreement of Guarantor and Lender.

Section 4.6     **GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THE NOTE, THE LOAN AGREEMENT, THE SECURITY INSTRUMENT, THIS GUARANTY OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

Section 4.7     This Guaranty may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together

6

shall constitute a single agreement of Guaranty.  The failure of any party hereto to execute this Guaranty, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 4.8    This Guaranty may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 4.9    (a) **THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN ARE DEEMED TO HAVE BEEN DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE OTHER LOAN DOCUMENTS, AND THIS GUARANTY AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(b)    **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING**

Section 4.10    Guarantor hereby represents and warrants that he is married and resides in the State of California, and his primary domicile is in the State of California.  Concurrently herewith, Guarantor has delivered to Lender a Spousal Consent (as defined below).  In the event (i) Guarantor enters into a new marriage while residing in and/or maintaining his primary domicile in the State of California or any other community property jurisdiction, or (ii) Guarantor enters into a new marriage while residing in/or maintaining his primary domicile in a non-community property jurisdiction and subsequently changes his state of residence and/or

7

primary domicile to a state that is a community property jurisdiction, then such Guarantor shall cause his spouse to execute and deliver to Lender a spousal consent with respect to this Guaranty (which spousal consent shall be in form and substance satisfactory to Lender) (a "**Spousal Consent**") within ten (10) days after the occurrence of any such marriage. Guarantor's failure to comply with any of the foregoing shall, at Lender's option, constitute an "Event of Default" hereunder and under the Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

0139458.0721479 4824-5822-4793v7

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the date first above set forth.

**GUARANTOR**:

_____

**JEFF KATOFSKY**, an individual

## BORROWER'S CERTIFICATION

In connection with that certain mortgage loan (the "**Loan**") being made by **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, having an address at 590 Madison Avenue, 9th Floor, New York, New York 10022 (together with its successors and/or assigns, "**Lender**") to **RKJ HOTEL MANAGEMENT LLC**, a Nevada limited liability company, having an address at 4558 Sherman Oaks Avenue, Sherman Oaks, California 91403 ("**Borrower**"), the undersigned hereby certifies to Lender as of this 14th day of January, 2020:

1.   True, complete and accurate copies of the financial statements of Borrower, and true, complete and accurate copies of the financial statements of Guarantor were delivered to Lender in connection with the Loan prior to the date hereof, and there has been no material adverse change in the assets, liabilities or financial condition of Borrower or Guarantor since the date such statements were delivered to Lender.

2.   True, complete and accurate copies of the operating statements of the Property were delivered to Lender in connection with the Loan prior to the date hereof, and there has been no material adverse change in the operating statement since the date such statements were delivered to Lender.

3.   The Borrower is a Nevada limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Nevada, and is authorized to do business in the State of Michigan.

4.   Neither the execution and delivery by the Borrower of the Loan Documents (as applicable) nor the performance of any of the actions and duties of the Borrower contemplated under the Loan Documents has constituted or will constitute a violation of (a) the organizational and other governing documents of the Borrower, (b) any agreement by which the Borrower is bound or to which any of its property or assets is subject, or (c) any law, regulation or court decree.

5.   There is no event or proceeding which is pending, threatened or which has occurred, which would materially adversely affect the Borrower or its properties or materially adversely affect the ability of the Borrower to perform its obligations under the Loan Documents.

6.   Attached hereto as <u>Exhibit A</u> are true, complete and accurate copies (including all amendments thereto) of the following documents with respect to Borrower:  (i) filed Articles of Organization, (ii) Operating Agreement, (iii) good standing certificate in the State of Nevada, (iv) authorizing resolutions and (v) good standing certificate in the State of Michigan.

7.   This Certificate may be relied upon by the O'Halloran Ryan PLLC, and Sadecki & Associates, P.L.L.C., counsel to the Borrower, in rendering its opinion of even date herewith in connection with the transaction contemplated hereby.

8.   This certificate may also be relied upon by Frost Brown Todd LLC, as counsel to Lender, and First American Title Insurance Company, as title insurance company.

0139458.0721479   4838-8422-2617v5

Any capitalized terms not defined herein shall have the meaning set forth in that certain Loan Agreement of even date herewith made by and between Borrower and Lender.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF**, the undersigned has caused this certificate to be executed as of the day and year first above written.

BORROWER:

**RKJ HOTEL MANAGEMENT LLC,**
a Nevada limited liability company

By:   WOFM Inc, a Nevada corporation

By: _____
Name:   Jeff Katofsky
Title:    President

Borrower's Certificate

# EXHIBIT A

## (BORROWER'S ORGANIZATIONAL DOCUMENTS)

(attached hereto)




*050103*

**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 4
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov



## Articles of Organization
## Limited-Liability Company
(PURSUANT TO NRS CHAPTER 86)

| Filed in the Office of | Business Number |
|---|---|
| | E0265692013-9 |
| | Filing Number |
| *[signature]* | 20130357257-35 |
| Secretary of State | Filed On |
| State Of Nevada | 05/30/2013 |
| | Number of Pages |
| | 1 |

(This document was filed electronically.)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                          ABOVE SPACE IS FOR OFFICE USE ONLY

| **1. Name of Limited-Liability Company:** (must contain approved limited-liability company wording; see instructions) | RKJ HOTEL MANAGEMENT LLC | | | Check box if a Series Limited-Liability Company ☐ | Check box if a Restricted Limited-Liability Company ☐ |
|---|---|---|---|---|---|

| **2. Registered Agent for Service of Process:** (check only one box) | ☐ Commercial Registered Agent: _____ Name | | |
|---|---|---|---|
| | ☒ Noncommercial Registered Agent (name and address below) **OR** | | ☐ Office or Position with Entity (name and address below) |
| | GREEN VALLEY MANAGEMENT | | |
| | Name of Noncommercial Registered Agent **OR** Name of Title of Office or Other Position with Entity | | |
| | 10120 EASTERN AVENUE SUITE 226 | HENDERSON | Nevada 89052 |
| | Street Address | City | Zip Code |
| | 10120 EASTERN AVENUE SUITE 226 | HENDERSON | Nevada 89052 |
| | Mailing Address (if different from street address) | City | Zip Code |

| **3. Dissolution Date:** (optional) | Latest date upon which the company is to dissolve (if existence is not perpetual): |
|---|---|

| **4. Management:** (required) | Company shall be managed by: ☒ Manager(s) **OR** ☐ Member(s) (check only one box) |
|---|---|

| **5. Name and Address of each Manager or Managing Member:** (attach additional page if more than 3) | 1) RICK BARRECA | | | |
|---|---|---|---|---|
| | Name | | | |
| | 4558 SHERMAN OAKS AVENUE | SHERMAN OAKS | CA | 91403 |
| | Street Address | City | State | Zip Code |
| | 2) | | | |
| | Name | | | |
| | Street Address | City | State | Zip Code |
| | 3) | | | |
| | Name | | | |
| | Street Address | City | State | Zip Code |

| **6. Effective Date and Time:** (optional) | Effective Date: | Effective Time: |
|---|---|---|

| **7. Name, Address and Signature of Organizer:** (attach additional page if more than 1 organizer) | JEFF KATOPSKY | | X JEFF KATOPSKY | |
|---|---|---|---|---|
| | Name | | Organizer Signature | |
| | 4558 SHERMAN OAKS AVENUE | SHERMAN OAKS | CA | 91403 |
| | Address | City | State | Zip Code |

| **8. Certificate of Acceptance of Appointment of Registered Agent:** | *I hereby accept appointment as Registered Agent for the above named Entity.* | |
|---|---|---|
| | X  GREEN VALLEY MANAGEMENT | 5/30/2013 |
| | Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity | Date |

This form must be accompanied by appropriate fees.

Nevada Secretary of State NRS 86 DLLC Articles
Revised: 8-31-11

**RESTATED OPERATING AGREEMENT FOR**
**RKJ HOTEL MANAGEMENT, LLC**
**A NEVADA LIMITED LIABILITY COMPANY**

This Restated Operating Agreement, is made as this 31st day of October, 2016 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

A.    On 19 June 2013, Articles of Organization for RKJ Hotel Management, LLC, a Nevada limited liability company (the "Company"), a limited liability company under the laws of the State of Nevada, were filed with the Nevada Secretary of State.

B.    The parties desire to adopt and approve this operating agreement for the Company. This Restated Operating Agreement replaces and supplants all prior Operating Agreements for the Company.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Restated Operating Agreement for the Company under the laws of the State of Nevada upon the terms and subject to the conditions of this Agreement.

**ARTICLE 1**
**DEFINITIONS**

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1_    Act shall mean Chapter 86 of the NRS as the same may be amended from time to time.

1.2_    Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3_    Agreement shall mean this Restated Operating Agreement, as originally executed and as amended from time to time.

1.4_    Articles shall mean the Articles of Organization for the Company originally filed with the Nevada Secretary of State and as amended from time to time.

1.5_    Bankruptcy shall mean, *(i)* the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally

affecting the rights of creditors and relief of debtors now or hereafter in effect; *(ii)* the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; *(iii)* the ordering of the winding up or liquidation of a Member's affairs; *(iv)* the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); *(v)* the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; *(vi)* the consent by a Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or *(vii)* the making by a Member of any general assignment for the benefit of its creditors.

1.6_ Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7_ Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8_ Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9_ Company shall mean RKJ Hotel Management, LLC, a Nevada Limited Liability Company.

1.10_ Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11_ NRS shall mean the Nevada Revised Statutes, as amended from time to time, and the provisions of succeeding law.

1.12_ Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

1.      When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

2.      By the unanimous written agreement of all Members.

1.13     "Distributable Net Cash shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14     Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to

this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    Reserved.

1.16    Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17    Former Members shall have the meaning ascribed to it in Section 8.1.

1.18    Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19    Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds Seventy Five percent (75%) of the aggregate of all Percentage Interests.

1.20    Manager shall mean Jeff Katofsky or any other person or entity who succeeds in that capacity.

1.21    Member shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

1.22    Member Nonrecourse Debt shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28     Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29     Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30     Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31     Tax Matters Partner shall be Jeff Katofsky or his successor as designated pursuant to Section 9.8.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1     Formation. Pursuant to the Act, the Members have formed a Nevada Limited Liability Company under the laws of the State of Nevada by filing the Articles with the Nevada Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company shall be RKJ Hotel Management, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3     Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2060, unless extended or sooner terminated as hereinafter provided.

2.4     Office and Agent. The Company shall continuously maintain an office and registered agent in the State of Nevada as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of Nevada, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5     Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6     Purposes of Company. Except as expressly set forth in this Agreement, the purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)    Operation, ownership and management of public hotel and related real estate owned, managed, operated or controlled by Company (the Property);

(2)    such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7    <u>Title to Property in the Name of the Company</u>. Title to Property and any other assets of the Company shall be held and owned in the name of the Company

2.8    <u>Tax Status of Company</u>. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1    <u>Initial Capital Contributions</u>. Each Member shall contribute such amount as is set forth on Exhibit B as his, hers or its initial Capital Contribution. Manager shall have $3,500,000 in its initial Capital Account from its initial investment, but shall not receive such funds from Distributions described below.

3.2    <u>Additional Capital Contributions</u>.

(1)    In addition, each Member shall contribute to the capital of the Company its Pro Rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)    If the Manager reasonably determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its Pro Rata share of such amounts as the Manager shall determine from time to time to be reasonably necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000) or thirty (30) days if over ten thousand dollars ($10,000) after the call is made for same by the Manager.

(3)    If the Manager reasonably determines that the Company requires additional funds for any purpose and requests that the Members contribute more funds to the Company, and not all Members so contribute then the following occurs: 1) Manager shall use best efforts to borrow such funds from a third party at any rate and term at his discretion, 2) The Members who do make such Additional Capital

Contributions shall receive ten percent (10%) annualized interest on such funds, and 3) For each ninety (90) day period in which such Additional Capital Contribution is not repaid, with interest or not paid by those non contributing Members , the non contributing Members shall have their Membership Interests diluted by ten percent (10%). That diluted interest shall then be distributed to the Members who funded the Additional Capital Contribution, in addition to the accrued interest described above, in proportion to the Additional Capital Contributions made.

(4)  Manager may reserve up to Two Hundred Thousand dollars ($200,000) from Cash Flow. Manager may not make a capital call for over $1,000,000 unless money is needed to pay a third party debt.

3.3   Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4   No Interest or Preferred Return. Except as otherwise expressly provided herein or in a separate agreement in writing executed by a majority of Members, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Accounts or loans. Distributions from Company, in any period per annum, shall be made to all Members based on the pro rata Percentage Interest in Company.

3.5   Limitation on Withdrawal of Capital Contribution. No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

## ARTICLE IV
## MEMBERS

4.1   Limited Liability. Except as provided in NRS relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party. If one or more Members or Manager is required to take recourse liability on any debt on behalf of the Company, all other Members shall be deemed to be jointly and severally liable on such recourse or liability and shall indemnify the other Members taking such recourse in accordance with their Membership Interests.

4.2    Admission of Additional Members. The Manager, with the approval of all of the Members, may admit to the Company additional Members. Notwithstanding, Katofsky Family Trust may transfer Membership Interest and admit Gillian Barecca or her nominee at any time. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

4.3    Purchase of Membership Interest. Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.4    Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.5    Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business..

4.6    Members Are Not Agents. Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager. No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Section 4.2 and Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional businesses or real property by the Company.

(v)    Matters designated in paragraph C below of this Section 4.7.

          (vi)     To enter into any joint venture investment with any Person.

          (vii)    To merge the Company with or to consolidate the Company with any Person, or otherwise cause the Company to participate in any reorganization with any Person.

          (xiii)   The decision to cause the Company to become a surety, guarantor, endorser or accommodation endorser for any Person.

          (ix)     Sale of substantially all of the assets of Company.

     B.     <u>Approval by Members Holding a Majority Interest</u>. Except as set forth in this Agreement, in Article V, and in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act.

     C.     <u>Other Voting Rights</u>. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

          (i)      Section 3.5 on remedies for a Member's failure to make a contribution;

          (ii)     Section 4.2 on admission of new Members;

          (iii)    Section 5.3B on a change in the purpose of the Company;

          (iv)   Section 5.3B on reorganization of the Company;

          (v)     Section 5.3B on other limitations on the Manager's authority;

          (vi)    Section 5.8 on transactions with the Manager and Affiliates of the Manager; and

          (vii)    Section 10.1 on dissolving the Company.

   4.8     <u>Meetings of Members</u>.

     A.     <u>Date, Time and Place of Meetings of Members; Secretary</u>. Meetings of Members may be held at such date, time and place within the State of Nevada as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

     B.     <u>Power to Call Meetings</u>. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

C.    Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

D.    Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.    Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

F.    Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

G.    Adjourned Meeting; Notice. Any Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-

five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

        H.    <u>Waiver of Notice or Consent</u>. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

        Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9.

        I.    <u>Action by Written Consent Without a Meeting</u>. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

        Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

        J.    <u>Telephonic Participation by Member at Meetings</u>. Members may participate in any Members' meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

        K.    <u>Record Date</u>. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record

date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

(i)      The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)      The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)      The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)      The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.      Proxies. Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless *(i)* revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or *(ii)* written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9      Certificate of Membership Interest.

A.      Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of Nevada; is a limited liability company; the

name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

    B. <u>Cancellation of Certificate</u>. All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

    C. <u>Replacement of Lost, Stolen or Destroyed Certificate</u>. Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

**ARTICLE V**
**MANAGEMENT AND CONTROL OF THE COMPANY**

  5.1 <u>Management of the Company by the Manager</u>.

    A. <u>Exclusive Management by Manager</u>. The day to day business and affairs of the Company shall be managed by the Manager. Except for situations in which the approval of the Members is expressly required by the Act, the Articles or this Agreement, the Manager shall have exclusive authority, power, and discretion to manage and control the day to day business and affairs of the Company; to make all decisions regarding those matters; to borrow money and obtain loans; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs. No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company.

    B. <u>Agency Authority of Manager</u>. The Manager, acting independently of the Members, are authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. All checks, drafts, and other instruments obligating the Company to pay money, may be signed by the Manager, acting alone. The Manager shall be authorized to sign contracts and obligations on behalf of the Company.

5.2     Election of Manager.

A.     Number. The Company shall have one (1) Manager.

B.     Removal. No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3     Powers of Manager.

A.     Powers of the Manager. Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

B.     Limitations On Powers of Manager. The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)     The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)     The merger of the Company with a corporation or a general partnership or other Person.

(iii)     The establishment of different classes of Members.

(iv)     An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)     Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest.

(vi)     Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)     Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)     The material amendment of this Agreement.

(ix)     The purchase of real property by the Company.

5.4     Members Have No Managerial Authority. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the

Articles and except as expressly required by the Act. No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5     **Performance of Duties; Liability of Manager**.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a)     one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)     any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

(c)     a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

5.6     **Devotion of Time**.  The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company.  The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

5.7     **Competing Activities**.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, except those that are the same as the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and

officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8    Transactions Between the Company and the Manager.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction.

5.9    Payments and Reimbursements to the Manager and Affiliates.  The Manager and Manager's Affiliates shall receive the following payments:

A.    Services Performed by Manager.  Except as otherwise provided herein, the Company shall pay the Manager a monthly management fee of three percent of gross income for services rendered to the Company in the reasonable scope of his management duties.

B.    Expenses.  The Company shall reimburse the Manager Manager's Affiliates and Members for the actual cost of goods and materials used for or by the Company.

5.10    Act of Manager as Conclusive Evidence of Authority.  Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Limited Liability.  No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

**ARTICLE VI**
**ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS**

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section 6.5(a) hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.    Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D.    Member Nonrecourse Deductions. Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

E.    Qualified Income Offset. Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), *(5)* or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), *(5)* and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

6.3    Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (*i.e.*, sales and dispositions made during the first fifteen *(15)* days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be

allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5     Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

A.     Distributions from Operations.

(i)     If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution, plus interest until each Member has recovered his, her or its additional capital contribution.

(ii)     If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned Capital Contribution until each Member has recovered his, her or its capital contribution.

(iii)     If such Distributable Net Cash is from Company's operations, to the Members in proportion to their Pro Rata Membership interest.

B.     Distributions from Sale, Financing or Refinancing of Company Real Property.

(i)     If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions, plus interest until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii)     Thereafter, to the Members in proportion to their Pro Rata Membership interest.

C.     Such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Except as expressly provided in the Act, neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager in its reasonable discretion may limit distributions by maintaining a working capital reserve of up to Two Hundred Thousand Dollars ($200,000.00).

6.6     Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a

dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.7     Restriction on Distributions.

A.     No distribution shall be made if, after giving effect to the distribution:

(i)     The Company would not be able to pay its debts as they become due in the usual course of business.

(ii)     The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.     The Manager may base a determination that a distribution is not prohibited on any of the following:

(i)     Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

(ii)     A fair valuation.

(iii)     Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

C.     Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8     Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a

creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9     Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
### TRANSFER AND ASSIGNMENT OF INTERESTS

7.1     Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2     Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3     Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4     Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.5     Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which

the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

7.6     Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his, hers or its legal representative or successor.

7.7     No Effect to Transfers in Violation of Agreement. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8     Buy-Sell. At any time and from time to time, a Member (in any case, the "Initiating Member") may purchase the Membership Interest of the other Member (in any case, the "Responding Member") or sell its Membership Interest to the Responding Member upon the

following terms:

(a)     The Initiating Member will notify the Responding Member in writing of its desire to initiate this buy-sell provision (the "Buy-Sell Notice"). The Buy-Sell Notice must state a valuation of the Property (the "Property Value"). The price payable as to any Member (the "Buy-Sell Price") will be that amount which the Member would receive pursuant to Section 6.7.B of this Agreement if the Property were sold for cash as of the date of the Buy-Sell Notice for the Property Value, all creditors, including Members, and liabilities, including Member Loans accrued liabilities, are paid in full, and the remaining proceeds distributed.

(b)     Within 20 days after the date of the Buy-Sell Notice (the "Response Date"), the Responding Member will deliver to the Initiating Member written notification of either (in any case, the "Response Notice"):

(i)     Such Responding Member's agreement to sell its entire Membership Interest at the Buy-Sell Price applicable to the Responding Member; or

(ii)    Such Responding Member's election to purchase the entire Membership Interest of the Initiating Member at the Buy-Sell Price applicable to the Initiating Member.

Failure by the Responding Member to respond by the Response Date will be deemed to be an election to proceed under Section 7.8(b)(i) above.

(c)     The Purchasing Member (herein so called), in addition to paying at the closing the Buy-Sell Price, will be obligated to loan to the Company an amount sufficient to discharge at the closing all outstanding and unpaid debts of the Company to the Selling Member (herein so called) as of such time, except any loans to the Company permitted by this Agreement which are secured by liens against the Property or any part thereof.

(d)     The Buy-Sell Price will be paid in cash at closing which will be held within 30 days after the Response Date or the date of the Response Notice, whichever date is earlier.

(e)     Upon receipt of the Buy-Sell Price, the Selling Member will execute and deliver all documents reasonably required to transfer the Membership Interest. The Selling Member will also execute such resignations and other documents as may be reasonably required by counsel for the Company.

7.9     Effective Date of Permitted Transfers of an Interest. Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

7.10    Consequences of Pledge or Grant of Security Interest. The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

## ARTICLE VIII
## CONSEQUENCES OF DEATH, DISSOLUTION,
## RETIREMENT OR BANKRUPTCY OF MEMBER

8.1     Purchase of Member's Interest. Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the rightful demand for the return of its Capital Account by the Member whose actions or conduct resulting in the Dissolution Event Former Member) or such Former Member's trustee or heirs, upon the inheritance or transfer by operation of law to any person, the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2     Withdrawal. Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3     Purchase Price. The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by ten percent (10%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4     Notice of Intent to Purchase. Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5     Election to Purchase Less Than All of An Interest. In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to Nevada law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6     Payment of Purchase Price. The purchase price shall be paid by the Company or the Remaining Member, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Member, as the case may be, may elect in their sole discretion.

8.7     Closing of Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or Nevada legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8     Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

**ARTICLE IX**
**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**

9.1     Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in Nevada all of the following:

A.     A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.     A current list of the full name and business or residence address of each Manager.

C.     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

D.     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.     Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2     Delivery to Members and Inspection.

A.     Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.     Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)      inspect and copy during normal business hours any of the Company records described in Section 9.IA through G; and

(ii)     obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.      Upon request of any Member, the Manager shall provide an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon not less than forty-eight (48) hours written notice to the Manager.

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.      The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.      The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3     <u>Additional Reports</u>.

A.      The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

B.      The Manager shall cause to be filed at least annually with the Nevada Secretary of State the statement required under the NRS.

9.4     Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5     Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the Nevada Secretary of State.

9.6     Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7     Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8     Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

9.9     Choice of Company's Accountant. The Company's Accountant shall be Fred Selwyn.

**ARTICLE X**
**DISSOLUTION AND WINDING UP**

10.1    <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

A.    Upon the happening of any event of dissolution specified in the Articles;

B.    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

C.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

D.    The sale of all or substantially all of the assets of Company.

10.2    <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Nevada Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.3    <u>Winding Up</u>. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof; shall cause the proceeds therefrom; to the extent sufficient therefor, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    <u>Distributions in Kind</u>. Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed

asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Manager or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5.  Order of Payment of Liabilities Upon Dissolution.

A.  The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.  The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

(i)  Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)  The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6  Compliance with Regulations. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7  Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8     Certificate of Cancellation. The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Nevada Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9     No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1     Indemnification of Agents. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an agent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit; provided, however, that in no event shall any party be indemnified from and against its gross negligence or willful misconduct. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems reasonably appropriate in the Manager's business judgment.

11.2     Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    Preexisting Relationship or Experience. (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    No Advertising. He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    Investment Intent. He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

12.4    Purpose of Entity. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

12.5    Economic Risk; Consulted with Advisor; Speculative Nature. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor.

12.6    No Registration of Membership Interest. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the NRS, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    Membership Interest in Restricted Security. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest

will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

12.8     No Obligation to Register. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9     No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the NRS, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

A.     There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.     (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.     In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10     Legends. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.     THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY. SUCH QUALIFICATION AND REGISTRATION IS NOT

REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

      B.      Any legend required by applicable state securities law.

    12.11  Investment Risk. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

    12.12  Investment Experience. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

    12.13  Restrictions on Transferability. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

    12.14  Information Reviewed. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

    12.15  No Representations by Company. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

        12.15.1 Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any

representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2 Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3 Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4 For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5 The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.16   Consultation with Attorney. He, she or it, with sufficient time, has been advised to consult with his, hers or its own independent attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and, with sufficient time, has done so, to the extent he, she or it considers necessary including, but not limited to, review of drafts of this Agreement.

12.17   Tax Consequences. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18   No Assurance of Tax Benefits. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of

income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19 <u>Indemnity</u>. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys. accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1 <u>Counsel to the Company</u>. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Company has initially selected, but not hired, Jeff Katofsky (Company Counsel) as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such written agreement Company Counsel shall owe no duties directly to any Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2 <u>Complete Agreement</u>. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3 <u>Binding Effect.</u> Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4 <u>Parties in Interest.</u> Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5 <u>Pronouns; Statutory References.</u> All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6 <u>Headings.</u> All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7 <u>Interpretation.</u> In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8 <u>References to this Agreement.</u> Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9 <u>Jurisdiction.</u> Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Nevada in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of Nevada.

13.10 <u>Disputed Matters.</u> Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Nevada before the

prevailing arbitration service, before a retired Judge or Magistrate, under the real estate arbitration rules for the State of Nevada. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11   Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12   Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13   Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14   Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15   Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16   Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17   No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the

Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

**13.18    Multiple Counterparts**. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**13.19    Attorney Fees**. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

**13.20    Time is of the Essence**. All dates and times in this Agreement are of the essence.

**13.21    Remedies Cumulative**. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

**13.22    No Third Party Beneficiary**. The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

**13.23    Not for Benefit of Creditors**. The provisions of the Agreement are intended only for the regulation of relations among Members and Company. The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

**13.24    Rights of Judgment Creditor of Member**. On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged the judgment creditor has only the rights of an assignee of the Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

**13.25    Legal Representative or Successor of a Member**. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

**13.26    Number of Members**. The Company shall at all times have at least two (2) members.

13.27   <u>No Responsibility for Pre-Formation Commitments</u>. In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company, neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager.  Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates).

13.28   <u>Cooperation in Tax Deferred Exchange</u>. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the assets, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the assets, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same

IN WITNESS WHEREOF all of the Members of **RKJ HOTEL MANAGEMENT**, LLC, A Nevada limited liability company, have executed this Agreement, effective as of the date written above.

By: _____
Name: Katofsky family Trust, Member
Its: Trustee

By: _____
Name: Jeff Katofsky, Managing Member

Alexis Ariella, LLC, Member

By: _____
Name: Sean Leoni
Its:   Manager

20666.001-3492345v2
RESTATED OPERATING AGREEMENT RKJ

40

January 6, 2017

SG Weisman

Weisman Holdings, LLC, Member

By: _____
Name: Sharen Golshan
Its:     Manager

SGR, LLC, Member

By: _____
Name: ~~Benjamin Soofer~~ BETZA SOOFER
Its:     Manager

Samra, LLC, Member

By: _____
Name:
Its:     Manager

**EXHIBIT "A"**
**Investors**

| Name | Percent |
|------|---------|
| Katofsky Family Trust<br>4558 Sherman Oaks Avenue<br>Sherman Oaks CA 91403 | 40.00% |
| Alexis Ariella, LLC<br>5455 Collingwood Circle<br>Calabasas CA 91302 | 20.00% |
| Wesiman Holdings, LLC<br>2283 Stratford Circle<br>LA CA 90077 | 20.00% |
| SGR, LLC<br>2815 Deep Canyon Drive<br>Beverly Hills CA 90210 | 5.00% |
| Samra, LLC | 15.00% |

**EXHIBIT "B"**
**Initial Capital Contributions**

| Name | Initial Capital |
|---|---|
| Katofsky Family Trust<br>4558 Sherman Oaks Avenue<br>Sherman Oaks CA 91403 | $2,210,000.00 |
| Samra, LLC<br>4558 Sherman Oaks Avenue<br>Sherman Oaks CA 91403 | $825,000 |
| Alexis Ariella, LLC<br>5455 Collingwood Circle<br>Calabasas CA 91302 | $1,100,000 |
| Wesiman Holdings, LLC<br>2283 Stratford Circle<br>LA CA 90077 | $1,100,000 |
| SGR, LLC<br>2815 Deep Canyon Drive<br>Beverly Hills CA 90210 | $275,000 |

**AMENDMENT TO THE RESTATED OPERATING AGREEMENT FOR
RKJ HOTEL MANAGEMENT, LLC
A NEVADA LIMITED LIABILITY COMPANY**

This Amendment to Operating Agreement (this "Amendment"), is made as of this _14th_day of January, 2020 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

A.  On 19 June 2013, Articles of Organization for **RKJ HOTEL MANAGEMENT, LLC,** a Nevada limited liability company (the "Company"), a limited liability company under the laws of the State of Nevada, were filed with the Nevada Secretary of State, Document Number E0265692013-9.

B.  On 31 October 2016, the members of the Company (hereinafter sometimes collectively referred to as the "Members", or individually as a "Member") entered into that certain Restated Operating Agreement of the Company (the "Operating Agreement").

C.  The Members desire to adopt and approve this Amendment to the Operating Agreement.

NOW, THEREFORE, the Members set forth the agreements in this Amendment under the laws of the State of Nevada upon the terms and subject to the conditions of this Amendment.

**Membership Interest Transfer**

Katofsky Family Trust hereby transfers 1% of its Membership Interest in Company to WOFM Inc, a Nevada corporation ("WOFM"), and the Members hereby consent to such transfer and the admission of WOFM as a Member of the Company.

**Section 1.20 shall be deleted in its entirety and replaced with the following:**

1.20     Manager shall mean **WOFM INC,** A Nevada corporation ("WOFM"), which is a single purpose entity (as more particularly described in WOFM's Articles of Formation, as the same have been or will be amended, restated and/or otherwise modified), only owning and acting on behalf of its interest and position within Company.

**The following Sections are added to the Operating Agreement**

1.32     A "**Single Purpose Entity**" means a limited liability company that:

(a)       is organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)       has not engaged and will not engage in any business or activity unrelated to the acquisition, development, ownership, management or operation of the Property;

(c)       has not owned and will not own any assets other than (i) the Property, or (ii) such incidental Personal Property as may be necessary for the operation of the Property;

(d)      has not engaged in, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets;

(e)      has preserved and will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation and will not without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents, or consent to or suffer the amendment, modification, termination or breach of any of the Organizational Documents;

(f)      has not owned and will not own any subsidiary or make any investment in, any person or entity;

(g)      has not commingled and will not commingle its assets with the assets of any of its managing members, Affiliates, principals or of any other person or entity;

(h)      has not incurred and will not incur any Indebtedness, other than the following: (i) the Debt and, prior to the date hereof, the Prior Loan, (ii) Permitted Equipment Lease, and (iii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount, together with Permitted Equipment Leases, not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to clause (iii) shall be (A) outstanding not more than sixty (60) days and (B) incurred in the ordinary course of business.  No Indebtedness, other than the Debt, may be secured (senior, subordinate or pari passu) by the Property;

(i)      has maintained and will maintain its financial statements, accounting records, bank accounts and other entity documents separate and apart from those of the members, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(j)      has not entered into or been a party to and will not enter into or be a party to any contract or agreement with any general partner, managing member, shareholder, principal or Affiliate of Borrower, any Guarantor, or any general partner, managing member, shareholder, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties;

(k)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(l)      has not made and will not make any loans to any third party;

(m)      has held itself out and identified itself and will hold itself out and identify itself to the public as a legal entity separate and distinct from any other Person;

(n)      has conducted and will conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that such entity is responsible for the debts of any third party (including any managing member, principal or Affiliate of such entity);

(o)     is and will endeavor to remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(p)     has maintained and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(q)     has filed and will file its own tax returns, if any, as may be required under applicable law, to the extent such entity is (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(r)     has allocated and will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(s)     has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and pay the salaries of its own employees from its own funds;

(t)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(u)     has held and will hold its assets in its own name and has conducted and will conduct its business in its own name;

(v)     has paid and will pay its own liabilities and expenses;

(w)     has observed and will observe all limited liability company formalities;

(x)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(y)     has not and will not acquire obligations or securities of its members or any other Affiliate;

(z)     maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name;

(aa)    has not pledged and will not pledge its assets for the benefit of any other Person;

(bb)    has not and will not have any obligation to, and will not, indemnify its officers, managers or members, as the case may be, unless such an obligation is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(cc)    except for Guarantor's obligations under the Loan Documents and Permitted Equipment Leases, does not and will not have any of its obligations guaranteed by any Affiliate of such entity;

(dd)    has complied and will comply with all of the terms and provisions contained in its Organizational Documents;

(ee)    has acted and will continue to act in a manner to make the statement of facts contained in its Organizational Documents true and correct;

(ff)    has considered and will continue to consider the interests of its creditors in

connection with all actions; and

(gg) has and will continue to have at least one (1) manager or managing member that is a Single Purpose Entity (as such term is defined in the Loan Agreement) that owns at least one-half of one percent (0.5%) of the membership interests of the Company.

Any capitalized terms used in this Section 1.32 but not otherwise herein defined shall have the meaning set forth in that certain Loan Agreement (the "Loan Agreement") to be entered into by and between the Company and **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company (the "Lender").

2.9     Single Purpose Entity. Notwithstanding anything in this Agreement to the contrary, for so long as that certain loan (the "Loan") from Lender to the Company, as evidenced by, among other things, the Loan Agreement, remains outstanding, the Company shall be and remain a Single Purpose Entity.

2.10     Limitation on Actions. The Company will not (and the Members agree that Company will not), without the unanimous consent of the board of directors of Manager, (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (B) seek or consent to the appointment of a receiver, liquidator or any similar official for the Company or a substantial portion of its assets or properties, (C) take any action that might cause the Company to become insolvent, (D) make an assignment for the benefit of creditors, (E) admit in writing Company's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligations, or (G) take any action in furtherance of any of the foregoing.

13.29     Separateness Provisions. Notwithstanding any other provision hereof (including, without limitation Sections 13.22 and 13.23 hereof), it is expressly acknowledged that Lender is an intended third-party beneficiary of the special purpose and separateness provisions of this Agreement (including, without limitation, Sections 1.32, 2.9 and 2.10 hereof).

IN WITNESS WHEREOF all of the Members of **RKJ HOTEL MANAGEMENT LLC**, A Nevada limited liability company, have executed this Amendment, effective as of the date written above.

Katofsky Family Trust, Member

By: _____
Name: Jeff Katofsky
Its: Trustee

WOFM Inc, Member

By:
Name: Jeff Katofsky
Its:    President

Alexis Ariella, LLC, Member

By:
Name: Sean Leoni
Its:    Manager

Wesiman Holdings, LLC, Member

By:
Name: Sharen Golshan
Its:    Manager

SGR, LLC, Member

By:
Name: Benjamin Soofer
Its:    Manager

Samra, LLC, Member

By:
Name:
Its:    Manager

0139458.0721479  4837-0609-8096v2



## SECRETARY OF STATE



STATE OF NEVADA

# CERTIFICATE OF EXISTENCE
# WITH STATUS IN GOOD STANDING

I, Barbara K. Cegavske, the duly qualified and elected Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporations sole, limited-liability companies, limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate.

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence, **RKJ HOTEL MANAGEMENT LLC**, as a DOMESTIC LIMITED-LIABILITY COMPANY (86) duly organized under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since 05/30/2013, and is in good standing in this state.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on 12/23/2019.

*Barbara K. Cegavske*

BARBARA K. CEGAVSKE
Secretary of State

Certificate Number: B20191223461846
You may verify this certificate
online at http://www.nvsos.gov

## RESOLUTION

THE UNDERSIGNED, being all of the members (the "Members") of **RKJ HOTEL MANAGEMENT LLC,** a Nevada limited liability company (the "Company"), by Unanimous Consent in Writing without the formality of convening a meeting, do hereby consent to the taking of the following actions and adoption of the following resolutions by the Members, with the same force and effect as though duly adopted at a duly held and convened meeting of the Members at which all of the Members were present and voting throughout:

WHEREAS, the Company desires to refinance the premises located at Marriott Delta Detroit - 31500 Wick Road, Romulus, Michigan 48174 ("Premises"); and

WHEREAS, the Company desires to finance the above described as a loan transaction with RIALTO MORTGAGE FINANCE, LLC ("RIALTO") in the amount of $20,500,000.00 ("Indebtedness"), upon the terms set forth in RIALTO'S Promissory Note, and the other related loan documents to the Company dated January 14 , 2020, ("Loan Documents"); and

NOW, THEREFORE, BE IT RESOLVED AS FOLLOWS:

RESOLVED, that the Company deems it to be advisable and in its best interest to finance the above described as a loan transaction in the manner contemplated by the Loan Documents; and be it

RESOLVED, that the Company hereby is authorized to enter into the loan transaction contemplated by the Loan Documents and to perform all obligations and accept all liabilities (including without limitation the indemnifications) contemplated by the Loan Documents and the documents to be executed in connection therewith, all upon such terms as the manager of the Company deems appropriate; and be it

RESOLVED, that the manager of the Company hereby is authorized and empowered to execute and deliver, in the name of and on behalf of the Company, all documents, agreements, instruments and certifications as such manager, in his sole discretion, deems necessary or advisable to consummate the transaction contemplated by the Loan Documents, and to take such further action as shall, in his judgment, be necessary or appropriate in order to carry out the intent and accomplish the purposes of the foregoing resolutions; and be it

RESOLVED, that all documents executed to carry out the intent of the foregoing resolutions by said manager, when so executed and delivered, shall be the valid obligation of and binding upon the Company, in the form and content in which they are so executed; and be it

RESOLVED, that all actions taken by or on behalf of the Company in carrying out the intent of the foregoing resolution, including without limitation, execution and acceptance of the Loan Documents, be and they hereby are ratified, approved and confirmed; and be it

RESOLVED, that this written consent may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, the foregoing Resolutions are unanimously adopted by written consent of all the Members this _____ day of _____, 2020.

MEMBERS:

By:_____
Katofsky Family Trust
By: Jeff Katofsky
Title: Trustee

WOFM Inc, Member

By: _____
Name: Jeff Katofsky
Its:     President

Alexis Ariella, LLC, Member

By: _____
Name: Sean Leoni
Its:    Manager

Wesiman Holdings, LLC, Member

By: _____
Name: Sharen Golshan
Its:    Manager

SGR, LLC, Member

By: _____
Name: Benjamin Soofer
Its:    Manager

Samra, LLC, Member

By: _____
Name:
Its:    Manager



## United States of America

## The State Michigan

### Department of Licensing and Regulatory Affairs

#### Lansing, Michigan

This is to Certify That

**RKJ HOTEL MANAGEMENT LLC**

a(n) Nevada  FOREIGN LIMITED LIABILITY COMPANY.

was validly authorized on October 15 , 2015, to transact business in Michigan, and that said limited liability company holds a valid certificate of authority to transact business in this state, and has satisfied its annual filing obligations.

This certificate is issued pursuant to the provisions of 1993 PA 23 to attest to the fact that the limited liability company is in good standing in Michigan as of this date and is duly authorized to transact in this state any business set forth in its application which a domestic limited liability company formed under this act may lawfully conduct except as limited by statements in its Application for Certificate of Authority or under the law of its jurisdiction of organization.

This certificate is in due form, made by me as the proper officer, and is entitled to have full faith and credit given it in every court and office within the United States.



In testimony whereof, I have hereunto set my hand, in the City of Lansing, this 23rd day of December , 2019.

*Linda Clegg*

Linda Clegg, Interim Director

Corporations, Securities & Commercial Licensing Bureau

Sent by electronic transmission

Certificate Number: 19127580890

Verify this certificate at: URL to eCertificate Verification Search http://www.michigan.gov/corpverifycertificate.

# Exhibit E



**Dykema Gossett PLLC**
10 S. Wacker Drive
Suite 2300
Chicago, IL 60606
WWW.DYKEMA.COM
Tel:  (312) 876-1700
Fax: (312) 876-1155

**Robert B. Groholski**
Direct Dial: (312) 627-2295
Direct Fax: (866) 864-3413
Email: RGroholski@dykema.com

August 7, 2020

**Via Overnight Courier**
RKJ Hotel Management LLC
4558 Sherman Oaks Avenue
Sherman Oaks, California 91043
Attn: Jeff Katofsky

Re:   Loan in the original principal amount of $20,500,000.00 (the "Loan") made by Rialto Mortgage Finance, LLC, a Delaware limited liability company ("Original Lender"), to RKJ Hotel Management LLC, a Nevada limited liability company ("Borrower")

### NOTICE OF EVENT OF DEFAULT AND RESERVATION OF RIGHTS

Dear Borrower:

Please be advised that this firm represents Rialto Capital Advisors, LLC ("Special Servicer"), as special servicer on behalf of Wilmington Trust, National Association, as Trustee for the benefit of the registered holders of Wells Fargo Commercial Mortgage Trust 2020-C55, Commercial Mortgage Pass-Through Certificates, Series 2020-C55 ("Noteholder") in connection with the captioned matter.

Reference is made to that certain **Loan Agreement** (as amended, restated or replaced from time to time, the "Loan Agreement") dated as of January 14, 2020 by and between Original Lender and Borrower pursuant to which Original Lender agreed, among other things, to make the Loan to Borrower. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

The Loan is evidenced by a certain Promissory Note dated as of January 14, 2020, made by Borrower and payable to the order of Original Lender in the original principal amount of Twenty Million Five Hundred Thousand and No/100 Dollars ($20,500,000.00) (as amended, restated or replaced from time to time, the "Note"), and is secured by, among other things (i) a certain Mortgage (the "Mortgage") dated as of January 14, 2020, made by Borrower in favor of Original Lender, which Mortgage encumbers certain real estate located at 31500 Wick Road, Romulus, Michigan 48174 (the "Property"), (ii) a certain Assignment of Leases and Rents dated as of January 14, 2020, made by Borrower in favor of Original Lender (the "Assignment of Leases"), which Assignment of Leases also encumbers the Property, and (iii) a certain Guaranty of Recourse Obligations dated as of January 14, 2020  made by Jeff Katofsky (the "Guarantor") in

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

108652.000064 4850-6871-5975.1

DYKEMA

RKJ Hotel Management LLC
August 7, 2020
Page 2

favor of Original Lender (as amended, restated or replaced from time to time, the "Guaranty"), and (iv) certain other agreements, documents and instruments (the Loan Agreement, the Note, the Mortgage, the Assignment of Leases, the Guaranty and such other agreements, documents and instruments, which evidence, secure or otherwise have been executed in connection with the Loan, in their original form and as amended, restated or replaced from time to time, are collectively referred to herein as the "Loan Documents").

Noteholder is the successor to Original Lender in, to and under the Loan and the Loan Documents.

On behalf of Noteholder, you are hereby given written notice that an "Event of Default" (as such term is defined in the Loan Documents) has occurred and is continuing under the Loan Documents. Specifically, **Borrower has failed to make the Monthly Debt Service Payment Amount, the Monthly Tax Deposit, the Monthly Insurance Deposit, and the Monthly Capital Expenditure Deposit due to Noteholder under the Loan Documents beginning on April 6, 2020 and continuing each month thereafter** (the foregoing Event of Default is hereinafter referred to as the "Existing Event of Default").

As a result of the Existing Event of Default set forth herein, you are hereby notified that Noteholder is and will be entitled, at any time after the date of this Letter, to exercise all or any of its rights and remedies under the Loan Documents, including but not limited to, acceleration of the Loan, foreclosure of the Mortgage, and/or exercising any other rights and remedies that may otherwise be available to Noteholder at law or in equity in order to collect the sums now or hereafter due and owing to Noteholder under the Note and the other Loan Documents and Noteholder hereby reserves every right and remedy provided for in the Loan Documents and all rights and remedies available to Noteholder now or hereafter existing at law or in equity.

Although Noteholder has not yet elected to exercise any of the other rights and remedies available to Noteholder under the Loan Documents or otherwise available at law and/or in equity by reason of the Existing Event of Default, Noteholder hereby advises you that it may do so any time after the date hereof. Continued delay in immediately exercising rights and remedies available to Noteholder by reason of the occurrence of the Existing Event of Default shall not constitute a waiver of Lender's right to do so in the future and nothing herein shall be construed as a waiver of the Existing Event of Default.

The description of the Existing Event of Default identified in this letter is not intended to enumerate an exhaustive, complete or exclusive list of all Defaults or Events of Default that may currently exist under the Loan Documents. Accordingly, this letter shall not constitute a waiver of any other Defaults or Events of Default of Borrower and/or any Guarantor under the Loan Documents that are not specifically enumerated herein, whether such Defaults or Events of Default exist or hereafter shall occur.

In the event that any payment is received by Noteholder from Borrower with respect to the Note and the other Loan Documents in an amount that is less than the amounts identified above, such

DYKEMA

RKJ Hotel Management LLC
August 7, 2020
Page 3

receipt shall not constitute an accord and satisfaction, and Borrower shall remain liable for all additional payments due and payable to Noteholder under the Note and the other Loan Documents.

In the past, Noteholder may have accepted partial or late payments under the Note and the other Loan Documents; however, from this date forward, please be advised that any payment of less than the full amount required to be paid is not acceptable. Further, from this date forward, please be advised that late payments are not acceptable. If, however, payment of less than the full amount required to be paid is accepted, or if late payments are accepted, such payments may be applied to the outstanding obligation due and owing to Noteholder, but will not serve to reinstate the indebtedness owing under the Loan Documents or forestall the acceleration and maturity of the Note. In addition, such payments will not constitute a waiver of any contractual, legal or equitable right Noteholder may have regarding the collection of this debt, including, but not limited to the right to accelerate the maturity of the Note, foreclose the Property and/or bring suit for payment of the entire amount of the indebtedness owing under the Loan Documents.

Nothing in this letter shall be construed as a charge of or demand for more interest than applicable usury laws allow or of any amount which is not recoverable or chargeable by the Noteholder under the Loan Documents or the applicable law, and if any amount is stated or referred to in this letter as being due, owing or payable which exceeds the maximum amount of interest allowed by applicable law or which is not lawfully recoverable or chargeable under the Loan Documents or the applicable law, then only so much of that amount as does not exceed such maximum amount and is lawfully chargeable or recoverable shall be considered as being demanded by this letter, and this sentence governs and controls over any conflicting or inconsistent provision of this letter.

Any discussions or correspondence among Noteholder, Special Servicer, Borrower and/or the Guarantor regarding the Loan Documents that have previously occurred or that may occur hereafter, including any proposed terms and conditions addressing any restructuring of the Loan, shall not (i) cause a modification of the Loan Documents, (ii) be construed or have the effect of curing, excusing, waiving, relinquishing, releasing or postponing the Existing Event of Default under the Loan Documents, (iii) establish a custom or course of dealing, or other basis for altering any obligation of Borrower or any right, power or privilege of the Noteholder under the Loan Documents, (iv) waive, limit or condition the rights and remedies of the Noteholder under the Loan Documents, at law or in equity, all of which are hereby expressly reserved, or (v) constitute a commitment to extend credit to Borrower or modify the Loan.

Notwithstanding any previous action or inaction by or on behalf of Noteholder to the contrary, you are hereby notified that Noteholder will hereafter require strict compliance by Borrower with the terms and conditions of the Note evidencing the Loan and the other Loan Documents, and Noteholder does not in any manner waive any rights or remedies available to Noteholder against Borrower under the Loan Documents or applicable law.

To the extent that Borrower or any other recipient of this letter is currently involved in bankruptcy proceedings, and a plan of reorganization has not been confirmed or the automatic stay under 11

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

Dykema

RKJ Hotel Management LLC
August 7, 2020
Page 4

U.S.C. §362(a) has not been terminated, or to the extent that Borrower or any other recipient has received a discharge in bankruptcy subsequent to the date of the Note, this letter shall not constitute a demand on such party, but is hereby given for informational purposes only.

After you have had a chance to review the foregoing, kindly contact Matthew Cohen of Special Servicer at (305) 929-7693 or matthew.cohen@rialtocapital.com if you have any questions, or have your counsel contact the undersigned if you are represented by counsel.

Very truly yours,

DYKEMA GOSSETT, PLLC

Robert B. Groholski

cc:     Jeff Katofsky
        4558 Sherman Oaks Avenue
        Sherman Oaks, California 91403
        (*Via Overnight Courier*)

        Daniel Ornstein (*via e-mail*)
        Matthew Cohen (*via e-mail*)
        Edward S. Weil, Esq. (*via e-mail*)
        Jerrold M. Peven, Esq. (*via e-mail*)

**Mandel, Candace**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Monday, August 10, 2020 11:45 AM |
| **To:** | Mandel, Candace |
| **Subject:** | FedEx Shipment 395598093042: Your package has been delivered |

*** EXTERNAL***



# Hi. Your package was delivered Mon, 08/10/2020 at 9:42am.



Delivered to 4558 SHERMAN OAKS AVE, SHERMAN OAKS, CA 91403
Received by S.SECRETARY

**OBTAIN PROOF OF DELIVERY**

## Personal Message

PSShip eMail Notification

| | |
|---|---|
| TRACKING NUMBER | <u>395598093042</u> |
| FROM | Dykema Gossett |
| | Suite 2300 |
| | 10 South Wacker Drive |
| | Chicago, IL, US, 60606 |
| TO | Jeff Katofsky |
| | 4558 SHERMAN OAKS AVE |
| | SHERMAN OAKS, CA, US, 91403 |
| REFERENCE | 05214: 108652-000064 |
| SHIPPER REFERENCE | 05214: 108652-000064 |
| SHIP DATE | Fri 8/07/2020 06:23 PM |
| DELIVERED TO | Receptionist/Front Desk |
| PACKAGING TYPE | FedEx Envelope |
| ORIGIN | Chicago, IL, US, 60606 |
| DESTINATION | SHERMAN OAKS, CA, US, 91403 |
| SPECIAL HANDLING | No Signature Required |
| NUMBER OF PIECES | 1 |
| TOTAL SHIPMENT WEIGHT | 0.50 LB |
| SERVICE TYPE | FedEx Priority Overnight |



# Download the FedEx® Mobile app

Get the flexibility you need to create shipments and request to customize your deliveries through the app.

**LEARN MORE**

## This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Dykema Gossett |
| **Name:** | Robert Groholski |
| **Email:** | RGroholski@dykema.com |

FOLLOW FEDEX

f   🐦   ◎   in   𝓅   ▶   G+

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:44 AM CDT 08/10/2020.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2020 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**Mandel, Candace**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Monday, August 10, 2020 11:44 AM |
| **To:** | Mandel, Candace |
| **Subject:** | FedEx Shipment 395597971160: Your package has been delivered |

*** EXTERNAL***



# Hi. Your package was delivered Mon, 08/10/2020 at 9:42am.



Delivered to 4558 SHERMAN OAKS AVE, SHERMAN OAKS, CA 91403
Received by S.SECRETARY

**OBTAIN PROOF OF DELIVERY**

## Personal Message

PSShip eMail Notification

| | |
|---|---|
| TRACKING NUMBER | <u>395597971160</u> |
| FROM | Dykema Gossett<br>Suite 2300<br>10 South Wacker Drive<br>Chicago, IL, US, 60606 |
| TO | Jeff Katofsky<br>4558 SHERMAN OAKS AVE<br>SHERMAN OAKS, CA, US, 91403 |
| REFERENCE | 05214: 108652-000064 |
| SHIPPER REFERENCE | 05214: 108652-000064 |
| SHIP DATE | Fri 8/07/2020 06:23 PM |
| DELIVERED TO | Receptionist/Front Desk |
| PACKAGING TYPE | FedEx Envelope |
| ORIGIN | Chicago, IL, US, 60606 |
| DESTINATION | SHERMAN OAKS, CA, US, 91403 |
| SPECIAL HANDLING | No Signature Required |
| NUMBER OF PIECES | 1 |
| TOTAL SHIPMENT WEIGHT | 0.50 LB |
| SERVICE TYPE | FedEx Priority Overnight |



# Download the FedEx® Mobile app

Get the flexibility you need to create shipments and request to customize your deliveries through the app.

LEARN MORE

## This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Dykema Gossett |
| **Name:** | Robert Groholski |
| **Email:** | RGroholski@dykema.com |

**FOLLOW FEDEX**

f  🐦  ◎  in  𝓟  ⌨  G+

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:44 AM CDT 08/10/2020.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

3

© 2020 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# Exhibit F



**Dykema Gossett PLLC**
39577 Woodward Avenue
Suite 300
Bloomfield Hills, MI 48304
WWW.DYKEMA.COM
Tel: (248) 203-0700
Fax: (248) 203-0763
**Adam M. Fishkind**
Direct Dial: (248) 203-0749
Direct Fax: (855) 236-1204
Email: AFishkind@dykema.com

September 16, 2020                                        VIA FEDERAL EXPRESS

RKJ Hotel Management LLC
4558 Sherman Oaks Avenue
Sherman Oaks, California 91403

Attention:  Jeff Katofsky

Re:    Loan in the original principal amount of $20,500,000.00 (the "Loan") made by Rialto
       Mortgage Finance, LLC, a Delaware limited liability company ("Original Lender"), to RKJ
       Hotel Management LLC, a Nevada limited liability company ("Borrower")

### NOTICE OF EVENT OF DEFAULT AND RESERVATION OF RIGHTS

Dear Borrower:

As you are aware, our firm represents Rialto Capital Advisors, LLC ("Special Servicer"), as special
servicer on behalf of Wilmington Trust, National Association, as Trustee for the benefit of the
registered holders of Wells Fargo Commercial Mortgage Trust 2020-C55, Commercial Mortgage
Pass-Through Certificates, Series 2020-C55 ("Noteholder") in connection with the captioned
matter.

Reference is made to that certain Loan Agreement (as amended, restated or replaced from time to
time, the "Loan Agreement") dated as of January 14, 2020 by and between Original Lender and
Borrower pursuant to which Original Lender agreed, among other things, to make the Loan to
Borrower. All capitalized terms used but not defined herein shall have the meanings ascribed to
them in the Loan Agreement.

The Loan is evidenced by a certain Promissory Note dated as of January 14, 2020, made by
Borrower and payable to the order of Original Lender in the original principal amount of Twenty
Million Five Hundred Thousand and No/100 Dollars ($20,500,000.00) (as amended, restated or
replaced from time to time, the "Note"), and is secured by, among other things (i) a certain
Mortgage (the "Mortgage") dated as of January 14, 2020, made by Borrower in favor of Original
Lender, which Mortgage encumbers certain real estate located at 31500 Wick Road, Romulus,
Michigan 48174 (the "Property") known as the Delta Hotel by Marriott (the "Hotel"); (ii) a certain

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

108652.000064 4846-6646-4459.3

DYKEMA

RKJ Hotel Management LLC
September 16, 2020
Page 2

Assignment of Leases and Rents dated as of January 14, 2020, made by Borrower in favor of
Original Lender (the "Assignment of Leases"), which Assignment of Leases also encumbers the
Property; (iii) a certain Guaranty of Recourse Obligations dated as of January 14, 2020 made by
Jeff Katofsky (the "Guarantor") in favor of Original Lender (as amended, restated or replaced from
time to time, the "Guaranty"); and (iv) certain other agreements, documents and instruments (the
Loan Agreement, the Note, the Mortgage, the Assignment of Leases, the Guaranty and such other
agreements, documents and instruments, which evidence, secure or otherwise have been executed
in connection with the Loan, in their original form and as amended, restated or replaced from time
to time, are collectively referred to herein as the "Loan Documents").

Noteholder is the successor to Original Lender in, to and under the Loan and the Loan Documents.

On behalf of Noteholder, you are hereby given written notice that certain Events of Default have
occurred and are continuing under the Loan Documents. Specifically, (i) Borrower closed the
Hotel in violation of Section 7.1(xiv) of the Loan Agreement; and (ii) Borrower failed to pay the
Monthly Debt Service Payment Amount, the Monthly Tax Deposit, the Monthly Insurance
Deposit, and the Monthly Capital Expenditure Deposit and other sums due to Noteholder under
the Loan Documents beginning on April 6, 2020 and continuing each month thereafter (each of
the foregoing Event of Default is hereinafter referred to as the "Existing Events of Default").

As a consequence of these Existing Events of Default, and pursuant to the terms and conditions of
the Loan Documents, Noteholder elects to, and does hereby, accelerate the entire indebtedness
owing under the Loan Documents. Accordingly, Noteholder demands payment of all outstanding
indebtedness, including, and without limitation, any and all principal, interest (including default
interest), prepayment premiums, advances, late fees and other sums owed in connection with the
Loan. The total payoff amount due through and including the anticipated date of payment will be
calculated upon a written request to Noteholder. Be advised that under the Loan Documents, you
are also responsible for attorneys' fees, loan administration expenses, applicable fees and any other
sums required to be paid under the Loan Documents.

As a result of the Existing Events of Default set forth herein, you are hereby notified that
Noteholder is and will be entitled, at any time after the date of this Letter, to exercise all or any of
its rights and remedies under the Loan Documents, including but not limited to, acceleration of the
Loan, foreclosure of the Mortgage, and/or exercising any other rights and remedies that may
otherwise be available to Noteholder at law or in equity in order to collect the sums now or
hereafter due and owing to Noteholder under the Note and the other Loan Documents and
Noteholder hereby reserves every right and remedy provided for in the Loan Documents and all
rights and remedies available to Noteholder now or hereafter existing at law or in equity.

DYKEMA

RKJ Hotel Management LLC
September 16, 2020
Page 3

Further, Noteholder requests that you immediately forward the "Hotel Closure Information" identified in the enclosed August 18, 2020 Marriott letter and advise of any selection made as noted in that letter.

Although Noteholder has not yet elected to exercise any of the other rights and remedies available to Noteholder under the Loan Documents or otherwise available at law and/or in equity by reason of the Existing Events of Default, Noteholder hereby advises you that it may do so any time after the date hereof. Continued delay in immediately exercising rights and remedies available to Noteholder by reason of the occurrence of the Existing Events of Default shall not constitute a waiver of Noteholder's right to do so in the future and nothing herein shall be construed as a waiver of the Existing Events of Default.

The description of the Existing Events of Default identified in this letter is not intended to enumerate an exhaustive, complete or exclusive list of all Defaults or Events of Default that may currently exist under the Loan Documents. Accordingly, this letter shall not constitute a waiver of any other Defaults or Events of Default of Borrower and/or any Guarantor under the Loan Documents that are not specifically enumerated herein, whether such Defaults or Events of Default exist or hereafter shall occur.

In the event that any payment is received by Noteholder from Borrower with respect to the Note and the other Loan Documents in an amount that is less than the amounts identified above, such receipt shall not constitute an accord and satisfaction, and Borrower shall remain liable for all additional payments due and payable to Noteholder under the Note and the other Loan Documents.

In the past, Noteholder may have accepted partial or late payments under the Note and the other Loan Documents; however, from this date forward, please be advised that any payment of less than the full amount required to be paid is not acceptable. Further, from this date forward, please be advised that late payments are not acceptable. If, however, payment of less than the full amount required to be paid is accepted, or if late payments are accepted, such payments may be applied to the outstanding obligation due and owing to Noteholder, but will not serve to reinstate the indebtedness owing under the Loan Documents or forestall the acceleration and maturity of the Note. In addition, such payments will not constitute a waiver of any contractual, legal or equitable right Noteholder may have regarding the collection of this debt, including, but not limited to the right to accelerate the maturity of the Note, foreclose the Property and/or bring suit for payment of the entire amount of the indebtedness owing under the Loan Documents.

Nothing in this letter shall be construed as a charge of or demand for more interest than applicable usury laws allow or of any amount which is not recoverable or chargeable by the Noteholder under the Loan Documents or the applicable law, and if any amount is stated or referred to in this letter as being due, owing or payable which exceeds the maximum amount of interest allowed by applicable law or which is not lawfully recoverable or chargeable under the Loan Documents or

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

108652.000064 4846-6646-4459.3

Dykema

RKJ Hotel Management LLC
September 16, 2020
Page 4

the applicable law, then only so much of that amount as does not exceed such maximum amount and is lawfully chargeable or recoverable shall be considered as being demanded by this letter, and this sentence governs and controls over any conflicting or inconsistent provision of this letter.

Any discussions or correspondence among Noteholder, Special Servicer, Borrower and/or the Guarantor regarding the Loan Documents that have previously occurred or that may occur hereafter, including any proposed terms and conditions addressing any restructuring of the Loan, shall not (i) cause a modification of the Loan Documents, (ii) be construed or have the effect of curing, excusing, waiving, relinquishing, releasing or postponing the Existing Events of Default under the Loan Documents, (iii) establish a custom or course of dealing, or other basis for altering any obligation of Borrower or any right, power or privilege of the Noteholder under the Loan Documents, (iv) waive, limit or condition the rights and remedies of the Noteholder under the Loan Documents, at law or in equity, all of which are hereby expressly reserved, or (v) constitute a commitment to extend credit to Borrower or modify the Loan.

Notwithstanding any previous action or inaction by or on behalf of Noteholder to the contrary, you are hereby notified that Noteholder will hereafter require strict compliance by Borrower with the terms and conditions of the Note evidencing the Loan and the other Loan Documents, and Noteholder does not in any manner waive any rights or remedies available to Noteholder against Borrower under the Loan Documents or applicable law.

To the extent that Borrower or any other recipient of this letter is currently involved in bankruptcy proceedings, and a plan of reorganization has not been confirmed or the automatic stay under 11 U.S.C. §362(a) has not been terminated, or to the extent that Borrower or any other recipient has received a discharge in bankruptcy subsequent to the date of the Note, this letter shall not constitute a demand on such party, but is hereby given for informational purposes only.

After you have had a chance to review the foregoing, kindly contact Matthew Cohen of Special Servicer at (305) 929-7693 or matthew.cohen@rialtocapital.com if you have any questions, or have your counsel contact the undersigned if you are represented by counsel.

Very truly yours,

DYKEMA GOSSETT, PLLC

Adam M. Fishkind
Enclosure

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

108652.000064 4846-6646-1459.3

Dykema

RKJ Hotel Management LLC
September 16, 2020
Page 5


cc:     Jeff Katofsky
        4558 Sherman Oaks Avenue
        Sherman Oaks, California 91403
        (*Via Overnight Courier*)

        Daniel Ornstein (*via e-mail*)
        Matthew Cohen (*via e-mail*)
        Edward S. Weil, Esq. (*via e-mail*)
        Jerrold M. Peven, Esq. (*via e-mail*)

108652.000064  4846-6646-4459.3



Marriott International, Inc.
Corporate Headquarters

10400 Fernwood Road
Bethesda, MD 20817

August 18, 2020

**Sent via E-Mail**

RKJ Hotel Management LLC
Attn/Email: Jeff Katofsky jeff@oremowlz.com
John Parker: john.parker@rhgcorp.com

Re:   <u>**Temporary Closure - 59-A68**</u>
      **Delta Hotels by Marriott**
      **31500 Wick Road**
      **Romulus, MI 48174 (the "Hotel")**

Dear Franchisee:

We appreciate your continued support in this unprecedented situation, and we are focused on working together to see the Hotel through these challenging times. We are writing to you regarding the temporary closure of your Hotel, which is operated under a franchise or license agreement dated March 22, 2018 currently by and between Marriott International, Inc. ("<u>Franchisor</u>") and RKJ Hotel Management LLC ("<u>Franchisee</u>") (as amended, the "<u>Agreement</u>").

To address the impact of COVID-19 on the business of the Hotel including the impact of cancellations, cancelled flights, reduced occupancy and governments taking action to contain the outbreak, you have advised us of your desire to temporarily close the Hotel. You have informed us that Franchisee has closed or will close the Hotel through no later than November 21, 2020 (the "<u>Initial Closed Period</u>"). We will discuss and mutually agree on any extensions to the Initial Closed Period ("<u>Extensions</u>") if the conditions continue to require you to do so, in order to manage the system and guest communications (the Initial Closed Period, together with any Extensions, being the "<u>Closed Period</u>"). **Please review the <u>Hotel Closure Information</u> on MGS regarding your options to effect the temporary closure in accordance with our standards, and <u>make your selection</u>** within a week of receipt of this letter.

Throughout the Closed Period the Agreement will remain in force and effect and will continue in force and effect following the Closed Period. The decision to close the Hotel, the closure process and the matters set out in this letter will not modify or be deemed to modify the Agreement and will not constitute a waiver or forbearance of any rights or remedies Franchisor may have under the Agreement.

You will be responsible for notifying Hotel guests that the Hotel will be temporarily closed during the Closed Period in accordance with our standards. We will not be liable for any losses, including losses resulting from cancellations or early departures, that might occur as a result of, or subsequent to, guests receiving such notice. Neither we nor you will take any reservations at the Hotel for dates occurring during the Closed Period.

Please note that you will remain responsible for any costs and expenses related to the temporary closure, as well as for compliance with your obligations under the Agreement, during and following the Closed Period, and that the Hotel may not be used for any other purpose during the Closed Period, unless we mutually agree on such use. If you have proposals you are considering for any temporary alternative use, please contact your account executive or ownerfranchiseservices@marriott.com.

Please provide us with at least 14 days prior written notice of your anticipated Re-Opening Date, so that we can discuss re-opening matters with you in good time. The "<u>Re-Opening Date</u>" will be the date that we agree on and provide you

with written notice so that we can coordinate to make sure that the Hotel, systems, and communications to the guests are all in good order.  If you have any questions with respect to the re-opening of your Hotel, please contact our Transitions Team at closure@marriott.com.

Thank you again for your continued support and cooperation.  Working together will see you, the Hotel, and us through these challenging times.  We would be grateful if you could acknowledge your receipt of this letter via a reply all email.  Thank you for your cooperation in this regard.

Yours sincerely,

MARRIOTT INTERNATIONAL, INC.

Kip W. Vreeland, Sr. Vice President, Full Service Franchising

2039615v1
1980765v4

2



November 24, 2020

Dear Customer,

The following is the proof-of-delivery for tracking number: 396890994757

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Receptionist/Front Desk |
| Signed for by: | R.EBECCA | Delivery Location: | 4558  SHERMAN OAKS AVE |
| Service type: | FedEx Standard Overnight | | SHERMAN OAKS, CA, 91403 |
| Special Handling: | Deliver Weekday | Delivery date: | Sep 17, 2020 12:45 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 396890994757 | Ship Date: | Sep 16, 2020 |
| | | Weight: | 0.5 LB/0.23 KG |

Recipient:
Jeff Katofsky, RKJ Hotel Management LLC
4558 SHERMAN OAKS AVE
SHERMAN OAKS, CA, US, 91403

Shipper:
Adam Fishkind, Dykema Gossett PLLC
Suite 300
39577 Woodward Avenue
Bloomfield Hills, MI, US, 48304

Reference          03911: 108652-000064



Thank you for choosing FedEx

# Exhibit G



| | | |
|---|---|---|
| | Marriott International, Inc.<br>Corporate Headquarters | 10400 Fernwood Road<br>Bethesda, MD  20817 |

August 18, 2020

**Sent via E-Mail**

RKJ Hotel Management LLC
Attn/Email: Jeff Katofsky jeff@oremowlz.com
John Parker: john.parker@rhgcorp.com

Re:     <u>Temporary Closure - 59-A68</u>
**Delta Hotels by Marriott**
**31500 Wick Road**
**Romulus, MI 48174 (the "Hotel")**

Dear Franchisee:

We appreciate your continued support in this unprecedented situation, and we are focused on working together to see the Hotel through these challenging times.  We are writing to you regarding the temporary closure of your Hotel, which is operated under a franchise or license agreement dated  March 22, 2018 currently by and between Marriott International, Inc. ("<u>Franchisor</u>") and RKJ Hotel Management LLC  ("<u>Franchisee</u>") (as amended, the "<u>Agreement</u>").

To address the impact of COVID-19 on the business of the Hotel including the impact of cancellations, cancelled flights, reduced occupancy and governments taking action to contain the outbreak, you have advised us of your desire to temporarily close the Hotel. You have informed us that Franchisee has closed or will close the Hotel through no later than November 21, 2020 (the "<u>Initial Closed Period</u>"). We will discuss and mutually agree on any extensions to the Initial Closed Period ("<u>Extensions</u>") if the conditions continue to require you to do so, in order to manage the system and guest communications (the Initial Closed Period, together with any Extensions, being the "<u>Closed Period</u>"). **Please review the** <u>**Hotel Closure Information**</u> **on MGS regarding your options to effect the temporary closure in accordance with our standards, and** <u>**make your selection**</u> **within a week of receipt of this letter.**

Throughout the Closed Period the Agreement will remain in force and effect and will continue in force and effect following the Closed Period. The decision to close the Hotel, the closure process and the matters set out in this letter will not modify or be deemed to modify the Agreement and will not constitute a waiver or forbearance of any rights or remedies Franchisor may have under the Agreement.

You will be responsible for notifying Hotel guests that the Hotel will be temporarily closed during the Closed Period in accordance with our standards.  We will not be liable for any losses, including losses resulting from cancellations or early departures, that might occur as a result of, or subsequent to, guests receiving such notice. Neither we nor you will take any reservations at the Hotel for dates occurring during the Closed Period.

Please note that you will remain responsible for any costs and expenses related to the temporary closure, as well as for compliance with your obligations under the Agreement, during and following the Closed Period, and that the Hotel may not be used for any other purpose during the Closed Period, unless we mutually agree on such use.  If you have proposals you are considering for any temporary alternative use, please contact your account executive or ownerfranchiseservices@marriott.com.

Please provide us with at least 14 days prior written notice of your anticipated Re-Opening Date, so that we can discuss re-opening matters with you in good time. The "<u>Re-Opening Date</u>" will be the date that we agree on and provide you

with written notice so that we can coordinate to make sure that the Hotel, systems, and communications to the guests are all in good order.  If you have any questions with respect to the re-opening of your Hotel, please contact our Transitions Team at closure@marriott.com.

Thank you again for your continued support and cooperation.  Working together will see you, the Hotel, and us through these challenging times.  We would be grateful if you could acknowledge your receipt of this letter via a reply all email.  Thank you for your cooperation in this regard.


Yours sincerely,

MARRIOTT INTERNATIONAL, INC.


Kip W. Vreeland, Sr. Vice President, Full Service Franchising

| PROOF OF SERVICE | ORDER REGARDING ALTERNATE SERVICE |
| --- | --- |
| | Case No. 20-016230-CB |

**TO PROCESS SERVER:** You must serve the copies of the order regarding alternate service and file proof of service with the court clerk. If you are unable to complete service, you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| [X] OFFICER CERTIFICATE | OR | [ ] AFFIDAVIT OF PROCESS SERVER |
| --- | --- | --- |
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

I served a copy of the                     [X] summons and complaint    [X] other: **Motion and Verification for Alternative Service**
                                                          Amended

and a copy of the order for alternate service upon Jeff Katofsky                                                                                                by

[X] 1. First-class mail to    15447 Valley Vista Boulevard, Sherman Oaks, CA 91403 (Verified)
                                          4558 Sherman Oaks Avenue, Sherman Oaks, CA 91403 (Verified)    , on    **May 13, 2021**
                                                                                                                                                                          Date

[ ] 2. Tacking or firmly affixing to the door at _____ , on _____
                                                                                                          Date

[ ] 3. Delivering at _____ , on _____
                                                                                                          Date

to a member of the defendant's household who is of suitable age and discretion to receive process, with instructions to deliver it promptly to the defendant.

[X] 4. Other: 15447 Valley Vista Boulevard, Sherman Oaks, CA 91403 (Verified) via Certified Mail
                    4558 Sherman Oaks Avenue, Sherman Oaks, CA 91403 (Verified) via Certified Mail    , on    **May 13, 2021**
                    specify                                                                                                                                            Date

I declare that the statements above are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled Fee | | /s/ Jonathan Kama |
| --- | --- | --- | --- |
| $ | $ | | Signature |
| Incorrect address fee | Miles traveled Fee | TOTAL FEE | Jonathan Kama |
| $ | $ | $ | Name (type or print) |
| | | | Attorney |
| | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                                              Date

My commission expires: _____  Signature: _____
                                              Date                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

Document received by the MI Wayne 3rd Circuit Court.

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

County in which action arose:

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| RSS WFCM2020-C55 - MI RHM, LLC, a Michigan limited liability company, | RKJ Hotel Management, LLC a Nevada limited liability company; Jeff Katofsky, a California resident |

(b) County of Residence of First Listed Plaintiff    Wayne County, Michigan
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wayne County, Michigan
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Brian M. Moore (P585584); Jonathan Kama, Jr. (P83703)
DYKEMA GOSSETT PLLC; 39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304; bmoore@dykema.com; jkama@dykema.com

Attorneys *(If Known)*
Mark W. Sadecki (for RKJ Hotel Management); 650 Broadway, P. O. Box 310
Davisburg, MI 48350-2454 (248) 328-1300; Jeff Katofsky, (pro se defendant);
4558 Sherman Oaks Ave., Sherman Oaks, CA 91403 (818) 990-1475

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|   & Enforcement of Judgment |    Slander    Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
|    Student Loans | ☐ 340 Marine    Injury Product | ☐ 710 Fair Labor Standards | ☐ 880 Defend Trade Secrets |    Corrupt Organizations |
|    (Excludes Veterans) | ☐ 345 Marine Product    Liability |    Act |    Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |    Liability | ☐ 720 Labor/Management | |    (15 USC 1681 or 1692) |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   **PERSONAL PROPERTY** |    Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 370 Other Fraud | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) |    Protection Act |
| ☒ 190 Other Contract |    Product Liability   ☐ 371 Truth in Lending | ☐ 751 Family and Medical | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   ☐ 380 Other Personal |    Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |    Injury    Property Damage | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI |    Exchange |
| | ☐ 362 Personal Injury -   ☐ 385 Property Damage | ☐ 791 Employee Retirement | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| |    Medical Malpractice    Product Liability |    Income Security Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | |    or Defendant) |    Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | |    26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | |    Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | |    Agency Decision |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | |    State Statutes |
| |    Other   ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |   ☐ 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC Sec. 1332(a).
Brief description of cause:
Breach of Loan Guaranty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ 20,500,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE   6/8/21    SIGNATURE OF ATTORNEY OF RECORD   *Jeff Katofsky, Def. Pro Se*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.          Other than stated above, are there any pending or previously          ☐ Yes
            discontinued or dismissed companion cases in this or any other          ☒ No
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :